UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



JUDGE CASTEL

07 CIV 9436

---

ERNEST GOTTDIENER, Derivatively and
on Behalf of Nominal Defendant,
TARRAGON CORPORATION,

Plaintiff,

WILLIAM S. FRIEDMAN, ROBERT P.
ROTHENBERG, WILLIE K. DAVIS,
LANCE LIEBMAN, LAWRENCE G.
SCHAFRAN, V.J. SCHRAG, CARL B.
WEISBROD, RICHARD S. FRARY,
MARTHA E. STARK, ROBERT C.
RHODIE, and ERIN DAVIS PICKENS,

Defendants,

TARRAGON CORPORATION,

Nominal Defendant.

Civil Action No.

COMPLAINT
(Jury Trial Demanded)



RECEIVED
OCT 2 2 2007
U.S.D.C. S.D.N.Y.
CASHIERS

---

### VERIFIED STOCKHOLDER'S DERIVATIVE COMPLAINT

Plaintiff, Ernest Gottdiener by and through his attorneys of record, brings this

Verified Derivative Complaint on behalf of Nominal Defendant Tarragon Corporation

("Tarragon" or the "Company"), and alleges upon personal knowledge as to his own acts and as

to all other matters upon information and belief, and based upon the investigation of Plaintiff's

counsel, which includes a review of regulatory filings and reports, securities analyst reports and

advisories about Tarragon, press releases and other public statements issued by the Company, as

follows:

**INTRODUCTION**

1.      This is a stockholder's derivative action brought by plaintiff, Ernest Gottdiener, who has held Tarragon stock at all relevant times.

2.      The Individual Defendants (identified below) were or are the members of Tarragon's Board of Directors and/or were officers of the Company. They have been and are highly compensated and benefit from compensation plans, which provide them with incentives to remain on the Board or in high level management positions and provide further incentives to maintain a high price for Tarragon stock.

3.      The Nominal Defendant, Tarragon, is a Nevada corporation. Tarragon and its subsidiaries engage in homebuilding and real estate development, and real estate service businesses in the United States. It develops, renovates, builds, and markets high and mid-rise condominiums; town homes, traditional new developments, and low-rise condominiums; and low and mid-rise rental apartment communities in the urban locations and communities. The company also engages in land development and conversion of existing rental apartment communities to condominiums. In addition, it offers real estate services, such as property management, condominium management, and acquisition and renovation of apartment properties, as well as provides mortgage lending services.

4.      As of December 31, 2006, Tarragon had 35 residential communities with 4,560 homes or home sites in inventory or under development in 6 states; and approximately 14,600 apartments in 12 states, including 11,000 in rental communities and 3,300 in condominium conversion communities. The Company was founded in 1973 and is based in New York, New York.

5.      On March 19, 2007, Tarragon informed investors that it planned to spin-off its Homebuilding Division as an independent publicly traded company during the year.  As a result, the Company informed investors that it was withholding its financial guidance until the spin-off was completed.  Additionally, the Company stated that its goal for 2007 was "to validate the confidence our investors have placed in the strength of our long term strategy, aggressively manage our balance sheet, and improve earnings over 2006."

6.      On July 17, 2007, *Bloomberg* reported that the Company's auditor had "failed to obtain sufficient competent evidential matter to support its audit opinion" regarding the Company's financial statements, and had "failed to identify an accounting violation that it should have identified and addressed before issuing its audit report." The article further disclosed that Tarragon had left a 90 percent owned partnership off of its balance sheet.

7.      Then on August 9, 2007, the Company shocked investors when it reported that it was unable to timely file its Quarterly Report because it needed additional time "to finalize its evaluation of property impairment charges and other write-downs necessitated by the recent decision to sell certain properties." The Company also disclosed that it was unable to obtain loan modifications and other financing, which had materially affected the Company's liquidity, and raised doubt about its ability to continue as a going concern. Additionally, the Company's Board of Directors had formed a special committee "to evaluate strategic and financial alternatives that may be available to Tarragon and its stakeholders," including "all available forms and sources of financing, property sales and other strategic transactions." Finally, the Company stated that it was postponing the spin-

off off its homebuilding business, and that it expected to record impairment charges in excess of $125 million.

8.      On this news, the Company's shares declined $1.88, or over 66.6 percent, to close on August 9, 2007 at $0.91 per share, on unusually heavy trading volume.

9.      The Complaint alleges that, throughout the relevant time period of January 5, 2005 and continuing, defendants failed to disclose material adverse facts about the Company's financial well-being, business relationships, and prospects.   Specifically, defendants failed to disclose or indicate the following: (1) that the Company had failed to consolidate a limited partnership into its consolidated financial statements; (2) that the Company had failed to properly report its consolidated statement of cash flows by misclassifying items among its operating, investing and financing activities; (3) that the Company had failed to timely take property impairment charges and other write-downs on certain properties; (4) that the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (5) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times; (6) that the Company was experiencing liquidity issues due to its inability to obtain loan modifications and financing; (7) that the Company lacked adequate internal and financial controls; and (8) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects for 2007 were lacking in a reasonable basis when made.

10.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, the Company has suffered significant losses and damages.

11.    Nevertheless, had the Individual Defendant directors of the Company, as identified below, fulfilled their responsibilities to the Company and its shareholders, they would have recognized the Company's financial and administrative controls were entirely inadequate, and they would have implemented changes required to ensure compliance with effective financial and administrative controls and accurate financial reporting.

12.    Accordingly, it is alleged that as a result of the reckless breach of their fiduciary duties to monitor and put into place reasonable control and review procedures, the Individual Defendants have inflicted upon the Nominal Defendant Tarragon severe and continuing damages.

## PARTIES

13.    Plaintiff Ernest Gottdiener is and, at the times of the wrongs complained of herein, was an owner of Tarragon stock and is domiciled in the state of Florida.

14.    Nominal Defendant Tarragon, Inc. is a Nevada Corporation that maintains its executive offices at 423 West 55th, 12th Floor, New York, New York.

15.    Defendant William S. Friedman ("Friedman") is a resident of the State of New York and was at all relevant times the Company's Chairman of the Board and Chief Executive Officer ("CEO") of the Company.

16.    Defendant Robert P. Rothenberg  ("Rothenberg") is a resident of the State of New York and was at all relevant times the Company's President, Chief Operating Officer ("COO"), Chief Executive Officer of Tarragon Development Corporation and director of the Company.

17.    Defendant Willie K. Davis ("Davis") is a resident of the State of New York and was at all relevant time a director of the Company.

18.     Defendant Lance Liebman ("Liebman") is a resident of the State of New York and has been a member of the Company's Board of Directors during the Relevant time Period.

19.     Defendant Lawrence G. Schafran ("Schafran") is a resident of the State of New York and has been a member of the Company's Board of Directors since 1998.

20.     Defendant Raymond V.J. Schrag ("Schrag") is a resident of the State of New York and has been a member of the Company's Board of Directors since 1998.

21.     Defendant Carl B. Weisbrod ("Weisbrod") is a resident of the State of New York and has been a member of the Company's Board of Directors since 1998.

22.     Defendant Richard S. Frary ("Frary") is a resident of the State of New York and has been a member of the Company's Board of Directors since 2004.

23.     Defendant Martha E. Stark ("Stark") is a resident of the State of New York and has been a member of the Company's Board of Directors since 2005.

24.     Defendant Robert C. Rohdie ("Rohdie") is a resident of the State of New York and has served as a member of the Board of Directors and as President and Chief Executive Officer of Tarragon Development Corporation, a wholly owned subsidiary responsible for real estate development and renovation projects, from February 2000 through August 14, 2007.

25.     Defendant Erin Davis Pickens ("Pickens") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and Executive Vice President.

26.     Defendants in paragraphs 15-25 are collectively referred to hereinafter as the "Individual Defendants." Defendants in paragraphs 15-24 are referred to herein as the Director Defendants". During the relevant time period, each of the Individual

Defendants, as senior executive officers and/or directors of Tarragon, were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

27.    At all times herein, the Individual Defendants, in performing each and all of the acts and/or non-actions described herein, functioned as the employees, agents, control persons and/or co-conspirators with each and every other Individual Defendant identified herein.

## VENUE AND JURISDICTION

28.    Both the venue and jurisdiction of this matter are proper in that the Nominal Defendant is headquartered in and at all times mentioned herein has and continues to do business in New York, New York.  Moreover, much of the preparation of the materially misleading and false public statements occurred in this District.

## DUTIES AND OBLIGATIONS OF DIRECTORS

29.    The Individual Defendants owed Tarragon and its shareholders fiduciary duties including the duties of care and loyalty that require, *inter alia*, that they control and manage the company in a fair, just, honest and equitable manner.

30.    To discharge their legal duties, the Director Defendants were required to

7

exercise reasonable and prudent supervision over, and keep themselves informed of Tarragon's senior management, policies, practices, controls and financial affairs which included, *inter alia*, taking steps necessary to ensure that adequate policies and reporting systems existed at Tarragon and functioned properly to ensure that relevant government rules and regulations under which Tarragon and its subsidiaries operated were followed, so as to prevent the engaging in of improper financial reporting and promote the efficient and proper use and preservation of its property and assets and engage in fair dealing with the investing public.

31. Moreover, Director Defendants, due to their substantial experience and expertise in the specialized area of business management, were aware of the highly fiduciary nature of the business -- that is, they were aware that Tarragon, as a publicly-owned business, was in a position of heightened trust and confidence with respect to the monies and the persons who invested their money in the business, and that this relationship gives rise to fiduciary duties and potential liabilities to the entities and persons to whom those duties are owed. Accordingly, their duties of loyalty, good faith and care to Tarragon and its shareholders required that they take appropriate action to ensure compliance by the Company with the fiduciary duties owed to third parties, so as to protect the Company and its shareholders from losses arising from liability for breach of those duties.

32. Further, the Director Defendants, pursuant to Nevada law, to the extent that they exercised control over management of the business and affairs of Tarragon and its subsidiaries, were required to use their knowledge, experience and ability to control and direct Tarragon management in furtherance of the best interests of Tarragon and its

shareholders. In addition, as many of the Director Defendants have, and at all relevant times had, special knowledge, skill, expertise and experience directly gained as a result of, among other things, their executive roles at Tarragon; and other financial services-related entities.

33.    These individual Director Defendants were required to use their special knowledge, skill, expertise and experience for the benefit of, *inter alia*, Tarragon and its subsidiaries, in the exercise of their judgment as directors of Tarragon.

34.    Thus, pursuant to their membership on the Board, as well as on various Committees of the Board, and, in some cases, positions as senior executive and managers at Tarragon, the Director Defendants, pursuant to Nevada law, owed the Company and its stockholders fiduciary obligations of candor, fidelity, trust, and loyalty, and are and were required to use their ability to control and direct Tarragon in a fair, just, and equitable manner, as well as to act in furtherance of the best interests of Tarragon and its stockholders. In addition, while they occupied their directorships, the Individual Defendants owed Tarragon the fiduciary duty to exercise due care and diligence in the management and administration of the affairs of the Company, and in the use and preservation of its property and assets.

35.    To discharge the aforesaid duties under Nevada law, the Director Defendants were required to exercise reasonable and prudent supervision over management and the policies, practices, controls, and financial affairs of the Company pursuant to their fiduciary obligations to use the same care and diligence as would an ordinary prudent person in a like position. Specifically, the Individual Defendants were required, among other things:

(a)    Manage, conduct, supervise and direct the business affairs of Tarragon in accordance with applicable state and federal law and rules and regulations;

(b)    Neither violate nor permit any officer, director, agent or employee of Tarragon to violate applicable state laws, federal laws, rules, regulations;

(c)    Establish and maintain systematic and accurate books and records of the business and affairs of Tarragon and procedures for the reporting of the business and affairs to the Board of Directors, and periodically investigate, or cause independent investigation to be made of, said books and records;

(d)    Maintain and implement an adequate and functioning system of internal financial and accounting controls, such that Tarragon financial statements and other publicly disseminated information would be accurate;

(e)    Exercise supervision over the public statements made and/or issued to the securities markets relating to Tarragon;

(f)    Remain informed as to the status of Tarragon's business, conditions, practices and operations, and upon receipt of notice or information of imprudent or unsound practices or operations, make reasonable inquiry in connection therewith, and take steps to correct such practices or operations and make such disclosures as are necessary to comply with state and federal securities laws;

(g)     and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

36.     Notwithstanding the above-referenced duties, the Director Defendants, in carrying out their functions for the Nominal Defendant Company, breached their fiduciary duties by, among other things:

(a)     permitting wrongful business practices to occur which had the effect of manipulating revenues and earnings;

(b)     inadequately supervising the employees, managers and putative independent auditors of Tarragon and failing to instruct and ensure that they acted with honesty and integrity in order to preserve and enhance Tarragon's reputation in the business community;

(c)     recklessly exposing Tarragon to millions of dollars of damages, including costs associated with class actions brought by shareholders of the Company for violations of federal securities laws; and

(d)     failing to institute legal action against those officers, directors, contractors and/or and employees of the Company, responsible for permitting Tarragon to engage in the conduct complained of herein.

## SUBSTANTIVE ALLEGATIONS AND BACKGROUND

### Background

35.     Tarragon is a homebuilder and real estate developer with multiple business

lines. The Company's homebuilding and real estate development segment focuses on

developing, renovating, building and marketing homes in high-density, urban locations

and planned communities.

**Materially False and Misleading**
**Statements Issued During the relevant Time Period**

36.    The Relevant Time Period begins on January 5, 2005. On this day, the

Company issued a press release entitled "Tarragon Corporation Affirms 2004 Guidance

And Releases 2005 Earnings Forecast." Therein, the Company, in relevant part, stated:

> Tarragon Corporation (Nasdaq: TARR), a leading homebuilder
> specializing in the development and marketing of high-density
> residential communities and a real estate investor with a portfolio of
> approximately 14,000 apartments, today reaffirmed its previous
> guidance for 2004, forecasting net income of $42 to $46 million, or
> approximately $2.40 to $2.60 per share, versus net income for fiscal
> 2003 of $31.2 million or $1.80 per share in each case on a fully diluted
> basis.

> Tarragon Corporation simultaneously announced its 2005 earnings
> guidance. Net income for fiscal 2005 is expected to be $75 to $80
> million, or approximately $3.85 to $4.10 per share, fully diluted, based
> on projected total consolidated revenue of $475 to $525 million. Most
> of the growth in earnings and revenue is from closings that are
> included in the $400 million Homebuilding Division contract backlog.
> Homebuilding Division pretax net income is expected to range from
> $110 to $115 million. Homebuilding Division sales revenue,
> including revenue from unconsolidated joint ventures, is projected to
> be $700 to $750 million with a gross margin over 24 percent.

> Investment Division growth in 2005 will come from the completion
> and lease-up of the 860 rental apartments currently under
> development, as well as opportunistic acquisitions of existing
> communities such as the 510 apartment portfolio in Manchester/West
> Haven, Connecticut, currently under purchase contract. Moreover,
> based on higher occupancy 'and rent levels, especially in Florida,
> Tarragon anticipates Investment Division net operating income,
> including net operating income from unconsolidated joint ventures, of
> $65 to $70 million, a 5 percent improvement over 2004.

> Tarragon Chairman and Chief Executive Officer, William S. Friedman, commented, "2004 was a banner year for the Homebuilding Division and 2005 should be even better. Our investments over the past 12 to 36 months, in both product and people, are now bearing fruit. We look forward to continuing to find and develop new projects as we realize revenues from our growing number of active, for-sale communities."

37.    On March 16, 2005, the Company issued a press release entitled "Tarragon Corporation Reports Record Results for 2004; Company Will Expand Homebuilding and Strengthen Balance Sheet by Selling Substantial Portion of Rental Portfolio." Therein, the Company, in relevant part, stated:

> Tarragon Corporation (Nasdaq: TARR), a leading urban homebuilder specializing in the development and marketing of high-density residential communities, announced today that its consolidated revenues for 2004 grew to $311 million, up 136 percent from revenues of $131.6 million in 2003. Increased revenue primarily reflects strong home sales, which grew, on a consolidated basis, from $56.3 million in 2003 to $220.5 million in 2004.

> The Company also reported record profits of $44.7 million, representing a 43 percent increase over 2003 net income of $31.2 million. Following the Company's 3-for-2 stock split that was effective February 10, 2005, and on a fully diluted per-share basis, earnings increased 41 percent year-to-year from $1.20 to $1.69. Income tax expense in 2004 was $15 million, while in 2003 there was no income tax due to the application of net operating loss carry-forwards.

> As a result of the growth in profitability of the Company's homebuilding business, Tarragon has adopted a strategic plan to sell a substantial portion of the assets in its rental portfolio (Investment Division). The Company will redeploy the capital now invested in these rental properties to support further expansion of homebuilding and to strengthen its balance sheet.

> Chairman and CEO William Friedman commented, "Tarragon is now principally an urban homebuilder, and to a much lesser extent an owner and manager of rental properties. Virtually all of our operating profits come from homebuilding while over half of our assets are still invested in rental properties. Moreover, the large amount of debt associated with our rental properties distorts the financial strength of

our Company, impeding our continued rapid growth.  At the same time, the market value of our rental properties has continued to increase due to their performance and current market conditions.  As a result, we see an opportunity to realize cash through the sale of our rental properties and redeploy a substantial portion of the capital invested in the rental portfolio to reduce debt and expand our homebuilding activities.  We plan on retaining approximately 2,000 apartments for conversion to condominiums or redevelopment."

Friedman said that Tarragon, together with its investment bankers, Lazard Freres & Co. LLC, examined various strategies for obtaining the best value for shareholders from the investment portfolio, including a spin-off and IPO.  He said that the analyses demonstrated that the maximum shareholder value is likely to result from selling a substantial portion of the portfolio to support the fast-growing and highly profitable homebuilding operations.

Friedman added, "Using the rental portfolio as a non-dilutive source of further homebuilding capital will be, we believe, strongly accretive to earnings while allowing us to reduce debt and get the highest possible return on shareholder assets."

38.    Also on March 16, 2005, Tarragon filed its Annual Report with the SEC

on Form 10-K.  The Company's 10-K was signed by the Individual Defendants, among

others, and reaffirmed the Company's financial results announced on the same day.

39.    The Company's 10-K filed on March 16, 2005 also contained Sarbanes-

Oxley required certifications, signed by Defendants Friedman and Pickens, who stated:

I, [William S. Friedman and Erin D. Pickens], certify that:

1.    I have reviewed this annual report on Form 10-K of Tarragon Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly

14

present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a- 15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(t)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have
disclosed, based on our most recent evaluation of internal
control over financial reporting, to the registrant's auditors
and the audit committee of the registrant's board of
directors (or persons performing the equivalent functions):

a.    All significant deficiencies and material
weaknesses in the design or operation of
internal control over financial reporting which
are reasonably likely to adversely affect the
registrant's ability to record, process,
summarize and report financial information; and

b.    Any fraud, whether or not material, that
involves management or other employees who
have a significant role in the registrant's internal
control over financial reporting.

***

Each of the undersigned officers of Tarragon Corporation [William
S. Friedman and Erin D Pickens], a Nevada corporation (the "Company"),
hereby certifies that (i) the Company's Annual Report on Form 10-K for
the year ended December 31, 2004, fully complies with the requirements
of Section 13(a) of the Securities Exchange Act of 1934 and (ii) the
information contained in the Company's Annual Report on Form 10-K for
the year ended December 31, 2004, fairly presents, in all material respects,
the financial condition and results of operations of the Company, at and
for the periods indicated.

40.    On May 10, 2005, Tarragon filed its Quarterly Report with the SEC on

Form 10-Q.  The Company's 10-Q was signed by Defendants Friedman and Pickens, and

contained Sarbanes-Oxley required certifications, substantially similar to the

certifications contained in ¶39, *supra*.

41.    On May 11, 2005, the Company issued a press release entitled "Tarragon

Corporation Reports First-Quarter 2005 Results; Net Income $21.6 Million vs. $1.9

Million; Value of Active Developments and Pipeline Soars 74 Percent to $3.3 Billion,

Raises Guidance on 2005 Homebuilding Sales and Earnings." Therein, the Company, in

relevant part, stated:

> Tarragon Corporation (Nasdaq: TARR), an urban homebuilder specializing in the development and marketing of high-density residential communities, today announced its first-quarter 2005 results and provided higher guidance for 2005.
>
> Total consolidated revenues increased 57 percent to $80.6 million, from first-quarter 2004 revenues of $51.4 million. Consolidated homebuilding sales rose 76 percent to $63.6 million, from first quarter 2004 homebuilding sales of $36.1 million. Net income, after provision for income taxes of $139 million, was $21.6 million in the first quarter of 2005 versus $1.9 million for the same period last year. There was no provision for income taxes in the first quarter of 2004. Income from continuing operations, after a tax provision of $7.3 million, grew six-fold to $11.4 million compared to $1.8 million in the first-quarter 2004, which had no tax provision. Fully diluted earnings-per-share for the first-quarter 2005 were $0.70 compared to $0.07 per share for the first-quarter 2004.
>
> Tarragon's rapid growth is illustrated by the following:
>
> • Total homebuilding revenue, including revenue from unconsolidated subsidiaries, grew 233 percent from $36.1 million in the first quarter of 2004 to $120 million in the first quarter of 2005
>
> • 527 homes worth $178 million were delivered in the first quarter of 2005, compared to 85 homes worth $17.7 million in the first quarter of 2004
>
> • 800 new contracts worth $257.6 million were signed in the first quarter of 2005 versus 315 contracts worth $47.6 million during the like period in 2004. The average price of the new contracts signed in 2005 was $322,000 compared to $250,000 in 2004
>
> • Total contract backlog as of March 31, 2005, increased 81 percent to $423.5 million from $234 million at March 31, 2004
>
> • Total value of homes in active developments (including backlog) increased 80 percent from $1.0 billion at March 31, 2004, to nearly $1.8 billion at March 31, 2005
>
> • The pipeline of future developments nearly doubled over the past twelve months from 2,600 homes, with a potential sales value of $880

million as of March 31, 2004, to over 5,100 homes with an estimated sales value of $1.5 billion as of March 31, 2005.

Tarragon Chairman and CEO William Friedman commented, "The pace of our homebuilding activity continues to accelerate -- sales, closings, acquisitions and new opportunities. We foresee continued rapid growth in the quarters ahead, and anticipate delivering more than 3,000 homes to buyers during the remainder of 2005. Despite moving several projects from pipeline to active development our pipeline grew 23 percent in the first quarter. This expanding pipeline, coupled with our active developments, now totals more than 10,000 homes."

**Capital Redeployment Activities**

Tarragon's capital redeployment strategy announced in March 2005 is proceeding rapidly. The Company is developing a disposition strategy for 39 rental properties with a market value of $275 million. Twenty seven of these properties are being actively marketed for sale. Of these, the Company has contracts or offers in hand on 14 properties totaling $96.6 million, which would result in pre-tax gains on sale of approximately $44 million.

Tarragon has also identified a portfolio of 27 high-quality rental properties, representing 6,500 units with a fair market value in excess of $500 million that it hopes to refinance and contribute to a joint venture with a financial partner to free up approximately $150 million in capital and reduce consolidated debt by over $190 million. These properties, in Connecticut and the southeast, achieved same-store NOI growth of 8.2 percent in the first quarter of 2005 compared to same quarter of 2004. Tarragon expects to manage the proposed joint venture and retain a minority interest in it. The joint venture is expected to acquire existing apartment communities within core markets and buy new rental properties to be developed by Tarragon.

Finally, eight rental properties comprising 2,500 apartments with a book value of $178 million will be retained for conversion to condominiums as market conditions warrant. These properties have an estimated condominium sellout exceeding $400 million.

Friedman commented, "Since adopting this strategic plan in mid- March we have moved quickly to implement it. We will continue to provide updates on the redeployment program throughout the year."

**Revised Guidance**

18

In January 2005 Tarragon estimated 2005 net income of $75 to $80 million. This estimate assumed $53 to $58 million of after-tax income from continuing operations (principally homebuilding activities) and $22 million in after-tax gain on sale of properties. With the decision to substantially divest the rental portfolio, Tarragon expects to realize extraordinary gains on sale of properties in 2005 that will materially exceed the January guidance.

Accordingly, the Company believes that for 2005, guidance based on its after-tax income from continuing operations (essentially excluding gain on property sales) will be more meaningful. Based on current backlog and activity, Tarragon expects total Homebuilding sales, including revenue from unconsolidated joint ventures, to range from $775 million to $825 million for 2005, which is 10 percent higher than the guidance issued in early January. Based on this increased sales volume, and somewhat higher than originally anticipated margins, Tarragon is increasing its guidance for after-tax income from continuing operations by 33 percent to a range of $70 to $75 million.

42.    On August 9, 2005, the Company issued a press release entitled "Tarragon Corporation Reports Second-Quarter 2005 Results; Revenue Up by 51 Percent; Backlog Up by 75 Percent; Pipeline Grows to 7,000 Homes." Therein, the Company, in relevant part, stated:

Tarragon Corporation (Nasdaq: TARR), a leading homebuilder specializing in the development and marketing of high-density residential communities, announced its second- quarter results and affirmed its guidance for 2005.

Total revenues for the quarter ended June 30, 2005, increased to $85 million, 51 percent higher than second-quarter 2004 revenues of $56.1 million. Net income for the second quarter ended June 30, 2005, was $9.1 million, versus $17.2 million in the prior year's second quarter, which included an income tax benefit, gain on sale and other nonrecurring items of $12.7 million. Diluted earnings per share for the second quarter 2005 were $0.30 compared to $0.65 in the second quarter of 2004. Pre-tax earnings from continuing operations increased 43 percent to $13.2 million this quarter from $9.3 million in the second quarter 2004.

For the six-month period revenues were $164.1 million, up 55 percent over the prior period revenues of $106.1 million. The six- month net

income was $30.7 million, up 60 percent over the prior year net income of $19.1 million, which also included the income tax benefit, gain on sale and other nonrecurring items mentioned above. Diluted earnings per share for the six-month period were $0.99 compared to $0.73 in the prior year.

Tarragon Chairman and CEO William Friedman commented, "Revenues for the quarter grew by 51 percent. This increase is even more impressive when we note that more than $40 million in sales were pushed out to the third quarter ending September 30 due to an unusual delay in processing condominium filings for one sold out condominium conversion project in Florida; those sales have now closed. Sales and pricing in all markets where we are participating continue to meet our highest expectations. Last weekend, for example, we signed contracts for 47 homes worth $14 million. Based on our growing contract backlog and the continued high rate of new sales, we affirm our guidance for the year."

Consolidated homebuilding revenue rose 64 percent to $69.1 million, from second-quarter 2004 homebuilding revenue of $42.1 million. Total homebuilding revenue including revenue from unconsolidated joint ventures, grew 217 percent from $42.1 million in the second quarter of 2004 to $133.3 million in the second quarter of 2005. For the six-month period ended June 30, 2005, consolidated and unconsolidated homebuilding revenue increased to $253.4 million (including $68.4 million accounted for under the percentage of completion method on four projects), up 224 percent over the same period last year.

The increase continues a growth trend that has seen record numbers of home deliveries. In the quarter ended June 30, 2005, 651 homes worth $163.5 million were delivered, compared to 77 homes worth $18.2 million in the second quarter of 2004. For the six-month period, 1,178 homes worth $341.5 million were delivered, compared to 162 homes worth $35.9 million during the same period last year.

Income from Continuing Operations, after provision for income taxes of $5.2 million, was $8.1 million in the second quarter of 2005. Second quarter 2004 Income from Continuing Operations of $14.3 million included a $5.0 million income tax benefit resulting from the Company's reversal of a valuation allowance against a deferred tax asset. For the six months ended June 30, 2005, Income from Continuing Operations before income tax tripled to $32 million from $10.8 million for the same period 2004.

***

**Company Affirms Guidance**

Based on the current backlog and scheduled closings, as well as additional sales volume expected to be generated from its active communities, Tarragon affirmed its earlier Guidance of 2005 After Tax Income from Continuing Operations of $70 - $75 million dollars.

43.    Also on August 9, 2005, Tarragon filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendants Friedman and Pickens, and reaffirmed the Company's financial results announced on the same day. The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶39, *supra*.

44.    On November 9, 2005, the Company issued a press release entitled "Tarragon Reports Record Results for Third Quarter 2005; Raises Full-year 2005 Estimate and Guides 2006 Earnings per Share from Continuing Operations with Growth of at Least 65 Percent Over 2005." Therein, the Company, in relevant part, stated:

Tarragon Corporation (Nasdaq: TARR), the urban homebuilder specializing in the development and marketing of high-density residential communities, announced its third-quarter results and raised its guidance for 2005.

**Third-quarter Financial highlights:**

- Fully diluted EPS reached $1.70 vs. $0.14 in the prior year

- Fully diluted EPS from continuing operations of $1.01 vs. $0.14 in the prior year

- Total consolidated homebuilding revenues of $243.4 million, representing a 328 percent increase over third quarter 2004

- Home deliveries of 1,160 at an average price of $243,000, resulting in sales of $281.0 million

- New orders of 962 homes worth $271.0 million, at an average price of $282,000

21

- Backlog value $540.0 million, up 51 percent over the previous year backlog of $357.0 million

- Total value of active developments increased to more than $2.3 billion, representing over 7,500 homes in 43 communities

- Additional future development pipeline of 8,600 homes in 24 communities

- Stockholders' equity as of September 30, 2005, of $291.3 million, up from $130.6 million one year earlier

**2005/2006 Guidance:**

- 2005 EPS from continuing operations of $2.27 - $2.42, up from $2.17 - $2.32 (excludes estimated income from previously announced investment division capital redeployment program and the charge associated with conversion of senior convertible notes)

- 2006 consolidated homebuilding revenues of at least $1.0 billion and EPS from continuing operations of at least $4.00 representing an increase of more than 65 percent over 2005 revised guidance.

2005 third-quarter net income was $50.5 million, or $1.70 per fully diluted share, compared to $3.9 million, or $0.14 per fully diluted share in 2004. Included in third-quarter 2005 net income is $22.4 million in after-tax gains on sale of investment assets. Total consolidated revenues for the quarter ended September 30, 2005, increased 264 percent to $260.1 million from third-quarter 2004 revenues of $71.5 million. Income from continuing operations increased more than seven-fold to $28.1 million this quarter from $3.8 million in the third quarter 2004. Third-quarter 2005 income from continuing operations included a one-time charge of $7.2 million relating to the conversion of $54.25 million of senior convertible notes into common stock.

Net income for the nine-month period was $81.1 million, or $2.70 per fully diluted share, up 252 percent over the prior year net income of $23.0 million, or $0.87 per fully diluted share. Included in the 2005 net income is $31.4 million of after-tax gains on sales of investment assets compared to $2.7 million for the same period last year. For the nine-month period total consolidated revenues were $425.4 million, up 138 percent over the prior period revenues of $178.7 million. For the nine months ended September 30, 2005, income from continuing operations was up 143 percent to $47.8 million, or $1.67 per fully diluted share, from $19.7 million, or $0.74 per share, for the same period 2004.

Consolidated homebuilding revenue rose 328 percent to $243.4 million from third-quarter 2004 homebuilding revenue of $56.9 million. Total homebuilding revenue, including revenue from unconsolidated joint ventures, grew 442 percent to $308.5 million in the third quarter 2005, from $56.9 million in the third quarter of 2004. For the nine-month period ended September 30, 2005, consolidated and unconsolidated homebuilding revenue increased to $561.9 million, up 316 percent from $135.1 million in 2004.

Tarragon Chairman and CEO William S. Friedman commented, "Sales have continued at a strong pace in Florida, South Carolina and New Jersey. October was one of our strongest months ever with 429 new orders worth $92.0 million, despite lost selling days due to weather. Based on the strength of this quarter's results and our contract backlog which, as of October 31, stood at $600.0 million, we have raised our guidance for the year and set a floor to our 2006 earnings expectations of $4.00 per share, fully diluted."

\*\*\*

**Company Raises 2005 Guidance and Announces 2006 Guidance**

Based on the current backlog and scheduled closings, Tarragon is raising its 2005 guidance of after-tax income from continuing operations to $73.0 - 78.0 million or $2.27 - $2.42 per fully diluted share, before income from the investment division capital redeployment program and costs associated with the conversion of its senior convertible notes in August 2005.

Tarragon also announced that it anticipates 2006 consolidated revenues in excess of $1.0 billion and income from continuing operations of at least $4.00 per fully diluted share.

45.    Also on November 9, 2005, Tarragon filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendants Friedman and Pickens, and reaffirmed the Company's financial results previously announced on the same day. The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶39, *supra*.

46.    On March 15, 2006, the Company issued a press release entitled "Tarragon Corporation Announces Record 2005 Financial Results." Therein, the Company, in relevant part, stated:

- 2005 Net Income of $146 Million or $4.71 Per Diluted Share Up 231 Percent

- Income From Continuing Operations of $3.36 Per Diluted Share, Up 173 Percent

- Full-Year Consolidated Revenue Up 102 Percent

- Total Homebuilding Sales Up 133 Percent

- Board Authorizes Additional One Million Share Repurchase Plan

- Company Announces $0.10 Per Share Dividend

- 2006 Guidance of $3.70 to $4.20 Income From Continuing Operations Per Diluted Share

> Tarragon Corporation (Nasdaq: TARR), a leading urban homebuilder specializing in the development and marketing of high-density residential communities, today announced record financial results for the year ended December 31, 2005.

> Tarragon also announced an annual dividend of $0.10 per share, payable on May 1, 2006 to shareholders of record as of the close of business on April 10, 2006, and a one million share increase in share repurchase authorization.

> Consolidated revenue for the full year 2005 was $571.9 million, up 102% from $282.9 million in 2004. Substantially all of the revenue increase was due to very strong homebuilding sales, which for the year totaled $504.7 million, up 129% from $220.5 million in 2004. Homebuilding sales, including revenue from unconsolidated properties, were $735.5 million in 2005, up 133% from $315.5 million in 2004.

> Net income for 2005 was $145.8 million, or $4.71 per diluted share, compared to $44.7 million, or $1.65 per diluted share, in 2004.

> "Tarragon has posted a record year with these solid financial results," said Chairman and CEO William S. Friedman. "Our focused growth strategy is gaining traction and we expect to continue that

momentum in 2006, even as the unprecedented growth rates that our industry has enjoyed in the past few years begin to moderate. We continue to strengthen our balance sheet and take steps to allow investors to participate in our growth, including declaring a dividend and repurchasing shares in the market. We believe that the long-term industry fundamentals remain very strong, especially in our urban markets."

During 2005 we executed a record 3,899 new orders worth $963 million, up 178% over 1,404 new orders worth $360 million, in 2004. Tarragon delivered 3,343 homes in 2005 at an average price of $268,000, excluding lots, resulting in sales of $878 million compared to 942 home deliveries in 2004 at an average price of $259,000, excluding lots, or $215 million in total sales. For the fourth quarter ended December 31, 2005, 527 new orders were executed worth $138.8 million up from 513 new orders during the same period last year worth $129.7 million. Home deliveries in the fourth quarter of 2005 totaled 949 worth $251 million compared to 526 home deliveries during the same period last year worth $144.6 million. As a result of the strong sales activity, the Company's non- cancelable contractual backlog rose 25% to $427.3 million, compared to the year earlier figure of $342.7 million.

Mr. Friedman commented, "While overall buyer traffic at our developments remains robust, some of our markets are returning to historically normal levels of housing sales activity. We have, for example, noted a marked slowdown in certain investor-driven West Coast Florida markets, but elsewhere in Florida the level of activity is only low compared to the unusually high levels of last year. Our guidance for 2006 assumes continued sluggishness in these West Coast Florida communities and moderate sales levels, in line with historical norms for the remainder of the market. In the Northeast, where we are opening sales offices for three new communities in the next month, pricing is stable, traffic is high and we are not anticipating a comparable slowdown in sales levels."

***

**2006 Guidance**

The Company is issuing full-year 2006 earnings guidance of $3.70 to $4.20 in Income from Continuing Operations per diluted share. The Company anticipates additional income from the completion of the capital redeployment program.

47.    On March 16, 2006, Tarragon filed its Annual Report with the SEC on Form 10-K. The Company's 10-K was signed by the Individual Defendants, among others, and reaffirmed the Company's financial results previously announced on March

15, 2006. The Company's 10-K also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶39, *supra*.

48.    On May 10, 2006, the Company issued a press release entitled "Tarragon Corporation Announces First Quarter 2006 Financial Results." Therein, the Company, in relevant part, stated:

- Net Income of $18.8 Million or $0.59 Per Diluted Share

- Consolidated Revenue up 23 Percent

- Company Maintains 2006 Guidance of $3.70 to $4.20 Income From Continuing Operations Per Diluted Share

- 209,024 Shares Repurchased

> Tarragon Corporation (Nasdaq: TARR), a leading urban homebuilder specializing in the development and marketing of high-density residential communities, today announced its financial results for the quarter ended March 31, 2006.

**Financial Results**

> Consolidated revenue for the first quarter of 2006 was $98.9 million, up 23 percent from $80.3 million in the same period of 2005. The increase was due principally to consolidated homebuilding sales, which totaled $89.2 million, up 40 percent from $63.6 million in the first quarter of 2005. The increase in consolidated revenue was partially offset by a $7.0 million decrease in rental and other revenue, which resulted from the implementation of the Company's capital redeployment program announced in March 2005.

> Homebuilding sales, including revenue from unconsolidated properties, were $111.9 million in the first quarter of 2006, down from $120.0 million in the same period of 2005. In the prior-year quarter, 12 percent of homebuilding sales were derived from Northeast projects compared to 1.9 percent in the current quarter. Over the next two quarters, sales will commence at several projects in the Northeast representing more than $275 million in homebuilding revenue.

> Income from continuing operations of $11.5 million was equal to that of the first quarter 2005.

Net income for the first quarter of 2006 was $18.8 million, or $0.59 per diluted share, compared to $21.6 million, or $0.70 per diluted share, in the first quarter of 2005, which included $10.3 million of after tax gains on sale of real estate compared to $7.3 million in the current quarter. Based on lower sales velocity in several markets in Florida, the Company increased its estimate of marketing and carrying costs on several of its developments. When estimates of project costs are revised, gross profit is adjusted in the period of change so that cumulative project earnings reflect the revised profit estimate. These adjustments decreased after tax net income in the first quarter of 2006 $5.1 million, or $0.16 per diluted share. Accordingly, overall margins are expected to expand in future quarters, provided current sales rates continue as expected.

Tarragon Chairman and CEO William S. Friedman commented, "We are maintaining our guidance for the year and we expect that our results will be more robust during the second half as additional communities in the Northeast hit the market and contribute to earnings. While less than 2 percent of our homebuilding revenue was derived from projects in the Northeast in the first quarter, we expect the Northeast market to contribute 27 percent of total 2006 homebuilding revenue and over 35 percent of gross profits. We expect this trend to continue into 2007 as our Northeast activities begin to mature."

**Share Repurchase Program**

During the first quarter of 2006 the Company repurchased 209,024 shares at an average price of $19.69 per share.

**2006 Guidance**

The company reaffirmed its 2006 guidance of $3.70 to $4.20 income from continuing operations per diluted share, based on current market and sales trends, as well as anticipated income from the completion of its capital redeployment program during 2006.

49.    Also on May 10, 2006, Tarragon filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendants Friedman and Pickens, and reaffirmed the Company's financial results announced on the same day. The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶39, *supra*.

50.    The statements contained in ¶¶ 36— 49 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the Company had failed to consolidate a limited partnership into its consolidated financial statements; (2) that the Company had failed to properly report its consolidated statement of cash flows by misclassifying items among its operating, investing and financing activities; (3) that the Company's financial statements were not prepared in accordance with GAAP; and (4) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

51.    On August 9, 2006, the Company shocked investors when it issued a press release entitled "Tarragon Corporation to Postpone Second Quarter Earnings Announcement and Conference Call; Company May Be Required to Consolidate Ansonia Partnership." Therein, the Company, in relevant part, revealed:

> Tarragon Corporation (Nasdaq: TARR), a leading urban homebuilder specializing in the development and marketing of high-density residential communities, today announced that it is reviewing its earlier determination that it was required to treat Ansonia Apartments, LP (Ansonia) as an unconsolidated partnership for financial reporting purposes.   The review relates only to the interpretation of existing accounting literature and does not involve new facts or circumstances.

> Ansonia owns approximately 6,300 rental apartments primarily in Connecticut and Florida.   Tarragon included summarized financial data from Ansonia's financial statements in notes to financial statements in the Company's 2005 Annual Report on Form 10-K.

> The Company is currently reviewing its accounting treatment of its investment in Ansonia with its independent accountants if the Company concludes that it is required to consolidate Ansonia, the Company will be required to restate certain prior period financial statements.  There would be no impact on income or revenue of the homebuilding division.

> Tarragon has postponed the issuance of its second quarter 2006 financial results and conference call, both originally scheduled for today, Wednesday, August 9, pending this review.   Tarragon will announce a

rescheduled date and time for its second quarter earnings release as soon as the review is concluded.

52.    Upon this partial disclosure, the Company's shares declined $1.67 per share, or 14 percent, to close on August 9, 2006 at $10.30 per share, on unusually heavy trading volume.

53.    On August 24, 2006, the Company issued a press release entitled "Tarragon Corporation Announces Second Quarter 2006 Financial Results; Second Quarter Net Income of $10.7 Million, or $0.34 Per Diluted Share, Up 22 Percent Over Second Quarter 2005 Net Income of $8.8 Million, or $0.28 Per Diluted Share." Therein, the Company, in relevant part, stated:

> Tarragon Corporation (Nasdaq: TARR), a leading urban homebuilder specializing in the development and marketing of high-density residential communities, today announced its financial results for the second quarter ended June 30, 2006.

> **Second Quarter Financial Results**

> Consolidated revenue for the second quarter of 2006 was $146.7 million, up 61 percent from $91.4 million in the same period of 2005. The increase was due principally to consolidated homebuilding sales, which totaled $122.3 million, up 77 percent from $69.1 million in the second quarter of 2005.

> Homebuilding sales, including revenue from unconsolidated properties, were $143.1 million in the second quarter of 2006, up from $133.3 million in the same period of 2005.

> Income from continuing operations was $8.4 million in the second quarter of 2006, compared to $8.0 million in the same period of 2005.

> Net income for the second quarter of 2006 was $10.7 million, or $0.34 per diluted share, up 22 percent from $8.8 million, or $0.28 per diluted share, in the second quarter of 2005. Included in the second quarter of 2006 is a $2.7 million expense associated with the write off of costs incurred for projects that have been cancelled.

> **Six-Month Financial Results**

Consolidated revenue for the first six months of 2006 was $260.8 million, up 47 percent from $176.9 million in the same period of 2005. Homebuilding sales, including revenue from unconsolidated properties, were $255.0 million in the first six months of 2006 compared to $253.4 million in the same period of 2005.

Income from continuing operations during the first six months of 2006 was $19.0 million compared to $19.4 million in the same period of 2005. Net income for the first six months of 2006 was down 6 percent to $28.6 million, or $0.90 per diluted share, compared to $30.4 million, or $0.98 per diluted share, in the comparable period of 2005.

Tarragon Chairman and CEO William S. Friedman commented, "Strong, higher-margin sales during the second quarter in our New Jersey communities, such as One Hudson Park in Edgewater and 1100 Adams in Hoboken, have helped to offset the weakness in many of our Florida condominium conversions, to produce revenue and net income that were substantially higher than the 2005 quarter. However, we expect the soft demand in the southeast markets, with lower margins resulting from increased carrying and marketing costs, to continue to apply pressure on our earnings. As a result, we are lowering our 2006 guidance for income from continuing operations per diluted share to $2.10 to $2.40. We expect net income, including discontinued operations, of $2.60 to $2.90 per diluted share.

Mr. Friedman continued, "Our outlook for 2007 remains solid because, in addition to completing the sellout of several profitable conversions from our rental portfolio, we expect significant profit from higher-margin properties now under construction, particularly in New Jersey. We believe our focus on unique waterfront developments meeting the demand from the growing number of non-traditional households and increased development of rental housing will help to insulate our operations from the conditions now impacting the broader market for residential real estate. Assuming a continuation of current market conditions, we expect net income in 2007 to at least equal that of 2006. Of particular importance, most of our condominium conversion sales are at communities where we have been selling for some time and have either paid off or substantially reduced the original acquisition financing. At June 30, the ratio of fully funded debt to total estimated sellout of our active conversions was 43 percent. Accordingly, each dollar of sales produces substantial free cash flow, giving us the financial flexibility we need to run our business, pay down debt and take advantage of opportunities."

***

**Share Repurchase Program**

During the second quarter of 2006 the Company repurchased 708,804 shares at an average price of $14.31 per share.

**2006 Guidance**

The Company anticipates $2.10 to $2.40 of income from continuing operations per diluted share in 2006, based on current market and sales trends and the impact of the Ansonia consolidation.

54.    Also on August 24, 2006, Tarragon filed its Quarterly Report with the SEC on Form 10-Q.  The Company's 10-Q was signed by Defendants Friedman and Pickens, and reaffirmed the Company's financial results announced on the same day. The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶39, *supra*.

55.    On November 9, 2006, the Company issued a press release entitled "Tarragon Corporation Announces Third Quarter 2006 Financial Results; Net Income of $6.0 Million or $0.19 Per Diluted Share for the Quarter Ended September 30, 2006 and $35.1 Million or $1.11 Per Diluted Share for the Nine Months Ended September 30, 2006; Company Plans to Spin Off Homebuilding Division to Shareholders in 2007." Therein, the Company, in relevant part stated:

Tarragon Corporation (Nasdaq: TARR), a leading urban homebuilder specializing in the development and marketing of high-density residential communities, today announced its financial results for the third quarter and nine months ended September 30, 2006.

**Third Quarter Financial Results**

Consolidated revenue for the third quarter of 2006 was $119.2 million, compared to $265.3 million in the same period of 2005.  Lower consolidated homebuilding revenue from condominium conversion closings in the Company's Florida markets from the year ago period accounts for the decrease.

Homebuilding sales, including revenue from unconsolidated properties, were $104.7 million in the third quarter of 2006, compared to $308.5 million in the third quarter of 2005.

Net income for the third quarter of 2006 was $6.0 million, or $0.19 per diluted share, compared to net income of $50.3 million, or $1.70 per diluted share, in the third quarter of 2005. Income from continuing operations was $2.8 million in the third quarter of 2006, compared to $28.2 million in the same period of 2005. Third quarter net income in 2005 included $22.4 million in after tax gains on sale of investment division properties, compared to $3.3 million in the third quarter of 2006.

Certain comparative results for 2005 have been restated to reflect the consolidation of Ansonia Apartments LP, as announced on August 22, 2006. Ansonia was previously treated as an unconsolidated partnership for financial reporting purposes.

**Nine-Month Financial Results**

Consolidated revenue for the first nine months of 2006 was $379.0 million, compared to $441.2 million in the same period of 2005. Homebuilding sales, including revenue from unconsolidated properties, were $359.7 million in the first nine months of 2006 compared to $561.9 million in the same period of 2005.

Income from continuing operations during the first nine months of 2006 was $22.5 million or $0.71 per diluted share compared to $47.9 million or $1.67 per diluted share in the same period of 2005. Net income for the first nine months of 2006 was $35.1 million, or $1.11 per diluted share, compared to $80.7 million, or $2.69 per diluted share, during the same period of 2005. During the first nine months of 2006 the Company wrote off $5.0 million in costs related to deals no longer being pursued compared to $0.7 million in the first nine months of 2005.

Tarragon Chairman and CEO William S. Friedman commented, "Our third quarter results reflect the continued slow down in condominium conversion sales along with declining margins, particularly in Florida. However, as our condominium conversions slowly sell Out, we are beginning to reduce debt and redeploy capital to higher-margin, new developments in New Jersey, Connecticut, Texas and Tennessee. In fact, during the first ten months of the year, we reduced debt associated with our condominium conversions by $164 million."

Mr. Friedman continued, "As a result of the continuing sales slowdown and lower margins, we are reducing our 2006 guidance for net income to $1.15 per diluted share and for income from continuing

operations to $0.75 per diluted share.  Going forward, our growing
pipeline of high-density, in-fill developments, primarily in New Jersey and
Connecticut will help offset market weakness in Florida and be a key
driver of revenue and net income growth in 2008 and beyond."

***

**Share Repurchase Program**

During the third quarter of 2006 the Company repurchased
116,859 shares at an average price of $10.69 per share.

56.    Also on November 9, 2006, Tarragon filed its Quarterly Report with the

SEC on Form 10-Q.  The Company's 10-Q was signed by Defendants Friedman and

Pickens, and reaffirmed the Company's financial results announced on the same day.

The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially

similar to the certifications contained in ¶39, *supra.*

57.    On March 19, 2007, the Company issued a press release entitled

"Tarragon Corporation Announces Fourth Quarter and Year End 2006 Financial Results;

Debt on completed condominiums reduced by nearly 50 percent in 2006." Therein, the

Company, in relevant part, stated:

Tarragon Corporation (Nasdaq: TARR), a leading developer of
multifamily housing for rent and for sale, today announced its financial
results for the fourth quarter and year ended December 31,2006.

**Year End Financial Results**

Based on unaudited results, net income for 2006 was $9.8 million,
or $0.31 per diluted share, compared to $88.5 million, or $2.93 per diluted
share, in 2005. 2006 net income was adversely impacted by unusual items
including impairment charges, write-offs and gross margin adjustments of
$34.9 million after tax, or $1.23 per share.  Of this $34.9 million, $26.3
million is reflected in cost of sales, resulting from market driven margin
reductions and impairments.  The margin adjustments were made to reflect
price reductions, slower absorption and increased marketing costs on
unsold units.   $6.4 million, after tax, is included in general and
administrative expense, resulting from the write-off of pursuit costs on
development projects that did not go forward.  Finally, $2.2 million of

impairment charges, after tax, represent the write-down of land inventory and properties held for sale to current estimated market value. This compares to $3.2 million of impairment charges and other write-downs, after tax, recorded in 2005. Loss from continuing operations for 2006 was $2.3 million or $(0.12) per diluted share compared to income from continuing operations of $45.8 million or $1.60 per diluted share in 2005.

The Company expects to report consolidated 2006 revenue of $544.9 million, an 8 percent decrease from $595.1 million in 2005, based on unaudited results. Homebuilding sales, including revenue from unconsolidated entities, decreased 31 percent to $508.2 million in 2006 from $735.5 million in 2005. Fewer condominium conversion closings in the Southeast market, which declined 34 percent from 2005, were the principal reason for the decline in revenue.

Tarragon Chairman and CEO William S. Friedman commented, "We have finished a disappointing year for the homebuilding industry and for Tarragon. We have used this period of slow sales to develop new marketing strategies, to reduce debt and to pursue developments with multiple exit strategies that work either as rentals or condominiums. Tarragon's long-term plan is to focus on smart growth and redevelopment projects in areas of high demand."

**Fourth Quarter Financial Results**

The Company expects to report a net loss for the fourth quarter of 2006 of $25.1 million, or $(0.89) per diluted share, compared to net income of $7.8 million, or $0.26 per diluted share, in the fourth quarter of 2005. Included in the fourth quarter of 2006 net loss were unusual items including impairment charges, write-downs and gross margin adjustments of $23.6 million after tax, or $0.83 per share. This $23.6 million includes $18.6 million from market driven margin reductions and impairments in cost of sales, $3.3 million from development pursuit costs written off to general and administrative expense and $1.7 million from impairment charges related to the write-down of land inventory and properties held for sale. No impairment charges or other write-downs were recorded in the fourth quarter of 2005. Loss from continuing operations was $25.6 million in the fourth quarter of 2006, compared to a loss of $2.9 million in the same period of 2005.

Based on unaudited results, consolidated revenue for the fourth quarter of 2006 was $163.8 million, an increase of 7.8 percent over consolidated revenue of $151.9 million in the same period of 2005. Homebuilding sales, including revenue from unconsolidated properties, declined 14 percent to $148.5 million in the fourth quarter of 2006, compared to $173.7 million in the fourth quarter of 2005. Florida sales

represented 49 percent of homebuilding sales in the 2006 fourth quarter compared to 81 percent in the 2005 period.

***

**Spin Off of Homebuilding Division**

The Company has filed a preliminary proxy statement with the Securities and Exchange Commission related to the proposed pro rata, tax-free spin off of its Homebuilding Division as an independent, publicly traded company. The transaction, which is subject to shareholder approval, is expected to be completed in mid-2007. Tarragon will continue to operate its real estate services business, which provides asset and property management, leasing and renovation services to residential and commercial properties. Following the spin off, Tarragon will change its name to Sage Residential, Inc. Tarragon's homebuilding and development business will be renamed Tarragon Corporation. Tarragon believes that the spin off will, among other things, provide both businesses with direct and differentiated access to financing and the capital markets, allow each company to grow through acquisitions appropriate to its business and provide each company with the opportunity to align management incentives with the performance of its business. If the spin off is consummated, Tarragon stockholders will hold a proportionate interest equal to their current ownership interest in Tarragon in two separate companies: Tarragon Corporation, which will have substantially reduced debt and higher book value as a result of its separation from the real estate services division due to that division's high level of fixed rate, non-recourse debt, and Sage, which will hold the assets of the real estate services division and associated debt. Although Sage will reflect negative book value as a result of historical-based accounting and depreciation, its net asset value, based on our current estimate of the fair market value of the assets of the real estate services division, is expected to approximate $7 per diluted share. "Sage will be a management-focused real estate services company, led by an award- winning team that has been recognized for its vision and expertise, that will be well positioned to significantly expand its net operating income and absorb additional business," said Mr. Friedman.

Mr. Friedman concluded, "Due to the effects that the timing of the spin off will have on our operating results, we will not issue guidance until the spin off is completed. Our goal for 2007 is to validate the confidence our investors have placed in the strength of our long term strategy, aggressively manage our balance sheet, and improve earnings over 2006."

**Share Repurchase Program**

During 2006, the Company repurchased 1,034,687 shares at an average price of $14.99 per share. No shares were repurchased in the 2006 fourth quarter

58.    The statements contained in ¶51—57 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the Company had failed to consolidate a limited partnership into its consolidated financial statements; (2) that the Company had failed to properly report its consolidated statement of cash flows by misclassifying items among its operating, investing and financing activities; (3) that the Company's financial statements were not prepared in accordance with GAAP; (4) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times; (5) that the Company was experiencing liquidity issues due to its inability to obtain loan modifications and financing; and (6) that the Company lacked adequate internal and financial controls.

## THE TRUTH BEGINS TO EMERGE

59.    On April 2, 2007, Tarragon filed an 8-K with the SEC, which in relevant part stated:

On March 27, 2007, management and the Audit Committee of Tarragon Corporation (the "Company") concluded, after a review of the Company's consolidated statements of cash flows and applicable accounting standards and related guidance relating to the presentation of cash flows, that the Company's consolidated statements of cash flows should be restated to reclassify certain items among operating, investing and financing activities. In reaching its conclusion, the Company also reviewed the presentation of other companies in its industry.

Such conclusion was discussed with, and approved by, the Audit Committee of the Company's Board of Directors. Also, the restatement has been discussed with the Company's independent registered public accountants.

As a result of the foregoing, the Company intends to include in its Annual Report on Form 10-K for the year ended December 31, 2006 (the "2006 10-K") a restatement of the consolidated statements of cash flows for the years ended December 31, 2005 and 2004 included in that report. The previously filed consolidated statements of cash flows for the years ended December 31, 2005 and 2004 should not be relied upon.

60.    Also on April 2, 2007, Tarragon filed its Annual Report with the SEC on Form 10-K. The Company's 10-K was signed by the Individual Defendants, among others, and contained Sarbanes-Oxley required certifications substantially similar to the certifications contained in ¶39, *supra.*

61.    On May 11, 2007, the Company issued a press release entitled "Tarragon Corporation Announces Financial Results for First Quarter of 2007; Spin-off of Homebuilding Business on Track." Therein, the Company, in relevant part, stated:

Tarragon Corporation (Nasdaq: TARR), a leading developer of multifamily housing for rent and for sale, today announced its financial results for the first quarter ended March 31, 2007.    In addition to presenting consolidated financial results in this release, the Company is including separate financial results, including net income, for its Homebuilding and Real Estate Services businesses in anticipation of the planned spin-off of its Homebuilding business.

**First Quarter 2007 Consolidated Financial Results**

The Company reported consolidated revenue for the first quarter of $150.4 million, compared to $114.2 million in first quarter of 2006. The loss from continuing operations was $4.4 million in the first quarter of 2007, compared to income from continuing operations of $11.4 million in the same period of 2006.

Net loss for the first quarter of 2007 was $4.2 million, or ($0.16) per diluted share. This compares to net income of $18.5 million, or $0.58 per diluted share for the first quarter 2006.

The first quarter 2007 results included $4.4 million in impairment charges and $5.5 million in depreciation expense. The financial results for the first quarter of 2007 also included $400 thousand in pre-tax gains on sales of properties, while results for the 2006 period included gains of $11.7 million, pre-tax.

"Our business model of pursuing hard to develop opportunities in high barrier to entry markets is being validated in this difficult real estate market. Income from our core developments in the Northeast and the sale of new, or recently renovated rental communities is expected to more than offset losses in our legacy condominium conversion properties in Florida," said Tarragon Chairman and Chief Executive Officer William Friedman. "Meanwhile, the Florida condominium conversions, even at today's reduced prices and sales rates, are contributing cash to rapidly reduce debt and to enhance our ability to pursue new opportunities, especially for rental and mixed use developments in the Northeast. This approach positions the Company favorably for the planned spin-off of our homebuilding business later this year."

Total consolidated debt reduction, before new borrowings, during the first quarter of 2007 was $65 million, including over $23 million related to completed condominium conversion projects. By year-end 2007, Tarragon presently expects to repay approximately $125 million of consolidated debt on condominium conversion communities, $130 million on newly built, for-sale developments and $165 million on rental apartment developments.

"We build and renovate rental communities to sell at a profit. In 2007, we expect to sell five rental communities for over $300 million. Proceeds from these sales will put both our Homebuilding and Real Estate Services businesses in a stronger position to respond to new opportunities," said Mr. Friedman.

**Homebuilding Business Financial Results**

The Company's Homebuilding business sales, including revenue from unconsolidated properties, were $130.5 million for the first quarter of 2007, compared to $111.9 million in the first quarter of 2006. Homebuilding net loss for the first quarter of 2007 was $1.1 million as compared to net income of $10.9 million for the first quarter of 2006. The decrease was primarily driven by margin reductions in Florida condominium conversion projects over the past year and impairment charges of $4.4 million in the first quarter of 2007 compared to none the same period a year ago. Mr. Friedman commented, "Our goal for 2007 is to reduce debt on our condominium conversion properties and to access our capital now invested in these assets for other opportunities. To keep sales moving, especially in Florida, we are aggressively pricing our homes. These sales will comprise a substantial portion of the results of our homebuilding operations for much of 2007. However, as the year progresses and we dispose of much of our existing condominium conversion inventory, we expect to see a return to more normal margins

and have significantly improved our balance sheet, both in terms of liquidity and debt. So as difficult as it may be to our current earnings, it is the right path to long-term stability and profitability for our homebuilding business."

***

**Active For Sale Projects**

At March 31, 2007, Tarragon's active for-sale communities (including backlog) totaled 3,811 homes in 33 communities, representing approximately $1.3 billion in projected revenue, compared to 7,948 homes in 44 communities representing about $2.4 billion in projected revenue at March 31, 2006. The $1.3 billion of active, for-sale developments as of March 31, 2007 is comprised of 45 percent new mid- and high-rise buildings, 30 percent condominium conversions and 25 percent new low-rise developments. These communities are currently expected to generate gross margins of 19 percent, 8 percent, and 21 percent, respectively. Overall, a 16 percent average gross margin is anticipated on homes in the active communities. Included in our gross margin are marketing and selling costs and development overhead representing approximately five percent of homebuilding revenue.

***

**Spin-Off of Homebuilding Division**

Tarragon has filed a proxy statement with the Securities and Exchange Commission related to the proposed pro rata, tax-free spin-off of its Homebuilding business as an independent, publicly traded company. The transaction, which is subject to shareholder approval, is expected to be completed in the third quarter of 2007. Tarragon will continue to operate the Real Estate Services business, which provides asset and property management, leasing and renovation services to residential and commercial properties. Following the spin-off, Tarragon will change its name to Sage Residential, Inc. Tarragon's Homebuilding business will be renamed Tarragon Corporation after the spin-off. Tarragon believes that the spin-off will, among other things, provide both businesses with direct and differentiated access to financing and the capital markets, allow each company to grow through acquisitions appropriate to its business and provide each company with the opportunity to align management incentives with the performance of its business. If the spin-off is consummated, Tarragon stockholders will hold a proportionate interest equal to their current ownership interest in Tarragon in two separate companies: the Tarragon Corporation Homebuilding business, which will have substantially reduced debt and higher book value as a result of its separation from the Real Estate Services business due to its high level of fixed rate, non-recourse debt, and Sage Residential, which will operate the

Real Estate Services business and hold the assets and associated debt. Although Sage Residential will reflect a negative book value as a result of historical-based accounting and depreciation, its net asset value, based on the current estimate of the fair market value of the assets of the Real Estate Services business, is expected to approximate $6 per diluted share, assuming 30 million shares outstanding.

**Share Repurchase Program**

No shares were repurchased in the first quarter of 2007.

62.    Also on May 11, 2007, Tarragon filed its Quarterly Report with the SEC on Form 10-Q.  The Company's 10-Q was signed by Defendants Friedman and Pickens, and reaffirmed the Company's financial results announced on the same day.  The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶39, *supra*.

63.    The statements contained in ¶¶59 —62 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the Company had failed to consolidate a limited partnership into its consolidated financial statements; (2) that the Company had failed to properly report its consolidated statement of cash flows by misclassifying items among its operating, investing and financing activities; (3) that the Company had failed to timely take property impairment charges and other write-downs on certain properties; (4) that the Company's financial statements were not prepared in accordance with GAAP; (5) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times; (6) that the Company was experiencing liquidity issues due to its inability to obtain loan modifications and financing; (7) that the Company lacked adequate internal and financial controls;, and (8) that, as a result of the foregoing, the Company's statements

about its financial well-being and future business prospects for 2007 were lacking in a
reasonable basis when made.

   64. On July 18, 2007, Bloomberg published an article entitled "Here's What
The Accounting Watchdog Keeps Hidden." The article, in relevant part, stated:

> *The official mission of the auditing profession's watchdog is "to*
> *protect the interests of investors." In practice, what it really protects best*
> *are the dirty secrets of the accounting firms and their corporate audit*
> *clients.*
>
>   Created in 2002 by the Sarbanes-Oxley Act, the Public Company
> Accounting Oversight Board inspects the firms that audit companies with
> U.S.-traded securities. *In its brief history, the board has identified scores*
> *of companies where outside auditors have done lousy jobs checking the*
> *books. Investors crave that kind of knowledge.*
>
>   In its reports to the public, though, the board doesn't name the
> companies. So last month, for instance, *when the board released its*
> *annual inspection report on Grant Thornton LLP, the sixth- largest U.S.*
> *accounting firm by revenue, one of the audits it criticized was at a*
> *company identified only as "Issuer A." Transparency, this isn't.*
>
>   *The report said Grant Thornton failed "to obtain sufficient*
> *competent evidential matter to support its audit opinion" and 'failed to*
> *identify" an accounting violation "that it should have identified and*
> *addressed before issuing its audit report."*
>
>   In a response letter, the firm complained about the harsh wording
> and said it actually had identified the problem. *The violation: Issuer A,*
> *which restated its financials last year, had left off its balance sheet a*
> *certain 90 percent-owned partnership, the rest of which was owned*
> *mainly by company insiders.*
>
> **What's Missing**
>
>   *Here's what the report left out: Issuer A is Tarragon Corp., a*
> *New York-based real-estate developer awash in Florida condominiums.*
> *Last year's restatement slashed 2005 net income 39 percent to $88.5*
> *million. And Grant Thornton remains its auditor.* Faced with those
> facts, some investors during proxy season almost certainly would vote to
> fire the auditor and perhaps even withhold votes from directors who sit on
> the company's audit committee.

I uncovered Tarragon's identity with the help of a database maintained by Audit Analytics, a Sutton, Massachusetts, research firm that tracks restatements. *While Tarragon's filings don't mention the accounting board's role in forcing Grant Thornton's hand, the facts surrounding the company's restatement were identical to Issuer A's. Tarragon's chief executive officer, William Friedman, confirmed the match. Grant Thornton and the accounting board declined to do so.*

**So Much Trouble**

*Investors shouldn't have to go to this much trouble.*

*"That's clearly information investors would want to have,"* says James Melican, chairman of Proxy Governance Inc., a research firm in Vienna, Virginia, that provides proxy-voting recommendations to investors. *"I don't see any particular reason why it should be secret."*

The board's inspection reports have multiple parts, most of which by law must remain secret. *The part that summarizes selected audits where inspectors found problems is the part the board must release publicly, under the Sarbanes-Oxley Act.*

\*\*\*

*Good audits should be especially paramount to Tarragon investors. In April, Tarragon announced yet another restatement, this time to correct its cash-flow statement.*

Tarragon shares are down 33 percent this year. The company swung to a $4.2 million net loss for the first quarter. And at March 31, Tarragon had just $20.6 million of unrestricted cash on its balance sheet of Friedman and his family, who own almost half of Tarragon's common stock. *Friedman says the loans provide the company with "more financial flexibility." He says he's happy with Grant Thornton, too.* [Emphasis added.]

65.     On July 25, 2007, the Company issued a press release entitled "Tarragon Corporation Comments on Unusual Trading Activity." Therein, the Company, in relevant part, stated:

Tarragon Corporation (Nasdaq: TARR), a leading developer of multifamily housing for rent and for sale, today commented on unusual trading activity in its common stock that has occurred over the past two days and that has resulted in significant price volatility. Tarragon's policy is not to respond to specific rumors or speculation in the market; however,

*there has been no material change to the Company's business outlook, financial position or any other aspect of its business that would account for such trading activity.*

*Tarragon Chairman and Chief Executive Officer William Friedman commented further, "We recently announced a sequential quarterly sales increase of nearly 100% in our Florida condominium conversion communities, demonstrating that we're continuing to manage the challenges we face in that market.  We're also making excellent progress toward our 2007 debt reduction goals* and expect to reduce consolidated and unconsolidated debt on condominium conversion communities by approximately $125 million and $130 million in debt on newly built, for-sale developments.  Over the next few quarters, we expect to close sales of over $600 million of completed rental properties which are expected to generate over $450 million in debt repayment and approximately $150 million in net cash proceeds as we execute our strategy to improve our balance sheet before, and after, the spin-off of our homebuilding business."

### Additional Information About the Spin-Off Transaction

Tarragon has filed a preliminary proxy statement with the Securities and Exchange Commission related to the proposed pro rata, tax-free spin-off of its homebuilding business as an independent, publicly traded company.  *The transaction, which is subject to shareholder approval, is expected to be completed during the third quarter of 2007.* Following the spin-off, Tarragon will change its name to Sage Residential, Inc.  Sage will continue to operate its real estate services business, which provides asset and property management, leasing and renovation services to residential and commercial properties.  Tarragon's homebuilding and development business will be renamed Tarragon Corporation.  [Emphasis added.]

66.     On August 9, 2007, the Company issued a press release entitled "Tarragon Will Delay Filing Its Second Quarter Form 10-Q; Company Seeks to Address Liquidity Issues; Expects to Record Significant Impairment Charges." Therein, the Company, in relevant part, stated:

Tarragon Corporation (NASDAQ: TARR) today announced that the filing of its Quarterly Report on Form 10-Q for the quarter ended June 30, 2007 will be delayed beyond the Securities and Exchange Commission's filing deadline of August 9, 2007 *in order to provide additional time for Tarragon to finalize its evaluation of property*

*impairment charges and other write-downs necessitated by the recent decision to sell certain properties under current adverse market conditions. Tarragon currently expects to record impairment charges in excess of $125 million.*

*Tarragon is currently experiencing liquidity issues caused by the sudden and rapid deterioration in the real estate credit markets. This has resulted in Tarragon being unable to complete approximately $50 million in financing transactions that had been under negotiation and were expected to close in August 2007.*

Tarragon's business has been adversely affected by the continuing and accelerated deterioration of the homebuilding industry in the markets in which Tarragon operates, and in the Florida market in particular. These conditions have led to declines in new home sales, increased use of sales discounts and other incentives and increased interest and other carrying costs, and have adversely affected Tarragon's gross margins from homebuilding sales as well as its overall liquidity situation. Tarragon has also incurred additional lease-up and debt service costs associated with apartment properties that had been targeted for conversion into condominiums but that it subsequently decided to operate as rental properties.

*These factors, combined with the inability to obtain anticipated loan modifications and additional financing, have materially affected Tarragon's liquidity, including the ability to repay existing indebtedness as it becomes due and meet other current obligations, and raise doubt about Tarragon's ability to continue as a going concern. In addition, Tarragon currently is not in compliance with a financial covenant contained in its existing subordinated debt an4 after the property impairment charges and other write-downs discussed above are recorded, Tarragon will not be in compliance with certain net worth maintenance and other financial covenants contained in this and other debt agreements. Tarragon has not made its August 2007 debt service payments as well as certain other vendor payments, and Tarragon is seeking deferral of such payments while it continues to negotiate to obtain debt and/or equity financing. Tarragon also currently owes approximately $37.0 million under its unsecured line of credit with affiliates of William S. Friedman, Tarragon's chief executive officer and chairman. Tarragon and Mr. Friedman have agreed that no further advances will be made under this credit line.*

Notwithstanding these issues, Tarragon believes that its real estate portfolio and development platform currently have significant equity value in excess of existing indebtedness. *Accordingly, Tarragon's board of directors has formed a special committee of independent directors to*

*evaluate strategic and financial alternatives that may be available to Tarragon and its stakeholders. The special committee is retaining Lazard to act as a financial adviser to Tarragon in evaluating its alternatives. Alternatives to be considered are expected to include all available forms and sources of financing, property 'sales and other strategic transactions. However, if Tarragon is unable to obtain sufficient liquidity to fund its operations in the near-term, it may be necessary for Tarragon to undertake such other actions as may be appropriate in the light of its current liquidity situation.* Tarragon does not intend to comment further publicly with respect to the exploration of strategic and financial alternatives unless a specific transaction or course of action is authorized by its board of directors.

Tarragon previously filed a preliminary proxy statement with the SEC related to the proposed pro rata, tax-free spin-off of its homebuilding division as an independent, publicly traded company. *Due to current market conditions and the related impact on Tarragon's financial condition, Tarragon has decided to postpone the spin-off of the homebuilding business as it concentrates on addressing its existing financial requirements.* [Emphasis added.]

67.    On this news, the Company shares declined $1.88, or over 66.6 percent, to close on August 9, 2007 at $0.91 per share, on unusually heavy trading volume.

### POST RELEVANT TIME PERIOD DEVELOPMENTS

68.    On August 15, 2007, *Bloomberg* reported:

Tarragon Corp., a U.S. homebuilder, is in talks with lenders to avert bankruptcy after receiving default notices and demands that the company immediately pay back 17 percent of its $1.6 billion in outstanding debt.

Barclays Capital Real Estate Inc. served a default notice related to six promissory notes, and General Electric Capital and Fannie Mae demanded immediate payment on other debt, New York-based Tarragon said in a filing today with the U.S. Securities and Exchange Commission.

"We have not filed for bankruptcy, and we are very hopeful that will not be necessary," Tarragon Chief Executive Officer William Friedman said today in an interview. "We are working on arranging financing and a liquidity plan that will permit us to satisfy the lenders."

\*\*\*

Tarragon, which builds condominiums and townhouses, said today that it received a delisting notice on Aug. 13 from the Nasdaq Stock Market for failing to file on time its quarterly earnings report for the period ended June 30.

The company's outstanding debt was $1.6 billion on July 31, according to today's statement.   Robert Rohdie, a Tarragon director, resigned from the board Aug. 14.

Barclay's demanded immediate payment of $15 million on the six notes.  Tarragon owes $163.2 million on that debt.  GE Capital is seeking immediate payment of about $185.7 million, while Fannie Mae wants the homebuilder to immediately pay back $65.8 million.

***

Tarragon is down 92 percent this year.  The stock rose 30 cents today to close at 92 cents in Nasdaq trading, valuing the company at $26.4 million.  The homebuilder had a market worth of $349 million at the end of 2006.

69.    On August 23, 2007, the Company filed an 8-K with the SEC which stated, in relevant part:

As previously disclosed by Tarragon Corporation (the "Company") in its press release filed with its Current Report on Form 8-K dated August 9, 2007, *the Company has not made its August 2007 debt service payments as well as certain other vendor payments.*

Accordingly, in connection with attempts by the Company's lenders to exercise contractual rights relating to such obligations, on August 17, 2007, *the Company received notices of default and acceleration from National City Bank ("National City") related to a loan made to a wholly owned subsidiary of the Company and acceleration notices from Fannie Mae related to four promissory notes issued by four other wholly owned subsidiaries of the Company.  Each of the notices state that these obligations have been accelerated, including accrued interest, expenses and approximately $75.1 million of outstanding principal under the National City loan and approximately $13.4 million, in the aggregate, of outstanding principal under the promissory notes issued to Fannie Mae.*  The National City loan is guaranteed by the Company.  The four Fannie Mae promissory notes generally are non-recourse to the Company.  *Defaults under the National City loan and Fannie Mae promissory notes also constitute a cross- default or event of default under certain of the Company's other loan agreements,*

46

*indentures, mortgages and other evidences of indebtedness, and the lenders that are parties thereto may elect to exercise their rights and remedies thereunder.*

The Company is currently in discussions with certain of its lenders with respect to the matters described above and in prior filings; however, there can be no assurance as to the outcome of any such discussions. [Emphasis added.]


### TARRAGON'S VIOLATION OF GAAP RULES
### IN ITS FINANCIAL STATEMENTS
### FILED WITH THE SEC

70.    These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for, and disclosure about its revenues, in violation of GAAP rules.

71.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. § 210. 10-01(a).

72.    The fact that Tarragon is restating its financial statements, and disclosed that these financial statements should not be relied upon is an admission that they were false and misleading when originally issued (APB No. 20, ¶17-13; SFAS No. 154, ¶25).

73. Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

    a.    The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

    b.    The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

    c.    The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1,¶40);

    d.    The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

    e.    The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" was violated (FASB Statement of Concepts No. 1, ¶50);

f.  The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶[ 58-59);

g.  The principle that "completeness, meaning that nothing is left Out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79); and

h.  The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, ¶95).

74.    The adverse information concealed by Defendants during the Relevant Time Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

**FUTILITY OF DEMAND ON THE BOARD OF DIRECTORS**

75.    Plaintiff has not made a demand on Tarragon's Board of Directors to pursue the claims asserted herein, because such demand is excused and would have been a futile act for the reasons set forth below and throughout this Complaint:

a.  All of the Director Defendant directors of the Company are accused of a breach of fiduciary duties for failing to put into place adequate internal controls and adequate means of supervision to prevent the wrongful conduct complained of herein and in other complaints filed against the Company,

creating a substantial doubt that any of the Director Defendants could consider a demand in a disinterested and independent manner;

b.   A substantial likelihood exists that Director Defendants did not exercise valid business judgment because the wrongful actions and/or inactions by Director Defendants alleged herein constituted breaches of their respective fiduciary duties of good faith, disclosure, and loyalty to Tarragon and its stockholders, and an abdication of the directors' responsibilities giving rise to liability to Tarragon; and

c.   Certain of the Defendants are presently defendants in certain federal securities class action suits described above, and face a substantial likelihood of liability given the misstatements of Tarragon's operating revenues, gains and expenses.   Accordingly, Tarragon's directors have disabling conflicts and could not be relied upon to reach a truly independent decision as to whether to commence action against themselves arising out of the same misconduct.

76.   As such, each and all of the Director Defendant directors were on direct notice that rigorous and ever-vigilant scrutiny of compliance with legal guidelines for ethical corporate conduct were absolutely essential to protect the Company and its shareholders from substantial liability and the potential financial impact to Tarragon

resulting from both pending civil actions and reputational harm in the market place.

77.    Given the importance to Tarragon to maintain the integrity of the financial reports and auditing practices as well as the need to maintain adequate internal controls and monitoring of business functions, the Tarragon Board of Directors was or should have been aware of the risk of harm to the Company and its shareholders.

78.    Moreover, Defendants Schrag, Schafran, Stark and Davis were members of the Company's Audit Committee making their responsibilities even greater.   The Committee was entrusted with a great deal of power and influence in connection with financial reporting and financial controls.   Their responsibility to the Company's shareholders to prevent and ferret out fraud and inadequate financial controls is even greater than the other directors.

79.    According to the 1992 "Internal Control -- Integrated Framework," published by the Committee of Sponsoring Organizations of the Treadway Commission, which is the accepted standard for defining and assessing the effectiveness of the internal control of organizations in the United States, "internal control" is defined as follows: Internal control is a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives in the following categories:

- Effectiveness and efficiency of operations.

- Reliability of financial reporting.

- *Compliance with applicable laws and regulations.*
  (Emphasis added.)

80.    As such, the Tarragon Audit Committee was at all times specifically

responsible for oversight of compliance by Tarragon with applicable laws and regulations. Relevant to this demand futility analysis, as noted above, several of the Audit Committee members have special skill, knowledge and experience that they were duty bound to bring to bear, in their roles as directors and members of the Audit Committee, for the benefit of Tarragon and its shareholders.

81. Additionally, defendants Liebman, Schafran, Schrag and Weisbrod are members of the Compensation Committee. While on the Committee, they approved compensation plans for directors and executives which included millions of dollars which have not been re-sought since the information that the Company's financial results were grossly inflated became known.

82. Despite of and in the face of all of this knowledge, and despite the fact that they were on notice of serious issues concerning the performance of the Company's products and the blatancy of the accounting violations and misrepresentations, the Individual Defendants recklessly failed to make adequate inquiry and/or take appropriate action to ensure that serious violations of various fiduciary duties would be recognized, tracked and, ultimately, reported through appropriate channels with notice to the full Tarragon Board of Directors.

83. Instead of ensuring that effective compliance reporting and corrective action was built into Tarragon's system of internal controls, by their reckless disregard of known risks, the Individual Defendants instead allowed a culture to persist at Tarragon that placed profits before fiduciary duties and compliance with all applicable laws and regulations.

84. The wrongful acts and omissions at issue constitute violations of law

resulting from the Individual Defendants' bad faith, knowing and reckless failure to take effective action to protect the Company and its shareholders by ensuring compliance by Tarragon with all applicable legal and regulatory requirements. Such conduct is thus not subject to the protection of the business judgment rule, nor are the Individual Defendants protected from personal liability for such bad faith misconduct by virtue of any exculpatory provision in the Company's certificate of incorporation.

85.    As a result of the Defendant Directors' bad faith and reckless breach of fiduciary duty, the Company and its shareholders have suffered, and will further suffer, massive financial harm.

86.    For all of these reasons, all of the Defendant Directors face a substantial likelihood of liability on the claims asserted in this action, making them materially interested with respect to consideration of a pre-suit demand. Accordingly, such demand would be futile, rendering pre-suit demand excused for the purposes of this derivative action.

87.    Moreover, to the extent that the Company presently maintains or previously maintained officers and directors liability insurance coverage, that insurance would be the primary or principal source of any recovery against the defendants, and would be rendered void if the Company commenced proceedings against the Individual Defendants, as these policies uniformly contain provisions which void coverage if the Company brings suit in its own name. For this reason also, demand is excused.

88.    Furthermore, defendant Friedman and affiliates made a $20 million unsecured line of credit available to the Company. The largest aggregate amount of indebtedness under the line of credit in 2005 was $12,488,107. Interest of $49,000

accrued during the year. As of December 31, 2005, there were no amounts outstanding under this line of credit. Effective in January 2006, the line of credit was increased to $30 million and its term extended until January 2008.

89.    Defendant Friedman and affiliates have also pledged 975,000 shares of Tarragon common stock as partial security for a line of credit with a bank. The Company has agreed to indemnify defendant Friedman and affiliates from any loss, cost, or liability associated with this accommodation pledge or the line of credit. As collateral for the indemnification obligations, the Company agreed to pledge shares of the company treasury stock to defendant Friedman and affiliates.

90.    In 1997, the Company formed Ansonia Apartments, L.P., a Delaware limited partnership ("Ansonia"), with Ansonia LLC, a New York limited liability company. Defendants Frary, Rothenberg and others are members in Ansonia LLC, which is the limited partner in Ansonia. Tarragon Development Corporation is the general partner of Ansonia.

91.    In November 2000, the Company formed Ansonia Liberty LLC, a Connecticut limited liability company, for the purpose of acquiring a 124-unit apartment community known as the "Liberty Building" located in New Haven, Connecticut. In October 2001, Frary acquired a 10% member interest in Ansonia Liberty LLC.

92.    In November 2005, the Company contributed its interests in fourteen apartment properties, including the Liberty Building, to Ansonia in exchange for an increased ownership interest in Ansonia, and Frary contributed his interest in Ansonia Liberty LLC in exchange for an individual ownership interest in Ansonia. Simultaneously, Ansonia closed a $391 million non-recourse structured financing secured

by first and second lien mortgages on 23 of its 25 properties and pledges of equity interests in the related property-owning entities.

93.    In 2005, the Company received $64.4 million in cash distributions from Ansonia, including $64 million representing our share of the net proceeds from the structured financing transaction. The Company also received property management fees of $1,142,087 from properties owned by Ansonia. Defendants Rothenberg and Frary received cash distributions of $2,802,593 and $1,167,760 respectively, from Ansonia in 2005. Defendant Frary also received $23,769 in cash distributions from Ansonia Liberty in 2005.

94.    In November 1999, the Company formed Tarragon Calistoga LLC, a Nevada limited liability company, with defendant Frary. The Company has an 80% managing member interest in Tarragon Calistoga LLC, and Frary holds the remaining 20% member interest. Tarragon Calistoga LLC owns (i) a 5% member interest in Calistoga Ranch Owners LLC, a California limited liability company, which owns a property development in Napa Valley, California, and (ii) a 25% member interest in CR Tarragon Palm Springs LLC, a California limited liability company, which owns a Palm Springs, California resort development. In June 2001, Frary received $133,289.50 in distributions from Tarragon Calistoga LLC and the Company received $533,157.99.

95.    Additionally, on February 14, 2005, and with the Company's securities trading at artificially inflated prices, the Company and security-holders sold $62 million of senior convertible notes. These notes were sold with a conversion ratio of 54.4662 shares of the Company's common stock per $1,000 note, which reflected an initial conversion price of $18.36 per share.

96.    Also, during the Relevant Time Period, and with the Company's securities trading at artificially inflated prices, Company insiders sold 4,154,651 shares of the Company's stock for gross proceeds of $9,082,458.  This trading by Company insiders is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of Shares | Price Per Share | Gross Proceeds |
|---|---|---|---|---|
| August 9, 2007 | Friedman, William, S. | 1,381,889 | $0.87 - $2.71 | $2,197,506 |
| August 9, 2007 | Friedman, Lucy N. (wife of Defendant) | 2432578 | $0.81 - $2.60 | $2,490,336 |
| August 8, 2007 | Friedman, Lucy N. (wife of Defendant) | 144200 | $2.90 - $3.60 | $460,422 |
| August 7, 2007 | Friedman, Lucy N. (wife of Defendant) | 15000 | $3.16 - $3.17 | $47,500 |
| June 7, 2007 | Rohdie, Robert | 3700 | $10.50 | $38,850 |
| May 11, 2006 | Weisbrod, Carl B. | 2000 | $17.02-17.12 | $34,000 |
| January 27, 2006 | Clinton, Chris | 1477 | $20.41 | $30,145 |
| December 16, 2005 | Davis, Willie K. | 1720 | $21.78 | $37,461 |
| September 19, 2005 | Liebman, Lance | 2000 | $18.51 | $37,020 |
| September 12, 2005 | Liebman, Lance | 200 | $19.80 | $3,960 |
| September 6, 2005 | Liebman, Lance | 2000 | $21.00 | $42,000 |
| September 6, 2005 | Swenson, Eileen | 20000 | $21.20 | $424,000 |
| September 1, 2005 | Weisbrod, Carl B. | 500 | $21.20 | $10,600 |
| September 1, 2005 | Weisbrod, Carl B. | 3000 | $21.59 | $64,770 |
| August 30, 2005 | Swenson, Eileen | 6100 | $21.31 | $129,991 |
| August 29, 2005 | Liebman, Lance | 2000 | $21.00 | $42,000 |
| August 26, 2005 | Swenson, Eileen | 6400 | $21.16 | $135,424 |

57

## PLAINTIFF'S FIRST CAUSE OF ACTION:
## DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY

| | | | | |
|---|---|---|---|---|
| August 25, 2005 | Swenson, Eileen | 7500 | $21.24 | $159,300 |
| July 18, 2005 | Rohdie, Robert | 1000 | $25.20 | $25,200 |
| June 28, 2005 | Schrag, Raymond | 500 | $23.90 | $11,950 |
| June 28, 2005 | Schrag, Raymond | 500 | $24.50 | $12,250 |
| June 27, 2005 | Friedman, Lucy N. (wife of Defendant) | 25000 | $23.55 | $588,750 |
| June 24, 2005 | Swenson, Eileen | 3500 | $22.07 | $77,245 |
| June 23, 2005 | Swenson, Eileen | 1500 | $22.97 | $34,455 |
| June 17, 2005 | Swenson, Eileen | 5000 | $23.06 | $115,300 |
| May 23, 2005 | Weisbrod, Carl B. | 3000 | $21.80 | $65,400 |
| May 23, 2005 | Weisbrod, Carl B. | 5000 | $21.87 | $109,350 |
| May 18, 2005 | Swenson, Eileen | 13200 | $21.10 | $278,520 |
| May 16, 2005 | Schafran, Lawrence G. | 25500 | $20.50 | $522,750 |
| May 16, 2005 | Liebman, Lance | 7000 | $21.26 | $148,820 |
| May 16, 2005 | Swenson, Eileen | 1300 | $22.11 | $28,743 |
| May 13, 2005 | Swenson, Eileen | 9500 | $22.36 | $212,420 |
| May 12, 2005 | Swenson, Eileen | 6000 | $22.16 | $132,960 |
| May 11, 2005 | Swenson, Eileen | 10000 | $22.71 | $227,100 |
| March 28, 2005 | Weisbrod, Carl B. | 4000 | $21.78 | $87,120 |
| February 24, 2005 | Schrag, Raymond | 787 | $21.24 | $18,840 |
| | TOTAL: | 4,154,651 | | $9,082,458 |

97.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

98.    The Individual Defendants breached their fiduciary duties to the Company and to its shareholders by failing in their responsibility to maintain adequate accounting controls and by employing improper accounting and audit practices and procedures, which artificially inflated the value of the Company's common stock.

99.    All of the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Tarragon in a manner consistent with the operations of a publicly held company.

100.    All of the Individual Defendants failed to properly consider the interests of the Company and its public shareholders and failed to exercise proper supervision and wasted corporate assets by paying bonuses to certain of its executive officers while inflating corporate earnings and putting the Company at risk for millions of dollars of legal liability and/or legal costs to defend the Company.

101.    Individual Defendants' misconduct described above constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

102.    All of the Individual Defendants owe and owed a fiduciary duty to Tarragon to supervise the issuance of its press releases and public filings to ensure that they were truthful and accurate and that they conformed to federal and state law. The Individual Defendants breached their fiduciary duty by failing to properly supervise and monitor Tarragon's accounting practices and the adequacy of its internal financial

controls and audits and by allowing misleading statements and filings to be issued and made. These actions could not have been exercised in good faith or with the prudence required of the business judgment rule to protect the interests of the Company and its shareholders.

103. Nevertheless, the Individual Defendants have engaged in a sustained and systematic failure to exercise their oversight responsibilities to ensure that Tarragon complied with Federal and State Laws, rules and regulations and to ensure the integrity of its financial reporting and statements to the public.

104. As a direct result of the Individual Defendants' breaches and ancillary conduct, Tarragon has been the subject of securities fraud class action lawsuits by allegedly defrauded investors, has lost market share, has had its reputation in the business community tarnished and has thus been damaged.

### PLAINTIFFS' SECOND CAUSE OF ACTION:
### CONTRIBUTION AND INDEMNIFICATION

105. Plaintiff repeats and realleges each and every allegation set forth above.

106. Tarragon is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to defendants' liability to the Company.

107. Tarragon's alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of defendants as alleged above, and Tarragon is entitled to contribution and indemnification from each of the defendants in connection with all such claims that have been, are or may in the future be asserted against Tarragon by virtue of Individual Defendants' misconduct.

108.   Plaintiff has no adequate remedy at law.

**WHEREFORE,** Plaintiff demands judgment as follows:

A.   Directing each and all of the Defendants to account to the Company for all damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

B.   Requiring each and all of the Defendants to return to Tarragon all salaries and the value of other remuneration of whatever kind paid to them by the Company during the time they were in breach of the fiduciary duties they owed to Tarragon.

C.   Directing each and all of the Defendants to pay interest at the highest rate allowable by law on the amount of damages sustained by the Company as a result of Defendants' culpable conduct;

D.   Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

E.   Granting such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Joshua M. Lifshitz
Bull & Lifshitz, LLP
18 East 41st Street
New York, New York 10017
Telephone: (212) 213-6222

## VERIFICATION

Ernest Gottdiener, being duly sworn, deposes and says:

I am a Plaintiff in the above-entitled action, have read the foregoing Verified
Shareholder Derivative Complaint and know the contents thereof, and the same is true to
my own knowledge, except as to the matters therein stated to be alleged upon information
and belief, and as to those matters I believe them to be true.

_Ernest Gottdiener_
Ernest Gottdiener

Sworn to before me this
___ day of _____, 2007

_____
Notary Public

STEVEN P SCHNIPPER
Notary Public of New Jersey
My Commission Exp Oct 14, 2009