UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVE
MAR 06 2008
U.S.D.C S.D N.Y.
CASHIER

———————————————————————— X

ERNEST GOTTDIENER, Derivatively and on )
Behalf of Nominal Defendant, TARRAGON, Inc. )    Civil Action No.: 07CV9436
                                           )
                                           )
                     Plaintiff,            )
                                           )    ECF Case
                                           )    Judge Castel
        vs.                                )
                                           )
WILLIAM S. FRIEDMAN, ROBERT P. ROTHENBERG, )
WILLIE K. DAVIS, LANCE LIEBMAN, LAWRENCE G. )
SCHAFRAN, V.J. SCHRAG, CARL B. WEISBROD,   )
RICHARD S. FRARY, MARTHA E. STARK, ROBERT  )
C. RHODIE, and ERIN DAVIS PICKENS,         )
                                           )
                                           )
                                           )
                                           )    AMENDED COMPLAINT
                     Defendants,           )    (Jury Trial Demanded)
                                           )
        And                                )
                                           )
TARRAGON CORPORATION,                      )
                                           )
                     Nominal Defendant.    )
———————————————————————— X

## AMENDED STOCKHOLDER'S DERIVATIVE COMPLAINT

Plaintiff, Ernest Gottdiener by and through his attorneys of record, brings this Amended Verified Stockholder's Derivative Complaint on behalf of Nominal Defendant Tarragon Corporation ("Tarragon" or the "Company"), and alleges upon personal knowledge as to his own acts and as to all other matters upon information and belief, and based upon the investigation of Plaintiff's counsel, which includes a review of regulatory filings and reports, securities analyst reports and advisories about Tarragon, press releases and other public statements issued by the Company, as follows:

## **INTRODUCTION**

1.     This is a stockholder's derivative action brought by plaintiff, Ernest Gottdiener, who has held Tarragon common stock at all relevant times.

2.     The Individual Defendants (identified below) were or are the members of Tarragon's Board of Directors and/or were officers of the Company.  They have been and are highly compensated and benefit from compensation plans, which provide them with incentives to remain on the Board or in high level management positions and provide further incentives to maintain a high price for Tarragon stock.

3.     The Nominal Defendant, Tarragon, is a Nevada corporation.  Tarragon and its subsidiaries engage in homebuilding and real estate development, and real estate service businesses in the United States.  It develops, renovates, builds, and markets high and mid-rise condominiums; town homes, traditional new developments, and low-rise condominiums; and low and mid-rise rental apartment communities in the urban locations and communities.  The Company also engages in land development and conversion of existing rental apartment communities to condominiums.  In addition, it offers real estate services, such as property management, condominium management, and acquisition and renovation of apartment properties, as well as provides mortgage lending services.

4.     As of December 31, 2006, Tarragon had 35 residential communities with 4,560 homes or home sites in inventory or under development in 6 states; and approximately 14,600 apartments in 12 states, including 11,000 in rental communities and 3,300 in condominium conversion communities.  The Company was founded in 1973

and is based in New York, New York.

5.    On March 19, 2007, Tarragon informed investors that it planned to spin-off its Homebuilding Division as an independent publicly traded company during the year.  As a result, the Company informed investors that it was withholding its financial guidance until the spin-off was completed.  Additionally, the Company stated that its goal for 2007 was "to validate the confidence our investors have placed in the strength of our long term strategy, aggressively manage our balance sheet, and improve earnings over 2006."

6.    On July 17, 2007, *Bloomberg* reported that the Company's auditor had "failed to obtain sufficient competent evidential matter to support its audit opinion" regarding the Company's financial statements, and had "failed to identify an accounting violation that it should have identified and addressed before issuing its audit report." The article further disclosed that Tarragon had left a 90 percent owned partnership off of its balance sheet.

7.    Then on August 9, 2007, the Company shocked investors when it reported that it was unable to timely file its Quarterly Report because it needed additional time "to finalize its evaluation of property impairment charges and other write-downs necessitated by the recent decision to sell certain properties." The Company also disclosed that it was unable to obtain loan modifications and other financing, which had materially affected the Company's liquidity, and raised doubt about its ability to continue as a going concern. Additionally, the Company's Board of Directors had formed a special committee "to evaluate strategic and financial alternatives that may be available to Tarragon and its stakeholders," including "all available forms and sources of financing, property sales and

other strategic transactions." Finally, the Company stated that it was postponing the spin-off of its homebuilding business, and that it expected to record impairment charges in excess of $125 million.

8.    On this news, the Company's shares declined $1.88, or over 66.6 percent, to close on August 9, 2007 at $0.91 per share, on unusually heavy trading volume.

9.    The Complaint alleges that, throughout the relevant time period of January 5, 2005 through the present (the "Relevant Period"), defendants failed to disclose material adverse facts about the Company's financial well-being, business relationships, and prospects. Specifically, defendants failed to disclose or indicate the following: (1) that the Company had failed to consolidate a limited partnership into its consolidated financial statements; (2) that the Company had failed to properly report its consolidated statement of cash flows by misclassifying items among its operating, investing and financing activities; (3) that the Company had failed to timely take property impairment charges and other write-downs on certain properties; (4) that the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (5) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times; (6) that the Company was experiencing liquidity issues due to its inability to obtain loan modifications and financing; (7) that the Company lacked adequate internal and financial controls; and (8) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects for 2007 were lacking in a reasonable basis when made.

10.    As a result of defendants' wrongful acts and omissions, and the

precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

11.     Nevertheless, had the Individual Defendant directors of the Company, as identified below, fulfilled their responsibilities to the Company and its shareholders, they would have recognized the Company's financial and administrative controls were entirely inadequate, and they would have implemented changes required to ensure compliance with effective financial and administrative controls and accurate financial reporting.

12.     Accordingly, it is alleged that as a result of the reckless breach of their fiduciary duties to monitor and put into place reasonable control and review procedures, the Individual Defendants have inflicted upon the Nominal Defendant Tarragon severe and continuing damages.

## PARTIES

13.     Plaintiff Ernest Gottdiener is and, at the times of the wrongs complained of herein, was an owner of Tarragon common stock and is domiciled in the state of Florida.

14.     Nominal Defendant Tarragon is a Nevada Corporation that maintains its executive offices at 423 West 55th, 12th Floor, New York, New York.

15.     Defendant William S. Friedman ("Friedman") is a resident of the State of New York and was at all relevant times the Company's Chairman of the Board and Chief Executive Officer ("CEO") of the Company.

16.     Defendant Robert P. Rothenberg  ("Rothenberg") is a resident of the State of New York and was at all relevant times the Company's President, Chief Operating Officer ("COO"), Chief Executive Officer of Tarragon Development Corporation and

director of the Company.

17.    Defendant Willie K. Davis ("Davis") is a resident of the State of New York and was at all relevant time a director of the Company.

18.    Defendant Lance Liebman ("Liebman") is a resident of the State of New York and has been a member of the Company's Board of Directors since 1998.

19.    Defendant Lawrence G. Schafran ("Schafran") is a resident of the State of New York and has been a member of the Company's Board of Directors since 1998.

20.    Defendant Raymond V.J. Schrag ("Schrag") is a resident of the State of New York and has been a member of the Company's Board of Directors since 1998.

21.    Defendant Carl B. Weisbrod ("Weisbrod") is a resident of the State of New York and has been a member of the Company's Board of Directors since 1998.

22.    Defendant Richard S. Frary ("Frary") is a resident of the State of New York and has been a member of the Company's Board of Directors since 2004.

23.    Defendant Martha E. Stark ("Stark") is a resident of the State of New York and has been a member of the Company's Board of Directors since 2005.

24.    Defendant Robert C. Rohdie ("Rohdie") is a resident of the State of New York and has served as a member of the Board of Directors and as President and Chief Executive Officer of Tarragon Development Corporation, a wholly owned subsidiary responsible for real estate development and renovation projects, from February 2000 through August 14, 2007.  In February 2000, Tarragon entered into an agreement to acquire the interests of Robert C. Rohdie and his affiliates in ten apartment communities. Defendant Rohdie, Tarragon's partner in the development of these projects, contributed his equity interests to Tarragon Development Company, LLC ("TDC"), an operating

entity the Company formed, in exchange for a preferred interest in TDC of $10 million. Defendant Rohdie's preferred interest in TDC earned a guaranteed return until September 30, 2006, when he converted his preferred interest into 668,096 shares of the Company's common stock and 616,667 shares of the Company's 10% cumulative preferred stock in accordance with the terms of the operating agreement of TDC. Defendant Rohdie received distributions of $770,366, $623,556 and $421,889 in 2006 (through the date of the conversion), 2005 and 2004, respectively, in payment of his guaranteed return.

25.    Defendant Erin Davis Pickens ("Pickens") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and Executive Vice President.

26.    Defendants in paragraphs 15-25 are collectively referred to hereinafter as the "Individual Defendants."  During the Relevant Time Period, each of the Individual Defendants, as senior executive officers and/or directors of Tarragon, were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

## **ADDITIONAL PERSONS**

27.    Beachworld Partners, L.P. ("Beachworld") is a Texas limited partnership

the business address of which is 423 West 55th Street, 12th Floor, New York, New York 10019. Defendant Friedman is the sole general partner of Beachworld and Lucy Friedman, defendant Friedman's wife, and their four children (Ezra H. Friedman, Tanya E. Friedman, Gideon Z. Friedman, Samuel N. Friedman) are Beachworld's partners. Beachworld jointly filed Schedules 13D with defendant Friedman with respect to their ownership interest in Tarragon. In addition, Beachworld has many other entangling business relationships with Tarragon.

28.    Grant Thornton LLP ("Grant Thornton") is the U.S. member firm of Grant Thornton International, a global accounting, tax and business advisory organization, which maintains its national headquarters at 175 West Jackson Boulevard, 20th Floor, Chicago, IL 60604. Grant Thornton made statements in its audit on Tarragon's financial statements for the fiscal years ended December 31, 2004, 2005, 2006 which, with Grant Thornton's consent, were included in the Forms 10-K filed by Tarragon with the SEC for those fiscal years. In addition, Grant Thornton reviewed Tarragon's Forms 10-Q prior to their being filed with the SEC.

29.    At all times herein, the Individual Defendants, in performing each and all of the acts and/or non-actions described herein, functioned as the employees, agents, control persons and/or co-conspirators with each and every other Individual Defendant identified herein.

## VENUE AND JURISDICTION

30.    Both the venue and jurisdiction of this matter are proper in that the Nominal Defendant is headquartered in and at all times mentioned herein has and continues to do business in New York, New York. Moreover, much of the preparation of

the materially misleading and false public statements occurred in this District.

## DUTIES AND OBLIGATIONS OF DIRECTORS

31.     The Individual Defendants owed Tarragon and its shareholders fiduciary duties including the duties of care and loyalty that require, *inter alia*, that they control and manage the company in a fair, just, honest and equitable manner.

32.     To discharge their legal duties, the Director Defendants were required to exercise reasonable and prudent supervision over, and keep themselves informed of Tarragon's senior management, policies, practices, controls and financial affairs which included, *inter alia*, taking steps necessary to ensure that adequate policies and reporting systems existed at Tarragon and functioned properly to ensure that relevant government rules and regulations under which Tarragon and its subsidiaries operated were followed, so as to prevent the engaging in of improper financial reporting and promote the efficient and proper use and preservation of its property and assets and engage in fair dealing with the investing public.

33.     Moreover, Director Defendants, due to their substantial experience and expertise in the specialized area of business management, were aware of the highly fiduciary nature of the business -- that is, they were aware that Tarragon, as a publicly-owned business, was in a position of heightened trust and confidence with respect to the monies and the persons who invested their money in the business, and that this relationship gives rise to fiduciary duties and potential liabilities to the entities and persons to whom those duties are owed.  Accordingly, their duties of loyalty, good faith and care to Tarragon and its shareholders required that they take appropriate action to ensure compliance by the Company with the fiduciary duties owed to third parties, so as

9

to protect the Company and its shareholders from losses arising from liability for breach of those duties.

34.     Further, the Director Defendants, pursuant to Nevada law, to the extent that they exercised control over management of the business and affairs of Tarragon and its subsidiaries, were required to use their knowledge, experience and ability to control and direct Tarragon management in furtherance of the best interests of Tarragon and its shareholders.  In addition, as many of the Director Defendants have, and at all relevant times had, special knowledge, skill, expertise and experience directly gained as a result of, among other things, their executive roles at Tarragon; and other financial services-related entities.

35.     These individual Director Defendants were required to use their special knowledge, skill, expertise and experience for the benefit of, *inter alia*, Tarragon and its subsidiaries, in the exercise of their judgment as directors of Tarragon.

36.     Thus, pursuant to their membership on the Board, as well as on various Committees of the Board, and, in some cases, positions as senior executive and managers at Tarragon, the Director Defendants, pursuant to Nevada law, owed the Company and its stockholders fiduciary obligations of candor, fidelity, trust, and loyalty, and are and were required to use their ability to control and direct Tarragon in a fair, just, and equitable manner, as well as to act in furtherance of the best interests of Tarragon and its stockholders.  In addition, while they occupied their directorships, the Individual Defendants owed Tarragon the fiduciary duty to exercise due care and diligence in the management and administration of the affairs of the Company, and in the use and preservation of its property and assets.

37.    To discharge the aforesaid duties under Nevada law, the Individual Defendants were required to exercise reasonable and prudent supervision over management and the policies, practices, controls, and financial affairs of the Company pursuant to their fiduciary obligations to use the same care and diligence as would an ordinary prudent person in a like position.  Specifically, the Individual Defendants were required, among other things:

(a)    Manage, conduct, supervise and direct the business affairs of Tarragon in accordance with applicable state and federal law and rules and regulations;

(b)    Neither violate nor permit any officer, director, agent or employee of Tarragon to violate applicable state laws, federal laws, rules, regulations;

(c)    Establish and maintain systematic and accurate books and records of the business and affairs of Tarragon and procedures for the reporting of the business and affairs to the Board of Directors, and periodically investigate, or cause independent investigation to be made of, said books and records;

(d)    Maintain and implement an adequate and functioning system of internal financial and accounting controls, such that Tarragon financial statements and other publicly disseminated information would be accurate;

(e)    Exercise supervision over the public statements made and/or issued to the securities markets relating to Tarragon;

(f) Remain informed as to the status of Tarragon's business, conditions, practices and operations, and upon receipt of notice or information of imprudent or unsound practices or operations, make reasonable inquiry in connection therewith, and take steps to correct such practices or operations and make such disclosures as are necessary to comply with state and federal securities laws;

(g) and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

38. Notwithstanding the above-referenced duties, the Individual Defendants, in carrying out their functions for the Nominal Defendant Company, breached their fiduciary duties by, among other things:

(a) permitting wrongful business practices to occur which had the effect of manipulating revenues and earnings;

(b) inadequately supervising the employees, managers and putative independent auditors of Tarragon and failing to instruct and ensure that they acted with honesty and integrity in order to preserve and enhance Tarragon's reputation in the business community;

(c) recklessly exposing Tarragon to millions of dollars of damages, including costs associated with class actions brought by shareholders of the Company for violations of federal securities laws; and

(d)  failing to institute legal action against those officers, directors, contractors and/or and employees of the Company, responsible for permitting Tarragon to engage in the conduct complained of herein.

## SUBSTANTIVE ALLEGATIONS AND BACKGROUND

### Background

39.  Tarragon is a homebuilder and real estate developer with multiple business lines.  The Company's homebuilding and real estate development segment focuses on developing, renovating, building and marketing homes in high-density, urban locations and planned communities.

### Materially False and Misleading
### Statements Issued During the relevant Time Period

40.  The Relevant Time Period begins on January 5, 2005.  On this day, the Company issued a press release entitled "Tarragon Corporation Affirms 2004 Guidance And Releases 2005 Earnings Forecast." Therein, the Company, in relevant part, stated:

> Tarragon Corporation (Nasdaq: TARR), a leading homebuilder specializing in the development and marketing of high-density residential communities and a real estate investor with a portfolio of approximately 14,000 apartments, today reaffirmed its previous guidance for 2004, forecasting net income of $42 to $46 million, or approximately $2.40 to $2.60 per share, versus net income for fiscal 2003 of $31.2 million or $1.80 per share in each case on a fully diluted basis.

> Tarragon Corporation simultaneously announced its 2005 earnings guidance.  Net income for fiscal 2005 is expected to be $75 to $80 million, or approximately $3.85 to $4.10 per share, fully diluted, based on projected total consolidated revenue of $475 to $525 million.  Most of the growth in earnings and revenue is from closings that are included in the $400 million Homebuilding Division contract backlog.  Homebuilding Division pretax net income is expected to range from $110 to $115 million.

> Homebuilding Division sales revenue, including revenue from unconsolidated joint ventures, is projected to be $700 to $750 million with a gross margin over 24 percent.
>
> Investment Division growth in 2005 will come from the completion and lease-up of the 860 rental apartments currently under development, as well as opportunistic acquisitions of existing communities such as the 510 apartment portfolio in Manchester/West Haven, Connecticut, currently under purchase contract. Moreover, based on higher occupancy and rent levels, especially in Florida, Tarragon anticipates Investment Division net operating income, including net operating income from unconsolidated joint ventures, of $65 to $70 million, a 5 percent improvement over 2004.
>
> Tarragon Chairman and Chief Executive Officer, William S. Friedman, commented, "2004 was a banner year for the Homebuilding Division and 2005 should be even better.  Our investments over the past 12 to 36 months, in both product and people, are now bearing fruit.  We look forward to continuing to find and develop new projects as we realize revenues from our growing number of active, for-sale communities."

41.    On March 16, 2005, the Company issued a press release entitled "Tarragon Corporation Reports Record Results for 2004; Company Will Expand Homebuilding and Strengthen Balance Sheet by Selling Substantial Portion of Rental Portfolio." Therein, the Company, in relevant part, stated:

> Tarragon Corporation (Nasdaq: TARR), a leading urban homebuilder specializing in the development and marketing of high-density residential communities, announced today that its consolidated revenues for 2004 grew to $311 million, up 136 percent from revenues of $131.6 million in 2003.  Increased revenue primarily reflects strong home sales, which grew, on a consolidated basis, from $56.3 million in 2003 to $220.5 million in 2004.
>
> The Company also reported record profits of $44.7 million, representing a 43 percent increase over 2003 net income of $31.2 million.  Following the Company's 3-for-2 stock split that was effective February 10, 2005, and on a fully diluted per-share basis, earnings increased 41 percent year-to-year from $1.20 to $1.69. Income tax expense in 2004 was $15 million, while in 2003 there

was no income tax due to the application of net operating loss carry-forwards.

As a result of the growth in profitability of the Company's homebuilding business, Tarragon has adopted a strategic plan to sell a substantial portion of the assets in its rental portfolio (Investment Division). The Company will redeploy the capital now invested in these rental properties to support further expansion of homebuilding and to strengthen its balance sheet.

Chairman and CEO William Friedman commented, "Tarragon is now principally an urban homebuilder, and to a much lesser extent an owner and manager of rental properties. Virtually all of our operating profits come from homebuilding while over half of our assets are still invested in rental properties. Moreover, the large amount of debt associated with our rental properties distorts the financial strength of our Company, impeding our continued rapid growth. At the same time, the market value of our rental properties has continued to increase due to their performance and current market conditions. As a result, we see an opportunity to realize cash through the sale of our rental properties and redeploy a substantial portion of the capital invested in the rental portfolio to reduce debt and expand our homebuilding activities. We plan on retaining approximately 2,000 apartments for conversion to condominiums or redevelopment."

Friedman said that Tarragon, together with its investment bankers, Lazard Freres & Co. LLC, examined various strategies for obtaining the best value for shareholders from the investment portfolio, including a spin-off and IPO. He said that the analyses demonstrated that the maximum shareholder value is likely to result from selling a substantial portion of the portfolio to support the fast-growing and highly profitable homebuilding operations.

Friedman added, "Using the rental portfolio as a non-dilutive source of further homebuilding capital will be, we believe, strongly accretive to earnings while allowing us to reduce debt and get the highest possible return on shareholder assets."

42. Also on March 16, 2005, Tarragon filed its Annual Report with the SEC on Form 10-K. The Company's 10-K was signed by the Individual Defendants, among others, and reaffirmed the Company's financial results announced on the same day.

43. The Company's 10-K filed on March 16, 2005 also contained Sarbanes-

Oxley required certifications, signed by Defendants Friedman and Pickens, who stated:

I, [William S. Friedman and Erin D. Pickens], certify that:

1.  I have reviewed this annual report on Form 10-K of Tarragon Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules l3a-15(f) and 15d-15(t)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

16

      c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

      d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

      a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

***

Each of the undersigned officers of Tarragon Corporation [William S. Friedman and Erin D Pickens], a Nevada corporation (the "Company"), hereby certifies that (i) the Company's Annual Report on Form 10-K for the year ended December 31, 2004, fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 and (ii) the information contained in the Company's Annual Report on Form 10-K for the year ended December 31, 2004, fairly presents, in all material respects, the financial condition and results of operations of the Company, at and for the periods indicated.

44.      The 2004 Form 10-K also contained a statement from defendant Grant

Thornton representing that it had conducted an audit of Tarragon in accordance with Generally Accepted Auditing Standards ("GAAS") and that the Company's financial results for the fiscal year ended December 31, 2004, were reported in conformity with Generally Accepted Accounting Principles ("GAAP"). Specifically, Grant Thornton addressed a letter dated March 15, 2005, to Tarragon's stockholders and board of directors, which was included with its consent in the 2004 Form 10-K, stating that:

> We have audited the accompanying consolidated balance sheets for Tarragon Corporation and subsidiaries as of December 31, 2004 and 2003, and the related consolidated statements of income, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2004. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States of America). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a text basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

> In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Tarragon Corporation and subsidiaries, as of December 31, 2004 and 2003, and the consolidated results of their operations and their consolidated cash flows for each of the three years in the period ended December 31, 2004 in conformity with accounting principles generally accepted in the United States of America.

> As discussed in Note 1 to the consolidated financial statements, the Company adopted, Statements of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets," No. 144 "Accounting for the Impairment or Disposal of Long-Lived Assets," and the fair value accounting method of No. 123

"Accounting for Stock-Based Compensation" in 2002 and No. 145 "Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections" in 2003, and Financial Accounting Standards Board Interpretation 46-R "Consolidation of Variable Interest Entities" in 2004.

We also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States of America), the effectiveness of Tarragon Corporation's internal control over financial reporting as of December 31, 2004, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 15, 2005 expressed an unqualified opinion on management's assessment of, and an adverse opinion on the effective operation of, internal control over financial reporting.

45.    On April 22, 2005, the Company agreed to purchase a 30% interest in Fenwick Tarragon Apartments, LLC from Felboa, Inc. ("Felboa") for a $967,000 promissory note secured by 55,402 shares of Tarragon common stock. Felboa had the right at the maturity of the promissory note on January 6, 2006, to either retain the common stock or to receive the $1 million and return the common stock.

46.    On May 10, 2005, Tarragon filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendants Friedman and Pickens, and contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶43, *supra*. The Form 10-Q also contained the following representation concerning the preparation and presentation of the financial statements contained in the Form 10-Q:

The accompanying Consolidated Financial Statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X.

47.     On May 11, 2005, the Company issued a press release entitled "Tarragon" Corporation Reports First-Quarter 2005 Results; Net Income $21.6 Million vs. $1.9 Million; Value of Active Developments and Pipeline Soars 74 Percent to $3.3 Billion, Raises Guidance on 2005 Homebuilding Sales and Earnings." Therein, the Company, in relevant parts stated:

> Tarragon Corporation (Nasdaq: TARR), an urban homebuilder specializing in the development and marketing of high-density residential communities, today announced its first-quarter 2005 results and provided higher guidance for 2005.
>
> Total consolidated revenues increased 57 percent to $80.6 million, from first-quarter 2004 revenues of $51.4 million.  Consolidated homebuilding sales rose 76 percent to $63.6 million, from first quarter 2004 homebuilding sales of $36.1 million.  Net income, after provision for income taxes of $139 million, was $21.6 million in the first quarter of 2005 versus $1.9 million for the same period last year.  There was no provision for income taxes in the first quarter of 2004. Income from continuing operations, after a tax provision of $7.3 million, grew six-fold to $11.4 million compared to $1.8 million in the first-quarter 2004, which had no tax provision.  Fully diluted earnings-per-share for the first-quarter 2005 were $0.70 compared to $0.07 per share for the first-quarter 2004.
>
> Tarragon's rapid growth is illustrated by the following:
>
> - Total homebuilding revenue, including revenue from unconsolidated subsidiaries, grew 233 percent from $36.1 million in the first quarter of 2004 to $120 million in the first quarter of 2005
>
> -  527 homes worth $178 million were delivered in the first quarter of 2005, compared to 85 homes worth $17.7 million in the first quarter of 2004
>
> - 800 new contracts worth $257.6 million were signed in the first quarter of 2005 versus 315 contracts worth $47.6 million during the like period in 2004. The average price of the new contracts signed in 2005 was $322,000 compared to $250,000 in 2004

- Total contract backlog as of March 31, 2005, increased 81 percent to $423.5 million from $234 million at March 31, 2004

- Total value of homes in active developments (including backlog) increased 80 percent from $1.0 billion at March 31, 2004, to nearly $1.8 billion at March 31, 2005

- The pipeline of future developments nearly doubled over the past twelve months from 2,600 homes, with a potential sales value of $880 million as of March 31, 2004, to over 5,100 homes with an estimated sales value of $1.5 billion as of March 31, 2005.

Tarragon Chairman and CEO William Friedman commented, "The pace of our homebuilding activity continues to accelerate -- sales, closings, acquisitions and new opportunities. We foresee continued rapid growth in the quarters ahead, and anticipate delivering more than 3,000 homes to buyers during the remainder of 2005. Despite moving several projects from pipeline to active development our pipeline grew 23 percent in the first quarter. This expanding pipeline, coupled with our active developments, now totals more than 10,000 homes."

**Capital Redeployment Activities**

Tarragon's capital redeployment strategy announced in March 2005 is proceeding rapidly. The Company is developing a disposition strategy for 39 rental properties with a market value of $275 million. Twenty seven of these properties are being actively marketed for sale. Of these, the Company has contracts or offers in hand on 14 properties totaling $96.6 million, which would result in pre-tax gains on sale of approximately $44 million.

Tarragon has also identified a portfolio of 27 high-quality rental properties, representing 6,500 units with a fair market value in excess of $500 million that it hopes to refinance and contribute to a joint venture with a financial partner to free up approximately $150 million in capital and reduce consolidated debt by over $190 million. These properties, in Connecticut and the southeast, achieved same-store NOI growth of 8.2 percent in the first quarter of 2005 compared to same quarter of 2004. Tarragon expects to manage the proposed joint venture and retain a minority interest in it. The joint venture is expected to acquire existing apartment communities within core markets and buy new rental properties to be developed by Tarragon.

Finally, eight rental properties comprising 2,500 apartments with a book value of $178 million will be retained for conversion to condominiums as market conditions warrant. These properties have an estimated condominium sellout exceeding $400 million.

Friedman commented, "Since adopting this strategic plan in mid- March we have moved quickly to implement it. We will continue to provide updates on the redeployment program throughout the year."

**Revised Guidance**

In January 2005, Tarragon estimated 2005 net income of $75 to $80 million. This estimate assumed $53 to $58 million of after-tax income from continuing operations (principally homebuilding activities) and $22 million in after-tax gain on sale of properties. With the decision to substantially divest the rental portfolio, Tarragon expects to realize extraordinary gains on sale of properties in 2005 that will materially exceed the January guidance.

Accordingly, the Company believes that for 2005, guidance based on its after-tax income from continuing operations (essentially excluding gain on property sales) will be more meaningful. Based on current backlog and activity, Tarragon expects total Homebuilding sales, including revenue from unconsolidated joint ventures, to range from $775 million to $825 million for 2005, which is 10 percent higher than the guidance issued in early January. Based on this increased sales volume, and somewhat higher than originally anticipated margins, Tarragon is increasing its guidance for after-tax income from continuing operations by 33 percent to a range of $70 to $75 million.

48.     On July 18, 2005, Tarragon issued a press release announcing an offer to convert its outstanding 8% Senior Convertible Notes due 2009 purportedly in order to simplify its capital structure. Tarragon offered 81.6993 shares of common stock and $50 in cash for each $1,000 principal amount of convertible notes tendered.

49.     On August 9, 2005, the Company issued a press release entitled "Tarragon Corporation Reports Second-Quarter 2005 Results; Revenue Up by 51 Percent; Backlog Up by 75 Percent; Pipeline Grows to 7,000 Homes." Therein, the Company, in relevant

part, stated:

> Tarragon Corporation (Nasdaq: TARR), a leading homebuilder specializing in the development and marketing of high-density residential communities, announced its second-quarter results and affirmed its guidance for 2005.
>
> Total revenues for the quarter ended June 30, 2005, increased to $85 million, 51 percent higher than second-quarter 2004 revenues of $56.1 million. Net income for the second quarter ended June 30, 2005, was $9.1 million, versus $17.2 million in the prior year's second quarter, which included an income tax benefit, gain on sale and other nonrecurring items of $12.7 million. Diluted earnings per share for the second quarter 2005 were $0.30 compared to $0.65 in the second quarter of 2004. Pre-tax earnings from continuing operations increased 43 percent to $13.2 million this quarter from $9.3 million in the second quarter 2004.
>
> For the six-month period revenues were $164.1 million, up 55 percent over the prior period revenues of $106.1 million. The six- month net income was $30.7 million, up 60 percent over the prior year net income of $19.1 million, which also included the income tax benefit, gain on sale and other nonrecurring items mentioned above. Diluted earnings per share for the six-month period were $0.99 compared to $0.73 in the prior year.
>
> Tarragon Chairman and CEO William Friedman commented, "Revenues for the quarter grew by 51 percent. This increase is even more impressive when we note that more than $40 million in sales were pushed out to the third quarter ending September 30 due to an unusual delay in processing condominium filings for one sold out condominium conversion project in Florida; those sales have now closed. Sales and pricing in all markets where we are participating continue to meet our highest expectations. Last weekend, for example, we signed contracts for 47 homes worth $14 million. Based on our growing contract backlog and the continued high rate of new sales, we affirm our guidance for the year."
>
> Consolidated homebuilding revenue rose 64 percent to $69.1 million, from second-quarter 2004 homebuilding revenue of $42.1 million. Total homebuilding revenue including revenue from unconsolidated joint ventures, grew 217 percent from $42.1 million in the second quarter of 2004 to $133.3 million in the second quarter of 2005. For the six-month period ended June 30, 2005, consolidated and unconsolidated homebuilding revenue

increased to $253.4 million (including $68.4 million accounted for under the percentage of completion method on four projects), up 224 percent over the same period last year.

The increase continues a growth trend that has seen record numbers of home deliveries. In the quarter ended June 30, 2005, 651 homes worth $163.5 million were delivered, compared to 77 homes worth $18.2 million in the second quarter of 2004. For the six-month period, 1,178 homes worth $341.5 million were delivered, compared to 162 homes worth $35.9 million during the same period last year.

Income from Continuing Operations, after provision for income taxes of $5.2 million, was $8.1 million in the second quarter of 2005. Second quarter 2004 Income from Continuing Operations of $14.3 million included a $5.0 million income tax benefit resulting from the Company's reversal of a valuation allowance against a deferred tax asset. For the six months ended June 30, 2005, Income from Continuing Operations before income tax tripled to $32 million from $10.8 million for the same period 2004.

                                    ***

**Company Affirms Guidance**

Based on the current backlog and scheduled closings, as well as additional sales volume expected to be generated from its active communities, Tarragon affirmed its earlier Guidance of 2005 After Tax Income from Continuing Operations of $70 - $75 million dollars.

50.     Also, on August 9, 2005, Tarragon filed its Quarterly Report with the SEC on Form l0-Q. The Company's l0-Q was signed by Defendants Friedman and Pickens, and reaffirmed the Company's financial results announced on the same day. The Company's l0-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶43, supra.

51.     On August 23, 2005, $54.25 million of Senior Convertible Notes were converted into 4,432,181 shares of Tarragon common stock pursuant to the terms of the revised offer to holders of the Senior Convertible Notes.

                                    24

52.     On November 9, 2005, the Company issued a press release entitled "Tarragon Reports Record Results for Third Quarter 2005; Raises Full-year 2005 Estimate and Guides 2006 Earnings per Share from Continuing Operations with Growth of at Least 65 Percent Over 2005." Therein, the Company, in relevant part, stated:

> Tarragon Corporation (Nasdaq: TARR), the urban homebuilder specializing in the development and marketing of high-density residential communities, announced its third-quarter results and raised its guidance for 2005.

**Third-quarter Financial highlights:**

- Fully diluted EPS reached $1.70 vs. $0.14 in the prior year

- Fully diluted EPS from continuing operations of $1.01 vs. $0.14 in the prior year

- Total consolidated homebuilding revenues of $243.4 million, representing a 328 percent increase over third quarter 2004

- Home deliveries of 1,160 at an average price of $243,000, resulting in sales of $281.0 million

- New orders of 962 homes worth $271.0 million, at an average price of $282,000

- Backlog value $540.0 million, up 51 percent over the previous year backlog of $357.0 million

- Total value of active developments increased to more than $2.3 billion, representing over 7,500 homes in 43 communities

- Additional future development pipeline of 8,600 homes in 24 communities

- Stockholders' equity as of September 30, 2005, of $291.3 million, up from $130.6 million one year earlier

**2005/2006 Guidance:**

- 2005 EPS from continuing operations of $2.27 - $2.42, up from $2.17 - $2.32 (excludes estimated income from previously announced investment division capital redeployment program

and the charge associated with conversion of senior convertible notes)

- 2006 consolidated homebuilding revenues of at least $1.0 billion and EPS from continuing operations of at least $4.00 representing an increase of more than 65 percent over 2005 revised guidance.

2005 third-quarter net income was $50.5 million, or $1.70 per fully diluted share, compared to $3.9 million, or $0.14 per fully diluted share in 2004. Included in third-quarter 2005 net income is $22.4 million in after-tax gains on sale of investment assets. Total consolidated revenues for the quarter ended September 30, 2005, increased 264 percent to $260.1 million from third-quarter 2004 revenues of $71.5 million. Income from continuing operations increased more than seven-fold to $28.1 million this quarter from $3.8 million in the third quarter 2004. Third-quarter 2005 income from continuing operations included a one-time charge of $7.2 million relating to the conversion of $54.25 million of senior convertible notes into common stock.

Net income for the nine-month period was $81.1 million, or $2.70 per fully diluted share, up 252 percent over the prior year net income of $23.0 million, or $0.87 per fully diluted share. Included in the 2005 net income is $31.4 million of after-tax gains on sales of investment assets compared to $2.7 million for the same period last year. For the nine-month period total consolidated revenues were $425.4 million, up 138 percent over the prior period revenues of $178.7 million. For the nine months ended September 30, 2005, income from continuing operations was up 143 percent to $47.8 million, or $1.67 per fully diluted share, from $19.7 million, or $0.74 per share, for the same period 2004.

Consolidated homebuilding revenue rose 328 percent to $243.4 million from third-quarter 2004 homebuilding revenue of $56.9 million. Total homebuilding revenue, including revenue from unconsolidated joint ventures, grew 442 percent to $308.5 million in the third quarter 2005, from $56.9 million in the third quarter of 2004. For the nine-month period ended September 30, 2005, consolidated and unconsolidated homebuilding revenue increased to $561.9 million, up 316 percent from $135.1 million in 2004.

Tarragon Chairman and CEO William S. Friedman commented, "Sales have continued at a strong pace in Florida, South Carolina and New Jersey. October was one of our strongest months ever with 429 new orders worth $92.0 million, despite lost

selling days due to weather. Based on the strength of this quarter's results and our contract backlog which, as of October 31, stood at $600.0 million, we have raised our guidance for the year and set a floor to our 2006 earnings expectations of $4.00 per share, fully diluted."

\*\*\*

**Company Raises 2005 Guidance and Announces 2006 Guidance**

Based on the current backlog and scheduled closings, Tarragon is raising its 2005 guidance of after-tax income from continuing operations to $73.0 - 78.0 million or $2.27 - $2.42 per fully diluted share, before income from the investment division capital redeployment program and costs associated with the conversion of its senior convertible notes in August 2005.

Tarragon also announced that it anticipates 2006 consolidated revenues in excess of $1.0 billion and income from continuing operations of at least $4.00 per fully diluted share.

53.    Also on November 9, 2005, Tarragon filed its Quarterly Report with the SEC on Form l0-Q. The Company's 10-Q was signed by Defendants Friedman and Pickens, and reaffirmed the Company's financial results previously announced on the same day. The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶43, supra.

54.    On November 16, 2005, Tarragon filed a Form 8-K with the SEC containing a slide presentation of a presentation defendant Friedman intended to make to professional investors at the Southwestern Showcase 2005 in Irving, Texas. The presentation projected 2005 after-tax income from continuing operations of $2.35 per share up 90% from 2004 and 2006 after-tax income from continuing operations of $4.00 per share on revenue of $l billion. The presentation also contained a slides titled "Tarragon - Strong Growth and Momentum" showing increasing year-end common stock

27

price for Tarragon and increasing income from continuing operations. A separate slide titled "Significant Growth in Sales Backlog" showed an increasing trend in the number of sales contracts and the aggregate amount of such backlogs. Another slide titled "Concentration in Markets with Pent-Up Demand" contained images of the 7 states in which Tarragon operated (Florida, New York, New Jersey, Connecticut, Texas, Tennessee and South Carolina) with a description of the number and type of pending projects in each state.

55.    On March 15, 2006, the Company issued a press release entitled "Tarragon Corporation Announces Record 2005 Financial Results." Therein, the Company, in relevant part, stated:

- 2005 Net Income of $146 Million or $4.71 Per Diluted Share Up 231 Percent

- Income From Continuing Operations of $3.36 Per Diluted Share, Up 173 Percent

- Full-Year Consolidated Revenue Up 102 Percent

- Total Homebuilding Sales Up 133 Percent

- Board Authorizes Additional One Million Share Repurchase Plan

- Company Announces $0.10 Per Share Dividend

- 2006 Guidance of $3.70 to $4.20 Income From Continuing Operations Per Diluted Share

Tarragon Corporation (Nasdaq: TARR), a leading urban homebuilder specializing in the development and marketing of high-density residential communities, today announced record financial results for the year ended December 31, 2005.

Tarragon also announced an annual dividend of $0.10 per share, payable on May 1, 2006 to shareholders of record as of the

close of business on April 10, 2006, and a one million share increase in share repurchase authorization.

Consolidated revenue for the full year 2005 was $571.9 million, up 102% from $282.9 million in 2004. Substantially all of the revenue increase was due to very strong homebuilding sales, which for the year totaled $504.7 million, up 129% from $220.5 million in 2004. Homebuilding sales, including revenue from unconsolidated properties, were $735.5 million in 2005, up 133% from $315.5 million in 2004.

Net income for 2005 was $145.8 million, or $4.71 per diluted share, compared to $44.7 million, or $1.65 per diluted share, in 2004.

"Tarragon has posted a record year with these solid financial results," said Chairman and CEO William S. Friedman. "Our focused growth strategy is gaining traction and we expect to continue that momentum in 2006, even as the unprecedented growth rates that our industry has enjoyed in the past few years begin to moderate. We continue to strengthen our balance sheet and take steps to allow investors to participate in our growth, including declaring a dividend and repurchasing shares in the market. We believe that the long-term industry fundamentals remain very strong, especially in our urban markets."

During 2005 we executed a record 3,899 new orders worth $963 million, up 178% over 1,404 new orders worth $360 million, in 2004. Tarragon delivered 3,343 homes in 2005 at an average price of $268,000, excluding lots, resulting in sales of $878 million compared to 942 home deliveries in 2004 at an average price of $259,000, excluding lots, or $215 million in total sales. For the fourth quarter ended December 31, 2005, 527 new orders were executed worth $138.8 million up from 513 new orders during the same period last year worth $129.7 million. Home deliveries in the fourth quarter of 2005 totaled 949 worth $251 million compared to 526 home deliveries during the same period last year worth $144.6 million. As a result of the strong sales activity, the Company's non-cancelable contractual backlog rose 25% to $427.3 million, compared to the year earlier figure of $342.7 million.

Mr. Friedman commented, "While overall buyer traffic at our developments remains robust, some of our markets are returning to historically normal levels of housing sales activity. We have, for example, noted a marked slowdown in certain

investor-driven West Coast Florida markets, but elsewhere in Florida the level of activity is only low compared to the unusually high levels of last year. Our guidance for 2006 assumes continued sluggishness in these West Coast Florida communities and moderate sales levels, in line with historical norms for the remainder of the market.  In the Northeast, where we are opening sales offices for three new communities in the next month, pricing is stable, traffic is high and we are not anticipating a comparable slowdown in sales levels."

***

**2006 Guidance**

The Company is issuing full-year 2006 earnings guidance of $3.70 to $4.20 in Income from Continuing Operations per diluted share.  The Company anticipates additional income from the completion of the capital redeployment program.

56.    On March 16, 2006, Tarragon filed its Annual Report with the SEC on Form 10-K.  The Company's 10-K was signed by the Individual Defendants, among others, and reaffirmed the Company's financial results previously announced on March 15, 2006.  The Company's 10-K also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶43, supra.

57.    The 2005 Form 10-K also contained a statement from defendant Grant Thornton stating that it had conducted an audit of Tarragon in accordance with GAAS and that the Company's financial results for the fiscal year ended December 31, 2005, were reported in conformity with GAAP.  Specifically, Grant Thornton addressed a letter dated March 15, 2006, to Tarragon's stockholders which was included with its consent in the 2005 Form 10-K stating that:

We have audited the accompanying consolidated balance sheets of Tarragon Corporation and subsidiaries (collectively, the "Company") as of December 31, 2005 and 2004, and the related consolidated statements of income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2005.  These financial statements are the responsibility of the

Company's management.   Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Tarragon Corporation and subsidiaries, as of December 31, 2005 and 2004, and the consolidated results of their operations and their consolidated cash flows for each of the three years in the period ended December 31, 2005, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 1 to the consolidated financial statements, the Company adopted Financial Accounting Standards Board Interpretation 46-R "Consolidation of Variable Interest Entities" in 2004.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Tarragon Corporation and subsidiaries' internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 15, 2006, expressed an unqualified opinion on management's assessment of, and an unqualified opinion on the effective operation of, internal control over financial reporting.

58.    On May 10, 2006, the Company issued a press release entitled "Tarragon Corporation Announces First Quarter 2006 Financial Results." Therein, the Company, in relevant part, stated:

- Net Income of $18.8 Million or $0.59 Per Diluted Share

- Consolidated Revenue up 23 Percent

- Company Maintains 2006 Guidance of $3.70 to $4.20 Income From Continuing Operations Per Diluted Share

- 209,024 Shares Repurchased

Tarragon Corporation (Nasdaq: TARR), a leading urban homebuilder specializing in the development and marketing of high-density residential communities, today announced its financial results for the quarter ended March 31, 2006.

**Financial Results**

Consolidated revenue for the first quarter of 2006 was $98.9 million, up 23 percent from $80.3 million in the same period of 2005. The increase was due principally to consolidated homebuilding sales, which totaled $89.2 million, up 40 percent from $63.6 million in the first quarter of 2005. The increase in consolidated revenue was partially offset by a $7.0 million decrease in rental and other revenue, which resulted from the implementation of the Company's capital redeployment program announced in March 2005.

Homebuilding sales, including revenue from unconsolidated properties, were $111.9 million in the first quarter of 2006, down from $120.0 million in the same period of 2005. In the prior-year quarter, 12 percent of homebuilding sales were derived from Northeast projects compared to 1.9 percent in the current quarter. Over the next two quarters, sales will commence at several projects in the Northeast representing more than $275 million in homebuilding revenue.

Income from continuing operations of $11.5 million was equal to that of the first quarter 2005.

Net income for the first quarter of 2006 was $18.8 million, or $0.59 per diluted share, compared to $21.6 million, or $0.70 per diluted share, in the first quarter of 2005, which included $10.3 million of after tax gains on sale of real estate compared to $7.3 million in the current quarter. Based on lower sales velocity in several markets in Florida, the Company increased its estimate of marketing and carrying costs on several of its developments. When estimates of project costs are revised, gross profit is adjusted

in the period of change so that cumulative project earnings reflect the revised profit estimate. These adjustments decreased after tax net income in the first quarter of 2006 $5.1 million, or $0.16 per diluted share. Accordingly, overall margins are expected to expand in future quarters, provided current sales rates continue as expected.

Tarragon Chairman and CEO William S. Friedman commented, "We are maintaining our guidance for the year and we expect that our results will be more robust during the second half as additional communities in the Northeast hit the market and contribute to earnings. While less than 2 percent of our homebuilding revenue was derived from projects in the Northeast in the first quarter, we expect the Northeast market to contribute 27 percent of total 2006 homebuilding revenue and over 35 percent of gross profits. We expect this trend to continue into 2007 as our Northeast activities begin to mature."

**Share Repurchase Program**

During the first quarter of 2006, the Company repurchased 209,024 shares at an average price of $19.69 per share.

**2006 Guidance**

The company reaffirmed its 2006 guidance of $3.70 to $4.20 income from continuing operations per diluted share, based on current market and sales trends, as well as anticipated income from the completion of its capital redeployment program during 2006.

59. Also on May 10, 2006, Tarragon filed its Quarterly Report with the SEC on Form l0-Q. The Company's l0-Q was signed by Defendants Friedman and Pickens, and reaffirmed the Company's financial results announced on the same day. The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶43, supra.

60. The statements contained in ¶¶ 40 - 59 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the Company had failed to consolidate a limited partnership into its consolidated

financial statements; (2) that the Company had failed to properly report its consolidated statement of cash flows by misclassifying items among its operating, investing and financing activities; (3) that the Company's financial statements were not prepared in accordance with GAAP; and (4) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

61.    On August 9, 2006, the Company shocked investors when it issued a press release entitled "Tarragon Corporation to Postpone Second Quarter Earnings Announcement and Conference Call; Company May Be Required to Consolidate Ansonia Partnership." Therein, the Company, in relevant part, revealed:

> Tarragon Corporation (Nasdaq: TARR), a leading urban homebuilder specializing in the development and marketing of high-density residential communities, today announced that it is reviewing its earlier determination that it was required to treat Ansonia Apartments, LP (Ansonia) as an unconsolidated partnership for financial reporting purposes. The review relates only to the interpretation of existing accounting literature and does not involve new facts or circumstances.
>
> Ansonia owns approximately 6,300 rental apartments primarily in Connecticut and Florida. Tarragon included summarized financial data from Ansonia's financial statements in notes to financial statements in the Company's 2005 Annual Report on Form 10-K.
>
> The Company is currently reviewing its accounting treatment of its investment in Ansonia with its independent accountants if the Company concludes that it is required to consolidate Ansonia, the Company will be required to restate certain prior period financial statements. There would be no impact on income or revenue of the homebuilding division.
>
> Tarragon has postponed the issuance of its second quarter 2006 financial results and conference call, both originally scheduled for today, Wednesday, August 9, pending this review. Tarragon will announce a rescheduled date and time for its second quarter earnings release as soon as the review is concluded.

62.    Upon this partial disclosure, the Company's shares declined $1.67 per share, or 14 percent, to close on August 9, 2006 at $10.30 per share, on unusually heavy trading volume.

63.    On August 9, 2006, the Company issued a press release entitled "Tarragon Corporation to Postpone Second Quarter Earnings Announcement and Conference Call; Company May Be Required to Consolidate Ansonia Partnership." The press release stated in part:

>    Tarragon ... today announced that it is reviewing its earlier determination that it was required to treat Ansonia Apartments, LP (Ansonia) as an unconsolidated partnership for financial reporting purposes. The review relates only to the interpretation of existing accounting literature and does not involve new facts or circumstances.
>
>    Ansonia owns approximately 6,300 rental apartments primarily in Connecticut and Florida. Tarragon included summarized financial data from Ansonia's financial statements in notes to financial statements in the Company's 2005 Annual Report on Form 10-K.
>
>    The Company is currently reviewing its accounting treatment of its investment in Ansonia with its independent accountants. If the Company concludes that it is required to consolidate Ansonia, the Company will be required to restate certain prior period financial statements. There would be no impact on income or revenue of the homebuilding division.

64.    This announcement was the first in a series of partial disclosures and revelations concerning the truth about Tarragon's business operations, finances, business metrics and future business and financial prospects. Nonetheless, Tarragon's common stock continued to trade at artificially inflated levels as this revelation, along with the ones made during the remainder of the Relevant Period, was accompanied by denials and continued misrepresentations by defendants. Upon this partial disclosure, Tarragon's

35

closed down sharply to trade at $10.30 per share on August 9, 2006 - a one-day decline of $1.67 per share or 14%.

65. On August 23, 2006, the Company filed with the SEC a Form 8-K, signed by defendant Pickens, elaborating on the August 9th press release disclosing that it failed to properly consolidate Ansonia Apartments, LP ("Ansonia") in its reported financial results. The Form 8-K in Item 4.02 stated that:

> On August 21, 2006, the Audit Committee of the Board of Directors of the Company (the "Audit Committee"), in consultation with members of the Company's management and its independent accountants, Grant Thornton, LLP ("Grant Thornton"), determined that the Company will make a change to the historical accounting treatment of the Company's investment in Ansonia Apartments, LP ("Ansonia"). This change relates only to the interpretation of existing accounting literature and does not involve new facts or circumstances.

> Ansonia is a joint venture in which the Company owns a majority equity interest. Historically, the Company has applied the equity method of accounting for its investment in Ansonia. However, as a result of a review of the accounting for the investment in Ansonia by management and the Company's independent accountants, the Audit Committee has decided that the Company will consolidate Ansonia's operations with the Company's operations in accordance with FASB Interpretation Number 46 (revised December 2003), Consolidation of Variable Interest Entities. Accordingly, the Company will restate its financial statements and other financial information for the years and for each of the quarters in the years 2005 and 2004 and for the first quarter of 2006.

> The effect of the change will be to increase the Company's assets by approximately $300 million and increase the Company's liabilities by approximately $400 million of primarily non-recourse debt of Ansonia. The change will also decrease the cumulative reported earnings of the Company and its investment division by about $75 million through March 31, 2006. However, there will be no impact on the Company's cash flow or the balance sheet or income statement of its homebuilding division, either as a result of the restatements or the change in accounting treatment of Ansonia.

In light of the restatement, the Company's stockholders should no longer rely on the Company's previously filed financial statements for the years and for each of the quarters in the years 2005 and 2004 and the first quarter of 2006. The Company intends to (I) file its Form 10-Q for the period ended June 30, 2006 on Thursday, August 24, 2006 and (2) file, as promptly as practicable, amendments to its other periodic reports that have previously been filed with the Securities and Exchange Commission for the periods beginning January 1, 2004 to reflect the restatements described in this Item 4.02.

The Audit Committee and management of the Company have discussed the matters disclosed in this item with Grant Thornton.

66.    On August 24, 2006, the Company issued a press release entitled "Tarragon Corporation Announces Second Quarter 2006 Financial Results; Second Quarter Net Income of $10.7 Million, or $0.34 Per Diluted Share, Up 22 Percent Over Second Quarter 2005 Net Income of $8.8 Million, or $0.28 Per Diluted Share." Therein, the Company, in relevant part, stated:

Tarragon Corporation (Nasdaq: TARR), a leading urban homebuilder specializing in the development and marketing of high-density residential communities, today announced its financial results for the second quarter ended June 30, 2006.

**Second Quarter Financial Results**

Consolidated revenue for the second quarter of 2006 was $146.7 million, up 61 percent from $91.4 million in the same period of 2005. The increase was due principally to consolidated homebuilding sales, which totaled $122.3 million, up 77 percent from $69.1 million in the second quarter of 2005.

Homebuilding sales, including revenue from unconsolidated properties, were $143.1 million in the second quarter of 2006, up from $133.3 million in the same period of 2005.

Income from continuing operations was $8.4 million in the second quarter of 2006, compared to $8.0 million in the same period of 2005.

Net income for the second quarter of 2006 was $10.7 million, or $0.34 per diluted share, up 22 percent from $8.8 million, or $0.28 per diluted share, in the second quarter of 2005. Included in the second quarter of 2006 is a $2.7 million expense associated with the write off of costs incurred for projects that have been cancelled.

**Six-Month Financial Results**

Consolidated revenue for the first six months of 2006 was $260.8 million, up 47 percent from $176.9 million in the same period of 2005. Homebuilding sales, including revenue from unconsolidated properties, were $255.0 million in the first six months of 2006 compared to $253.4 million in the same period of 2005.

Income from continuing operations during the first six months of 2006 was $19.0 million compared to $19.4 million in the same period of 2005. Net income for the first six months of 2006 was down 6 percent to $28.6 million, or $0.90 per diluted share, compared to $30.4 million, or $0.98 per diluted share, in the comparable period of 2005.

Tarragon Chairman and CEO William S. Friedman commented, "Strong, higher-margin sales during the second quarter in our New Jersey communities, such as One Hudson Park in Edgewater and 1100 Adams in Hoboken, have helped to offset the weakness in many of our Florida condominium conversions, to produce revenue and net income that were substantially higher than the 2005 quarter. However, we expect the soft demand in the southeast markets, with lower margins resulting from increased carrying and marketing costs, to continue to apply pressure on our earnings. As a result, we are lowering our 2006 guidance for income from continuing operations per diluted share to $2.10 to $2.40. We expect net income, including discontinued operations, of $2.60 to $2.90 per diluted share.

Mr. Friedman continued, "Our outlook for 2007 remains solid because, in addition to completing the sellout of several profitable conversions from our rental portfolio, we expect significant profit from higher-margin properties now under construction, particularly in New Jersey. We believe our focus on unique waterfront developments meeting the demand from the growing number of non-traditional households and increased development of rental housing will help to insulate our operations

from the conditions now impacting the broader market for residential real estate. Assuming a continuation of current market conditions, we expect net income in 2007 to at least equal that of 2006. Of particular importance, most of our condominium conversion sales are at communities where we have been selling for some time and have either paid off or substantially reduced the original acquisition financing. At June 30, the ratio of fully funded debt to total estimated sellout of our active conversions was 43 percent. Accordingly, each dollar of sales produces substantial free cash flow, giving us the financial flexibility we need to run our business, pay down debt and take advantage of opportunities."

***

**Share Repurchase Program**

During the second quarter of 2006 the Company repurchased 708,804 shares at an average price of $14.31 per share.

**2006 Guidance**

The Company anticipates $2.10 to $2.40 of income from continuing operations per diluted share in 2006, based on current market and sales trends and the impact of the Ansonia consolidation.

67.   Also on August 24, 2006, Tarragon filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendants Friedman and Pickens, and reaffirmed the Company's financial results announced on the same day. The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶43, supra.

68.   The August 24th Form 10-Q also contained the following disclosure concerning Tarragon's recognition of revenue from One Hudson Park, a condominium project the Company was developing in Edgewater, New Jersey:

We use the percentage-of-completion method to recognize revenue on our mid-rise and high-rise condominium developments where construction typically takes eighteen months or longer to complete. One of the criteria for revenue recognition under the

percentage-of-completion method is that construction must be beyond a preliminary stage. We believe that most developers use a measure of 25% to 50% of construction costs to conclude construction is beyond a preliminary stage. Prior to 2006, when 50% of estimated construction costs had been incurred, we concluded that construction was beyond a preliminary stage. In 2006, we began using 40% of construction costs for this measure. This change in accounting estimate resulted in commencing revenue recognition for One Hudson Park, for which 46% of estimated construction costs had been incurred as of June 30, 2006, and after the other requirements of revenue recognition under the percentage-of-completion method had been met. For the quarter ended June 30, 2006, we recognized homebuilding sales revenue of $22.2 million and gross profit of $6.5 million for this project.

69.    On November 9, 2006, the Company issued a press release entitled "Tarragon Corporation Announces Third Quarter 2006 Financial Results; Net Income of $6.0 Million or $0.19 Per Diluted Share for the Quarter Ended September 30, 2006 and $35.1 Million or $1.11 Per Diluted Share for the Nine Months Ended September 30, 2006; Company Plans to Spin Off Homebuilding Division to Shareholders in 2007." Therein, the Company, in relevant part stated:

Tarragon Corporation (Nasdaq: TARR), a leading urban homebuilder specializing in the development and marketing of high-density residential communities, today announced its financial results for the third quarter and nine months ended September 30, 2006.

**Third Quarter Financial Results**

Consolidated revenue for the third quarter of 2006 was $119.2 million, compared to $265.3 million in the same period of 2005. Lower consolidated homebuilding revenue from condominium conversion closings in the Company's Florida markets from the year ago period accounts for the decrease.

Homebuilding sales, including revenue from unconsolidated properties, were $104.7 million in the third quarter of 2006, compared to $308.5 million in the third quarter of 2005.

40

Net income for the third quarter of 2006 was $6.0 million, or $0.19 per diluted share, compared to net income of $50.3 million, or $1.70 per diluted share, in the third quarter of 2005. Income from continuing operations was $2.8 million in the third quarter of 2006, compared to $28.2 million in the same period of 2005. Third quarter net income in 2005 included $22.4 million in after tax gains on sale of investment division properties, compared to $3.3 million in the third quarter of 2006.

Certain comparative results for 2005 have been restated to reflect the consolidation of Ansonia Apartments LP, as announced on August 22, 2006. Ansonia was previously treated as an unconsolidated partnership for financial reporting purposes.

**Nine-Month Financial Results**

Consolidated revenue for the first nine months of 2006 was $379.0 million, compared to $441.2 million in the same period of 2005. Homebuilding sales, including revenue from unconsolidated Properties were $359.7 million in the first nine months of 2006 compared to $561.9 million in the same period of 2005.

Income from continuing operations during the first nine months of 2006 was $22.5 million or $0.71 per diluted share compared to $47.9 million or $1.67 per diluted share in the same period of 2005. Net income for the first nine months of 2006 was $35.1 million, or $1.11 per diluted share, compared to $80.7 million, or $2.69 per diluted share, during the same period of 2005. During the first nine months of 2006 the Company wrote off $5.0 million in costs related to deals no longer being pursued compared to $0.7 million in the first nine months of 2005.

Tarragon Chairman and CEO William S. Friedman commented, "Our third quarter results reflect the continued slow down in condominium conversion sales along with declining margins, particularly in Florida. However, as our condominium conversions slowly sell out, we are beginning to reduce debt and redeploy capital to higher-margin, new developments in New Jersey, Connecticut, Texas and Tennessee. In fact, during the first ten months of the year, we reduced debt associated with our condominium conversions by $164 million."

Mr. Friedman continued, "As a result of the continuing sales slowdown and lower margins, we are reducing our 2006 guidance for net income to $1.15 per diluted share and for income from continuing operations to $0.75 per diluted share. Going

forward, our growing pipeline of high-density, in-fill developments, primarily in New Jersey and Connecticut will help offset market weakness in Florida and be a key driver of revenue and net income growth in 2008 and beyond."

*** 

**Share Repurchase Program**

During the third quarter of 2006 the Company repurchased 116,859 shares at an average price of $10.69 per share.

70. Also on November 9, 2006, Tarragon filed its Quarterly Report with the SEC on Form l0-Q. The Company's 10-Q was signed by Defendants Friedman and Pickens, and reaffirmed the Company's financial results announced on the same day. The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶43, supra.

71. On March 19, 2007, the Company issued a press release entitled "Tarragon Corporation Announces Fourth Quarter and Year End 2006 Financial Results; Debt on completed condominiums reduced by nearly 50 percent in 2006." Therein, the Company, in relevant part, stated:

Tarragon Corporation (Nasdaq: TARR), a leading developer of multifamily housing for rent and for sale, today announced its financial results for the fourth quarter and year ended December 31, 2006.

**Year End Financial Results**

Based on unaudited results, net income for 2006 was $9.8 million, or $0.31 per diluted share, compared to $88.5 million, or $2.93 per diluted share, in 2005. 2006 net income was adversely impacted by unusual items including impairment charges, write-offs and gross margin adjustments of $34.9 million after tax, or $1.23 per share. Of this $34.9 million, $26.3 million is reflected in cost of sales, resulting from market driven margin reductions and impairments. The margin adjustments were made to reflect price reductions, slower absorption and increased marketing costs on unsold units. $6.4 million, after tax, is included in general and

administrative expense, resulting from the write-off of pursuit costs on development projects that did not go forward. Finally, $2.2 million of impairment charges, after tax, represent the write-down of land inventory and properties held for sale to current estimated market value. This compares to $3.2 million of impairment charges and other write-downs, after tax, recorded in 2005. Loss from continuing operations for 2006 was $2.3 million or $(0.12) per diluted share compared to income from continuing operations of $45.8 million or $1.60 per diluted share in 2005.

The Company expects to report consolidated 2006 revenue of $544.9 million, an 8 percent decrease from $595.1 million in 2005, based on unaudited results. Homebuilding sales, including revenue from unconsolidated entities, decreased 31 percent to $508.2 million in 2006 from $735.5 million in 2005. Fewer condominium conversion closings in the Southeast market, which declined 34 percent from 2005, were the principal reason for the decline in revenue.

Tarragon Chairman and CEO William S. Friedman commented, "We have finished a disappointing year for the homebuilding industry and for Tarragon. We have used this period of slow sales to develop new marketing strategies, to reduce debt and to pursue developments with multiple exit strategies that work either as rentals or condominiums. Tarragon's long-term plan is to focus on smart growth and redevelopment projects in areas of high demand."

**Fourth Quarter Financial Results**

The Company expects to report a net loss for the fourth quarter of 2006 of $25.1 million, or $(0.89) per diluted share, compared to net income of $7.8 million, or $0.26 per diluted share, in the fourth quarter of 2005. Included in the fourth quarter of 2006 net loss were unusual items including impairment charges, write-downs and gross margin adjustments of $23.6 million after tax, or $0.83 per share. This $23.6 million includes $18.6 million from market driven margin reductions and impairments in cost of sales, $3.3 million from development pursuit costs written off to general and administrative expense and $1.7 million from impairment charges related to the write-down of land inventory and properties held for sale. No impairment charges or other write-downs were recorded in the fourth quarter of 2005. Loss from continuing operations was $25.6 million in the fourth quarter of 2006, compared to a loss of $2.9 million in the same period of 2005.

Based on unaudited results, consolidated revenue for the fourth quarter of 2006 was $163.8 million, an increase of 7.8 percent over consolidated revenue of $151.9 million in the same period of 2005. Homebuilding sales, including revenue from unconsolidated properties, declined 14 percent to $148.5 million in the fourth quarter of 2006, compared to $173.7 million in the fourth quarter of 2005. Florida sales represented 49 percent of homebuilding sales in the 2006 fourth quarter compared to 81 percent in the 2005 period.

\*\*\*

**Spin Off of Homebuilding Division**

The Company has filed a preliminary proxy statement with the Securities and Exchange Commission related to the proposed pro rata, tax-free spin off of its Homebuilding Division as an independent, publicly traded company. The transaction, which is subject to shareholder approval, is expected to be completed in mid-2007. Tarragon will continue to operate its real estate services business, which provides asset and property management, leasing and renovation services to residential and commercial properties. Following the spin off, Tarragon will change its name to Sage Residential, Inc. Tarragon's homebuilding and development business will be renamed Tarragon Corporation. Tarragon believes that the spin off will, among other things, provide both businesses with direct and differentiated access to financing and the capital markets, allow each company to grow through acquisitions appropriate to its business and provide each company with the opportunity to align management incentives with the performance of its business. If the spin off is consummated, Tarragon stockholders will hold a proportionate interest equal to their current ownership interest in Tarragon in two separate companies: Tarragon Corporation, which will have substantially reduced debt and higher book value as a result of its separation from the real estate services division due to that division's high level of fixed rate, non-recourse debt, and Sage, which will hold the assets of the real estate services division and associated debt. Although Sage will reflect negative book value as a result of historical-based accounting and depreciation, its net asset value, based on our current estimate of the fair market value of the assets of the real estate services division, is expected to approximate $7 per diluted share. "Sage will be a management-focused real estate services company, led by an award-winning team that has been recognized for its vision and expertise, that will be well positioned

to significantly expand its net operating income and absorb additional business," said Mr. Friedman.

Mr. Friedman concluded, "Due to the effects that the timing of the spin off will have on our operating results, we will not issue guidance until the spin off is completed. Our goal for 2007 is to validate the confidence our investors have placed in the strength of our long term strategy, aggressively manage our balance sheet, and improve earnings over 2006."

**Share Repurchase Program**

During 2006, the Company repurchased 1,034,687 shares at an average price of $14.99 per share. No shares were repurchased in the 2006 fourth quarter.

.

72. The statements contained in **¶¶61, 63, 65-71** were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the Company had failed to consolidate a limited partnership into its consolidated financial statements; (2) that the Company had failed to properly report its consolidated statement of cash flows by misclassifying items among its operating, investing and financing activities; (3) that the Company's financial statements were not prepared in accordance with GAAP; (4) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times; (5) that the Company was experiencing liquidity issues due to its inability to obtain loan modifications and financing; and (6) that the Company lacked adequate internal and financial controls.

**THE TRUTH BEGINS TO EMERGE**

73. On April 2, 2007, Tarragon filed a Form 8-K with the SEC, which in relevant part stated:

45

On March 27, 2007, management and the Audit Committee of Tarragon Corporation (the "Company") concluded, after a review of the Company's consolidated statements of cash flows and applicable accounting standards and related guidance relating to the presentation of cash flows, that the Company's consolidated statements of cash flows should be restated to reclassify certain items among operating, investing and financing activities. In reaching its conclusion, the Company also reviewed the presentation of other companies in its industry.

Such conclusion was discussed with, and approved by, the Audit Committee of the Company's Board of Directors. Also, the restatement has been discussed with the Company's independent registered public accountants.

As a result of the foregoing, the Company intends to include in its Annual Report on Form 10-K for the year ended December 31, 2006 (the "2006 10-K") a restatement of the consolidated statements of cash flows for the years ended December 31, 2005 and 2004 included in that report. The previously filed consolidated statements of cash flows for the years ended December 31, 2005 and 2004 should not be relied upon.

74.    Also on April 2, 2007, Tarragon filed its Annual Report with the SEC on Form 10-K. The Company's 10-K was signed by the Individual Defendants, among others, and contained Sarbanes-Oxley required certifications substantially similar to the certifications contained in ¶43, supra.

75.    The 2006 Form 10-K also contained the following disclosure concerning Tarragon's recognition of revenues from the sale of condominiums in its new developments:

In November 2006, the FASB ratified EITF Issue No. 06-8, "Applicability of a Buyer's Continuing Investment Under FASB Statement No. 66 for Sales of Condominiums" (EITF 06-8). EITF 06-8 provides guidance in assessing the collectability of the sales price, which is required to recognize profit under the percentage-of-completion method pursuant to SFAS No. 66. EITF 06-8 states that an entity should evaluate the adequacy of the buyer's initial and continuing investment in reaching its conclusion that the sales price is collectible. The continuing investment criterion in

paragraph 12 of SFAS No. 66 would be met by requiring the buyer to either (1) make additional payments during the construction term at least equal to the level annual payments that would be required to fund principal and interest payments on a hypothetical mortgage for the remaining purchase price of the property or (2) increase the initial investment by an equivalent aggregate amount. If the test for initial and continuing investment is not met, the deposit method should be applied and profit recognized only once the aggregate deposit meets the required investment test for the duration of the construction period. EITF 06-8 will be effective for the first annual reporting period beginning after March 15, 2007, and early adoption is permitted. Accounting for sales of condominiums not consistent with EITF 06-8 would require a cumulative effect adjustment to retained earnings in the period of adoption. Although we have not yet assessed the impact on our financial position, results of operations and cash flows, ***we believe we may be required, in some cases, to collect additional deposits from the buyer in order to recognize revenue under the percentage of completion method.*** If, in these cases, we were not able to meet the requirements of EITF 06-8, we would be required to delay revenue recognition until the aggregate investment tests described in SFAS No. 66 and EITF 06-8 have been met. (Emphasis added).

76.    In truth and in fact, the need to collect additional deposits or payments from prospective condominium purchasers was not a mere possibility. Instead, the relatively small deposits placed on new condominium units in projects such as One Hudson Park were insufficient to demonstrate a commitment on the part of those prospective purchasers to actually follow through with the proposed purchases and revenue should not have been recognized in connection with such projects under the percentage of completion method.

77.    On May 11, 2007, the Company issued a press release entitled "Tarragon Corporation Announces Financial Results for First Quarter of 2007; Spin-off of Homebuilding Business on Track." Therein, the Company, in relevant part, stated:

Tarragon Corporation (NASDAQ: TARR), a leading developer of multifamily housing for rent and for sale, today

announced its financial results for the first quarter ended March 31, 2007. In addition to presenting consolidated financial results in this release, the Company is including separate financial results, including net income, for its Homebuilding and Real Estate Services businesses in anticipation of the planned spin-off of its Homebuilding business.

First Quarter 2007 Consolidated Financial Results

The Company reported consolidated revenue for the first quarter of $150.4 million, compared to $114.2 million in first quarter of 2006. The loss from continuing operations was $4.4 million in the first quarter of 2007, compared to income from continuing operations of $11.4 million in the same period of 2006.

Net loss for the first quarter of 2007 was $4.2 million, or ($0.16) per diluted share. This compares to net income of $18.5 million, or $0.58 per diluted share for the first quarter 2006.

The first quarter 2007 results included $4.4 million in impairment charges and $5.5 million in depreciation expense. The financial results for the first quarter of 2007 also included $400 thousand in pre-tax gains on sales of properties, while results for the 2006 period included gains of $11.7 million, pre-tax.

"Our business model of pursuing hard to develop opportunities in high barrier to entry markets is being validated in this difficult real estate market. Income from our core developments in the Northeast and the sale of new, or recently renovated rental communities is expected to more than offset losses in our legacy condominium conversion properties in Florida," said Tarragon Chairman and Chief Executive Officer William Friedman. "Meanwhile, the Florida condominium conversions, even at today's reduced prices and sales rates, are contributing cash to rapidly reduce debt and to enhance our ability to pursue new opportunities, especially for rental and mixed use developments in the Northeast. This approach positions the Company favorably for the planned spin-off of our homebuilding business later this year."

Total consolidated debt reduction, before new borrowings, during the first quarter of 2007 was $65 million, including over $23 million related to completed condominium conversion projects. By year-end 2007, Tarragon presently expects to repay approximately $125 million of consolidated debt on condominium

conversion communities, $130 million on newly built, for-sale developments and $165 million on rental apartment developments.

"We build and renovate rental communities to sell at a profit. In 2007, we expect to sell five rental communities for over $300 million. Proceeds from these sales will put both our Homebuilding and Real Estate Services businesses in a stronger position to respond to new opportunities," said Mr. Friedman.

Homebuilding Business Financial Results

The Company's Homebuilding business sales, including revenue from unconsolidated properties, were $130.5 million for the first quarter of 2007, compared to $111.9 million in the first quarter of 2006. Homebuilding net loss for the first quarter of 2007 was $1.1 million as compared to net income of $10.9 million for the first quarter of 2006. The decrease was primarily driven by margin reductions in Florida condominium conversion projects over the past year and impairment charges of $4.4 million in the first quarter of 2007 compared to none the same period a year ago. Mr. Friedman commented, "Our goal for 2007 is to reduce debt on our condominium conversion properties and to access our capital now invested in these assets for other opportunities. To keep sales moving, especially in Florida, we are aggressively pricing our homes. These sales will comprise a substantial portion of the results of our homebuilding operations for much of 2007. However, as the year progresses and we dispose of much of our existing condominium conversion inventory, we expect to see a return to more normal margins and have significantly improved our balance sheet, both in terms of liquidity and debt. So as difficult as it may be to our current earnings, it is the right path to long-term stability and profitability for our homebuilding business."

Real Estate Services Business Financial Results

The Real Estate Services business had rental revenue of $26.6 million in the first quarter of 2007 compared to $22.7 million in the same period of 2006. Net operating income for the first quarter of 2007 was $13.8 million compared to $10.7 million in the first quarter of 2006. Real Estate Services' first quarter 2007 net loss was $3.1 million, after pre-tax depreciation expense of $5.5 million, compared to first quarter 2006 net income of $7.5 million after pre-tax depreciation expense of $3.4 million. First quarter 2006 results included pre-tax gains on sale of real estate of $11.7 million compared to pre-tax gains of $400 thousand the first

quarter of 2007. There was $14.7 million of interest expense in the first quarter of 2007 compared to $5.4 million in the year ago period. This increase was primarily due to the transfer of several properties from the Homebuilding business to the Real Estate Services business at the end of 2006. In addition, $5.7 million of interest was capitalized in the first quarter 2006 compared to none in the current quarter.

Homebuilding Business Operations

Sales, Orders and Backlog

In the first quarter of 2007, the Company's homebuilding business wrote 283 net new orders totaling $84.7 million at an average sale price of $299,000, compared with 461 net new orders totaling $105.1 million for the same period in 2006 at an average sale price of $228,000. The Company delivered 353 homes in the first quarter 2007 for $83 million, at an average price, excluding land development, of $244,000, compared with 663 homes for $156.3 million, with an average price of $241,000, in the first quarter of 2006.

At the end of the first quarter of 2007, the backlog was $245.7 million representing 647 homes compared with $376.1 million at the end of the first quarter of 2006 representing 1,592 homes. The average contract price, excluding land development, was $437 thousand at March 31, 2007 compared to $289 thousand at March 31, 2006 as a result of an increase in Northeast contracts included in backlog. As of March 31, 2007, 55 percent of the backlog value is derived from contracts written in the Northeast, up from 18 percent a year ago.

Active For Sale Projects

At March 31, 2007, Tarragon's active for-sale communities (including backlog) totaled 3,811 homes in 33 communities, representing approximately $1.3 billion in projected revenue, compared to 7,948 homes in 44 communities representing about $2.4 billion in projected revenue at March 31, 2006.  The $1.3 billion of active, for-sale developments as of March 31, 2007 is comprised of 45 percent new mid-and high-rise buildings, 30 percent condominium conversions and 25 percent new low-rise developments.  These communities are currently expected to generate gross margins of 19 percent, 8 percent, and 21 percent, respectively.  Overall, a 16 percent average gross margin is anticipated on homes in the active communities.  Included in our

gross margin are marketing and selling costs and development overhead representing approximately five percent of homebuilding revenue.

Active For Rent Projects

The homebuilding business continues to build rental communities and currently has eight projects, representing 2,561 apartment homes, in various stages of development. Five of these communities comprising 1,631 apartment homes are expected to remain with the homebuilding business following the proposed spin-off and three representing 930 apartments will be owned and operated by the Real Estate Services business, to be renamed Sage Residential Services post spin-off.

Spin-Off of Homebuilding Division

Tarragon has filed a proxy statement with the Securities and Exchange Commission related to the proposed pro rata, tax-free spin-off of its Homebuilding business as an independent, publicly traded company. The transaction, which is subject to shareholder approval, is expected to be completed in the third quarter of 2007. Tarragon will continue to operate the Real Estate Services business, which provides asset and property management, leasing and renovation services to residential and commercial properties. Following the spin-off, Tarragon will change its name to Sage Residential, Inc. Tarragon's Homebuilding business will be renamed Tarragon Corporation after the spin-off. Tarragon believes that the spin-off will, among other things, provide both businesses with direct and differentiated access to financing and the capital markets, allow each company to grow through acquisitions appropriate to its business and provide each company with the opportunity to align management incentives with the performance of its business. If the spin-off is consummated, Tarragon stockholders will hold a proportionate interest equal to their current ownership interest in Tarragon in two separate companies: the Tarragon Corporation Homebuilding business, which will have substantially reduced debt and higher book value as a result of its separation from the Real Estate Services business due to its high level of fixed rate, non-recourse debt, and Sage Residential, which will operate the Real Estate Services business and hold the assets and associated debt. Although Sage Residential will reflect a negative book value as a result of historical-based accounting and depreciation, its net asset value, based on the current estimate of the fair market value of the assets

51

of the Real Estate Services business, is expected to approximate $6 per diluted share, assuming 30 million shares outstanding.

Share Repurchase Program

No shares were repurchased in the first quarter of 2007.

78. On September 30, 2006, Tarragon issued 616,667 shares of 10% cumulative preferred stock, liquidation value $12.00, and 668,096 shares of Tarragon common stock to Rhodie LLC in connection with Rhodie's right to convert its membership units in Tarragon Development Corporation into Tarragon securities.

79. On May 11, 2007, Tarragon filed with the SEC a Form 12b-25, Notification of Late Filing, with respect to its Form 10-Q for the fiscal quarter ended March 30, 2007. The reason given for the delay was that Tarragon and Grant Thornton were still in the process of reviewing the Company's financial statements.

80. Also on May 11, 2007, Tarragon filed its Quarterly Report with the SEC on Form l0-Q.  The Company's l0-Q was signed by Defendants Friedman and Pickens, and reaffirmed the Company's financial results announced on the same day; (a) repeated the representation concerning the Company's financial statements having been prepared in accordance with GAAP *(see* ¶44 above); (b) repeated the representation concerning the impact of ITF 06-08 on the Company's reported financial results *(see* ¶75 above).  The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶43, supra.

81. The statements contained in ¶¶73 - 75, 77, 79 - 80 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the Company had failed to consolidate a limited partnership into its consolidated financial statements; (2) that the Company had failed to properly report its

consolidated statement of cash flows by misclassifying items among its operating, investing and financing activities; (3) that the Company had failed to timely take property impairment charges and other write-downs on certain properties; (4) that the Company's financial statements were not prepared in accordance with GAAP; (5) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times; (6) that the Company was experiencing liquidity issues due to its inability to obtain loan modifications and financing; (7) that the Company lacked adequate internal and financial controls;, and (8) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects for 2007 were lacking in a reasonable basis when made.

82.    On July 11, 2007, Tarragon filed a Form 8-K with the SEC attaching a copy of a press release dated July 10, 2007. The press release stated, in relevant part, that:

> Tarragon ... today announced that it wrote 342 net orders at its condominium conversion properties in the second quarter of 2007 totaling $57.6 million at an average sale price of $168,000, compared with 174 net orders totaling $32.7 million for the first quarter in 2007 at an average sale price of $188,000. Tarragon delivered 308 condominium conversion homes in the second quarter of 2007 representing $53.7 million in sales compared to 264 conversion homes representing $47.8 million in the first quarter of 2007.

> Overall, in the second quarter of 2007 Tarragon delivered a total of 442 homes representing over $115 million in sales, compared to 353 homes representing $83 million in the first quarter 2007. Tarragon wrote a total of 353 net orders totaling $64.7 million in the second quarter of 2007 compared with 283 net orders totaling $84.7 million for the first quarter of 2007.

> For the calendar year, Tarragon presently expects to reduce consolidated debt on condominium conversion communities by over $100 million, and unconsolidated conversion debt by $22 million, while repaying $130 million in debt on newly built, for -

sale developments and $190 million on rental apartment developments.

At the end of the second quarter, the Company's non-cancelable contractual backlog was $195 million, or 558 homes, compared to $246 million, or 647 homes, at the end of the first quarter of 2007.

Tarragon Chairman and Chief Executive Officer William Friedman commented, "We are very pleased that, despite the continuing avalanche of negative publicity about the real estate market in Florida, our sales efforts produced nearly double the rate of sales in our Florida conversion communities during the second quarter compared to the first. The increase is due to value pricing, promotions and the latent demand for quality housing in the growing markets where we are selling homes. In addition, over the first six months of 2007 we have repaid $70 million of consolidated and unconsolidated conversion-related debt, putting us ahead of our $125 million target for the year. We expect to maintain this aggressive sales approach as we execute our strategy to improve our balance sheet before, and after, the spin-off of our homebuilding business."

83.    On July 18, 2007, *Bloomberg* published an article entitled "Here's What The Accounting Watchdog Keeps Hidden." The article, in relevant part, stated:

> *The official mission of the auditing profession's watchdog is "to protect the interests of investors." In practice, what it really protects best are the dirty secrets of the accounting firms and their corporate audit clients.*

> Created in 2002 by the Sarbanes-Oxley Act, the Public Company Accounting Oversight Board inspects the firms that audit companies with U.S.-traded securities. *In its brief history, the board has identified scores of companies where outside auditors have done lousy jobs checking the books. Investors crave that kind of knowledge.*

> In its reports to the public, though, the board doesn't name the companies. So last month, for instance, *when the board released its annual inspection report on Grant Thornton LLP, the sixth- largest U.S. accounting firm by revenue, one of the audits it criticized was at a company identified only as "Issuer A." Transparency, this isn't.*

*The report said Grant Thornton failed "to obtain sufficient competent evidential matter to support its audit opinion" and 'failed to identify" an accounting violation "that it should have identified and addressed before issuing its audit report."*

In a response letter, the firm complained about the harsh wording and said it actually had identified the problem. *The violation: Issuer A, which restated its financials last year, had left off its balance sheet a certain 90 percent-owned partnership, the rest of which was owned mainly by company insiders.*

**What's Missing**

*Here's what the report left out: Issuer A is Tarragon Corp., a New York-based real-estate developer awash in Florida condominiums. Last year's restatement slashed 2005 net income 39 percent to $88.5 million. And Grant Thornton remains its auditor.* Faced with those facts, some investors during proxy season almost certainly would vote to fire the auditor and perhaps even withhold votes from directors who sit on the company's audit committee.

I uncovered Tarragon's identity with the help of a database maintained by Audit Analytics, a Sutton, Massachusetts, research firm that tracks restatements. *While Tarragon's filings don't mention the accounting board's role in forcing Grant Thornton's hand, the facts surrounding the company's restatement were identical to Issuer A's. Tarragon's chief executive officer, William Friedman, confirmed the match. Grant Thornton and the accounting board declined to do so.*

**So Much Trouble**

*Investors shouldn't have to go to this much trouble.*

*"That's clearly information investors would want to have,"* says James Melican, chairman of Proxy Governance Inc., a research firm in Vienna, Virginia, that provides proxy-voting recommendations to investors. *"I don't see any particular reason why it should be secret."*

The board's inspection reports have multiple parts, most of which by law must remain secret. *The part that summarizes selected audits where inspectors found problems is the part the board must release publicly, under the Sarbanes-Oxley Act.*

55

***

*Good audits should be especially paramount to Tarragon investors. In April, Tarragon announced yet another restatement, this time to correct its cash-flow statement.*

Tarragon shares are down 33 percent this year. The company swung to a $4.2 million net loss for the first quarter. And at March 31, Tarragon had just $20.6 million of unrestricted cash on its balance sheet of Friedman and his family, who own almost half of Tarragon's common stock. *Friedman says the loans provide the company with "more financial flexibility." He says he's happy with Grant Thornton, too.*
[Emphasis added.]

84.     On July 25, 2007, the Company issued a press release entitled "Tarragon Corporation Comments on Unusual Trading Activity." Therein, the Company, in relevant part, stated:

Tarragon Corporation (Nasdaq: TARR), a leading developer of multifamily housing for rent and for sale, today commented on unusual trading activity in its common stock that has occurred over the past two days and that has resulted in significant price volatility. Tarragon's policy is not to respond to specific rumors or speculation in the market; however, *there has been no material change to the Company's business outlook, financial position or any other aspect of its business that would account for such trading activity.*

*Tarragon Chairman and Chief Executive Officer William Friedman commented further, "We recently announced a sequential quarterly sales increase of nearly 100% in our Florida condominium conversion communities, demonstrating that we're continuing to manage the challenges we face in that market. We're also making excellent progress toward our 2007 debt reduction goals* and expect to reduce consolidated and unconsolidated debt on condominium conversion communities by approximately $125 million and $130 million in debt on newly built, for-sale developments. Over the next few quarters, we expect to close sales of over $600 million of completed rental properties which are expected to generate over $450 million in debt repayment and approximately $150 million in net cash proceeds as we execute our strategy to improve our balance sheet before, and after, the spin-off of our homebuilding business."

**Additional Information About the Spin-Off Transaction**

Tarragon has filed a preliminary proxy statement with the Securities and Exchange Commission related to the proposed pro rata, tax-free spin-off of its homebuilding business as an independent, publicly traded company. ***The transaction, which is subject to shareholder approval, is expected to be completed during the third quarter of 2007.*** Following the spin-off, Tarragon will change its name to Sage Residential, Inc. Sage will continue to operate its real estate services business, which provides asset and property management, leasing and renovation services to residential and commercial properties. Tarragon's homebuilding and development business will be renamed Tarragon Corporation. [Emphasis added.]

85. On August 9, 2007, the Company issued a press release entitled "Tarragon Will Delay Filing Its Second Quarter Form l0-Q; Company Seeks to Address Liquidity Issues; Expects to Record Significant Impairment Charges." Therein, the Company, in relevant part, stated:

Tarragon Corporation (NASDAQ: TARR) today announced that the filing of its Quarterly Report on Form l0-Q for the quarter ended June 30, 2007 will be delayed beyond the Securities and Exchange Commission's filing deadline of August 9, 2007 ***in order to provide additional time for Tarragon to finalize its evaluation of property impairment charges and other write-downs necessitated by the recent decision to sell certain properties under current adverse market conditions. Tarragon currently expects to record impairment charges in excess of $125 million***.

***Tarragon is currently experiencing liquidity issues caused by the sudden and rapid deterioration in the real estate credit markets. This has resulted in Tarragon being unable to complete approximately $50 million in financing transactions that had been under negotiation and were expected to close in August 2007.***

Tarragon's business has been adversely affected by the continuing and accelerated deterioration of the homebuilding industry in the markets in which Tarragon operates, and in the Florida market in particular. These conditions have led to declines

in new home sales, increased use of sales discounts and other incentives and increased interest and other carrying costs, and have adversely affected Tarragon's gross margins from homebuilding sales as well as its overall liquidity situation. Tarragon has also incurred additional lease-up and debt service costs associated with apartment properties that had been targeted for conversion into condominiums but that it subsequently decided to operate as rental properties.

*These factors, combined with the inability to obtain anticipated loan modifications and additional financing, have materially affected Tarragon's liquidity, including the ability to repay existing indebtedness as it becomes due and meet other current obligations, and raise doubt about Tarragon's ability to continue as a going concern. In addition, Tarragon currently is not in compliance with a financial covenant contained in its existing subordinated debt and after the property impairment charges and other write-downs discussed above are recorded, Tarragon will not be in compliance with certain net worth maintenance and other financial covenants contained in this and other debt agreements. Tarragon has not made its August 2007 debt service payments as well as certain other vendor payments, and Tarragon is seeking deferral of such payments while it continues to negotiate to obtain debt and/or equity financing. Tarragon also currently owes approximately $37.0 million under its unsecured line of credit with affiliates of William S. Friedman, Tarragon's chief executive officer and chairman. Tarragon and Mr. Friedman have agreed that no further advances will be made under this credit line.*

Notwithstanding these issues, Tarragon believes that its real estate portfolio and development platform currently have significant equity value in excess of existing indebtedness. *Accordingly, Tarragon's board of directors has formed a special committee of independent directors to evaluate strategic and financial alternatives that may be available to Tarragon and its stakeholders. The special committee is retaining Lazard to act as a financial adviser to Tarragon in evaluating its alternatives. Alternatives to be considered are expected to include all available forms and sources of financing, property 'sales and other strategic transactions. However, if Tarragon is unable to obtain sufficient liquidity to fund its operations in the near-term, it may be necessary for Tarragon to undertake such other actions as may be appropriate in the light of its current liquidity situation.* Tarragon does not intend to comment further publicly with respect to the exploration of strategic and financial alternatives unless a

specific transaction or course of action is authorized by its board of directors.

Tarragon previously filed a preliminary proxy statement with the SEC related to the proposed pro rata, tax-free spin-off of its homebuilding division as an independent, publicly traded company. ***Due to current market conditions and the related impact on Tarragon's financial condition, Tarragon has decided to postpone the spin-off of the homebuilding business as it concentrates on addressing its existing financial requirements.*** [Emphasis added.]

86.    Also, on August 9, 2007, Tarragon filed a Form 8-K with the SEC disclosing, among other things, that the filing of its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2007, would be delayed beyond the SEC's filing deadline of August 9, 2007 in order to provide additional time for Tarragon to finalize its evaluation of property impairment charges and other write-downs and that Tarragon expected to record impairment charges in excess of $125 million.

87.    On this news, the Company shares declined $1.88, or over 66.6 percent, to close on August 9, 2007 at $0.94 per share, on unusually heavy trading volume.

88.    The true facts, which were known by defendants but concealed from the investing public during the Relevant Time Period, were as follows:

(a) In violation of GAAP, the Company had failed to consolidate an unprofitable variable interest entity into its consolidated financial statements;

(b) In violation of GAAP, the Company had failed to properly account for its statement of cash flows by failing to properly classify its cash inflows and cash outflows as operating, investing and financing activities;

(c) In violation of GAAP, the Company had failed to timely take property

impairment charges and other write-downs;

(d) In violation of GAAP, the Company was recognizing revenue on the percentage-of-completion method when it lacked a reasonable assurance that persons making initial deposits for purchases of condominiums would follow through on their initial commitments;

(e) Due to the deterioration in the real estate credit markets, the Company was experiencing liquidity issues due to inability to obtain loan modifications and additional financing and there was serious doubt about Tarragon's ability to continue as a going concern;

(f) As the Company was experiencing a massive downturn in its business, Tarragon would not be able to remain in full compliance with all of its debt covenants and was, in fact, as of June 30, 2007 no longer in compliance with certain covenants; and

(g) With respect to statements made in July 2007, given the increased volatility in the homebuilding industry and the real estate credit markets, the Company had no reasonable basis to make projections about its 2007 results. As a result, the Company's projections issued during the Relevant Time Period about its 2007 results were false and misleading.

## POST RELEVANT TIME PERIOD DEVELOPMENTS

89.    On August 15, 2007, *Bloomberg* reported:

> Tarragon Corp., a U.S. homebuilder, is in talks with lenders to avert bankruptcy after receiving default notices and demands that the company immediately pay back 17 percent of its $1.6 billion in outstanding debt.

Barclays Capital Real Estate Inc. served a default notice related to six promissory notes, and General Electric Capital and Fannie Mae demanded immediate payment on other debt, New York-based Tarragon said in a filing today with the U.S. Securities and Exchange Commission.

"We have not filed for bankruptcy, and we are very hopeful that that will not be necessary," Tarragon Chief Executive Officer William Friedman said today in an interview. "We are working on arranging financing and a liquidity plan that will permit us to satisfy the lenders."

\*\*\*

Tarragon, which builds condominiums and townhouses, said today that it received a delisting notice on Aug. 13 from the Nasdaq Stock Market for failing to file on time its quarterly earnings report for the period ended June 30.

The company's outstanding debt was $1.6 billion on July 31, according to today's statement. Robert Rhodie, a Tarragon director, resigned from the board Aug. 14.

Barclay's demanded immediate payment of $15 million on the six notes. Tarragon owes $163.2 million on that debt. GE Capital is seeking immediate payment of about $185.7 million, while Fannie Mae wants the homebuilder to immediately pay back $65.8 million.

\*\*\*

Tarragon is down 92 percent this year. The stock rose 30 cents today to close at 92 cents in Nasdaq trading, valuing the company at $26.4 million. The homebuilder had a market worth of $349 million at the end of 2006.

90.    On August 23, 2007, the Company filed an 8-K with the SEC which stated, in relevant part:

As previously disclosed by Tarragon Corporation (the "Company") in its press release filed with its Current Report on Form 8-K dated August 9, 2007, *the Company has not made its August 2007 debt service payments as well as certain other vendor payments.*

Accordingly, in connection with attempts by the Company's lenders to exercise contractual rights relating to such obligations, on August 17, 2007, *the Company received notices of default and acceleration from National City Bank ("National City") related to a loan made to a wholly owned subsidiary of the Company and acceleration notices from Fannie Mae related to four promissory notes issued by four other wholly owned subsidiaries of the Company. Each of the notices state that these obligations have been accelerated, including accrued interest, expenses and approximately $75.1 million of outstanding principal under the National City loan and approximately $13.4 million, in the aggregate, of outstanding principal under the promissory notes issued to Fannie Mae.* The National City loan is guaranteed by the Company. The four Fannie Mae promissory notes generally are non-recourse to the Company. *Defaults under the National City loan and Fannie Mae promissory notes also constitute a cross- default or event of default under certain of the Company's other loan agreements, indentures, mortgages and other evidences of indebtedness, and the lenders that are parties thereto may elect to exercise their rights and remedies thereunder.*

The Company is currently in discussions with certain of its lenders with respect to the matters described above and in prior filings; however, there can be no assurance as to the outcome of any such discussions. [Emphasis added.]

91.     On or about December 24, 2007, Tarragon filed with the SEC its Form 10-Q for the fiscal quarter ended June 30, 2007, which had previously been scheduled to be filed by August 15, 2007. The Form 10-Q, among other things, disclosed that:

(a) Tarragon did not pay August 2007 debt service as scheduled and received notices of default and acceleration from certain of its lenders. Tarragon had restored its good standing on loans from General Electric Capital Corporation ("GECC") and Fannie Mae. However, with respect to several loans including a $157.1 million senior credit facility from Barclay's Capital Real Estate, Inc., the Company continued to be in default;

(b) Tarragon had not paid certain loans that have matured since June 30, 2007, and was seeking extensions of the maturities from these lenders;

(c) Tarragon had received notices of default, as guarantor, from the lenders of three unconsolidated entities because August 2007 and September 2007 debt service payments were not made timely;

(d) Tarragon, as of June 30, 2007, was not in compliance with financial covenants for debts totaling $342.5 million and, of that amount, $77.2 million has been satisfied through the sale of properties securing the debt;

(e) Tarragon had recorded a $17.9 million allowance for estimated customer defaults in June 2007 with respect to customer defaults on the Company's One Hudson Park development;

(f) Eighteen (18) buyers at One Hudson Park had defaulted after June 30, 2007 on units with a total purchase price of $16.3 million; and

(g) The default rate for high-rise and mid-rise condominium developments had accelerated from 2.4% for the full year 2006, to 42.9% for the second fiscal quarter of 2007 ended June 30, 2007 to 316% for the third fiscal quarter of 2007.

92.    On December 24, 2007, the Company also filed its Form 10-Q for the quarter ended September 30, 2007. The Form 10-Q disclosed that:

> In July 2007, we began experiencing increased buyer defaults at One Hudson Park. Deposits required for projects in this product-type have typically been 5% to 20% of the purchase price, which we concluded were sufficient to motivate buyers to comply with their contractual obligations. At One Hudson Park, where buyers were required to make deposits of up to 10% of the purchase price, revenue has been recognized on the percentage of completion method on firm contracts that meet the requirements established in SFAS No. 66, "Accounting For Sales of Real Estate"

("SFAS 66"), including the conclusion that sale prices are collectible. Recent changes in the credit markets have made it more difficult for buyers to obtain suitable financing, resulting in five buyers defaulting subsequent to September 30, even though they made significant nonrefundable deposits (ranging from $32,000 to $163,000). The allowance for estimated losses due to potential customer defaults takes into consideration these five defaults, as well as an estimate of expected future defaults under firm contracts existing at September 30, 2007. The allowance of $7.7 million was recorded as a reduction to homebuilding sale revenue.

### TARRAGON'S VIOLATION OF GAAP RULES
### IN ITS FINANCIAL STATEMENTS
### <u>FILED WITH THE SEC</u>

93.     These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for, and disclosure about its revenues, in violation of GAAP rules.

### TARRAGON'S FALSE FINANCIAL
### <u>REPORTING DURING THE RELEVANT TIME PERIOD</u>

94.     The Individual Defendants breached their fiduciary duties to shareholders by causing the Company to falsely report its results for fiscal 2004 through August 9, 2007 by improper accounting entries, which inflated the Company's reported net income and manipulated the Company's reported cash flows. The Company subsequently has admitted that its financial statements for fiscal 2004, 2005 and the first three quarters of fiscal 2006 should not be relied upon.

95.     Tarragon included its false financial statements and results in press releases and in its SEC filings. The SEC filings represented that the financial information presented therein was a fair statement of Tarragon's financial results and that the results

were prepared in accordance with GAAP.

96.    These representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of Tarragon's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

97.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.   Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. § 210. 10-01(a).

98.    The fact that Tarragon is restating its financial statements, and disclosed that these financial statements should not be relied upon is an admission that they were false and misleading when originally issued (APB No. 20, ¶17-13; SFAS No. 154, ¶25).

**Failure to Consolidate Unprofitable Variable Interest Entity**

99.    Tarragon overstated its income during the Relevant Time Period by failing to consolidate its unprofitable variable interest entity Ansonia into its consolidated financial statements in violation of GAAP, making the statements reporting earnings based upon that improper consolidation (¶¶ 40 - 47, 49, 50, 52, 53, 55 - 59, above) materially false or misleading and causing all statements during that period of time

projecting future revenues and earnings to be lacking in a reasonable basis.

100.    Prior to the enactment of FASB Interpretation Number ("FIN") 46(R) in December 2003, a company would consider whether or not to consolidate another entity into its consolidated financial statements based solely on financial control. If the company controlled the entity through voting interest *(i.e.,* by owning more than a 50% interest), then consolidation would generally take place. With the enactment of FIN 46(R)[1], a company is required to assess its equity investments to determine if they are "variable interest entities" and to decide whether to consolidate the variable interest entity based on factors other than strict voting control. Variable interests may arise from financial instruments, service contracts, guarantees, leases or other arrangements with the entity. A company will consolidate the entity if it determines it is the primary beneficiary of the entity and the risks associated with the entity are not properly dispersed amongst the other owners. A company is the primary beneficiary if it will absorb a majority of the entity's losses or returns.

101.    If an investment in which a company owns more than a 20% interest does not qualify as a variable interest entity, then a company may treat the entity as an equity investment for accounting purposes. Under the equity method a company records its initial investment at the original cost. Thereafter, the company will record its proportionate share of the operating income or loss from the investment each period thereby increasing or decreasing its cost basis in the investment. When a company's investment balance reaches zero, the company will discontinue recording its shares of the

---

1 FIN 46(R) is effective for all non-purpose variable interest entities for the first interim or annual period ending after March 15, 2004. In the case of Tarragon, it applied to the Company's results for the quarter ending March 31, 2004 - the Company's first quarter 2004 results.

loss except to the extent that the company has guaranteed any of the investment's obligations. APB No. 18, ¶¶6( b) and 19.

102.    Tarragon has numerous investments in partnerships or joint ventures. Tarragon adopted FIN 46(R) as of January 1, 2004, for all of its partnerships and joint ventures formed before February 1, 2003. Upon the adoption of FIN 46(R), Tarragon consolidated seven partnerships and joint ventures into the Company's consolidated financial results which had previously been unconsolidated. Tarragon was not required to take any charges upon consolidating any of these seven variable interest entities as none of the entities' assets were less than their liabilities. Nevertheless, despite its adoption of FIN 46(R), Tarragon failed to consolidate Ansonia into its financial statements.

103.    In December 1997, Tarragon formed Ansonia with Ansonia LLC in order to acquire and reposition or renovate older suburban apartment properties in central and eastern Connecticut. Tarragon was the general partner of Ansonia while Ansonia LLC was its limited partner. The four principals out of the five of Ansonia LLC are or were affiliated with the Company:

>   1.    Richard Frary - Frary has been a member of Ansonia LLC since 1997. He joined Tarragon in April 2004 as a director.
>
>   2.    Defendant Rothenberg - Rothenberg has been a managing member of Ansonia LLC since 1997.  He joined Tarragon in September 2000 as its COO and a director.
>
>   3.    Saul Spitz - Spitz has been a member of Ansonia LLC since 1997. He joined Tarragon in September 2000 as its Executive Vice President of Acquisition.
>
>   4.    Eileen Swenson - Swenson has been a member of Ansonia LLC since 1999. She joined Tarragon in September 2000 as President of Tarragon Management, Inc.

104.    In 1997, Tarragon obtained a 70% interest in the partnership due to its

initial contribution to Ansonia. The outside partners did not make any monetary contributions to Ansonia at the outset but obtained a 30% interest in the partnership subject to their obligation to pay Tarragon 30% of the amounts contributed to the partnership by the Company plus interest. In August 2001, the outside partners - most of whom were officers and/or directors of Tarragon *by* this point - met their obligation to pay Tarragon 30% of the amounts it contributed plus interest through a contribution of $232,000 cash and the issuance of notes totaling $5.3 million. The notes, which were payable from 30% of Ansonia's net cash flow, were fully paid in 2002. In November 2005, Tarragon contributed additional properties into Ansonia in exchange for an increase in its interest from 70% to 89.44%.

105.    Here, in violation of GAAP, Tarragon failed to consolidate Ansonia's unprofitable results into its own despite the fact that it was the limited partnerships' primary beneficiary. Given its general partnership interest in Ansonia of almost 90% and the fact that the remaining limited partnership interest in Ansonia was held primarily by individuals who were directly or indirectly related to Tarragon as officers and/or directors of the Company, Tarragon should have consolidated Ansonia into its financial statements. Had it consolidated Ansonia, as it was required to do under FIN 46(R), Tarragon's financial results would have been harmed.

106.    As a result of its restatement, Tarragon was forced to record a $16.8 million charge for a change in accounting principle in its fiscal year 2004 results upon adoption of FIN 46(R) to take into account the difference between the assets of Ansonia and its liabilities at the time. Further, Tarragon was forced to record unprofitable results for the partnership into its fiscal year 2005 and first quarter 2006 results.

107.    Tarragon restated its financial statements for fiscal years 2004 and 2005 and for the first quarter of 2006 due to this accounting violation. The chart below demonstrates the material impact this violation had on Tarragon's financial results during the Relevant Time Period:

**Effect on Tarragon's Financial Statements**

| (in thousands except EPS) | FY04 | FY05 | lQFY06 |
|---|---|---|---|
| | | | |
| Net Income as Originally Reported | 44,708 | 145,791 | 18,828 |
| Net Income as Restated | 29,518 | 88,498 | 18,474 |
| | | | |
| Diluted EPS as Originally Reported | $1.65 | $4.71 | $0.59 |
| Diluted EPS as Restated | $1.09 | $2.93 | $0.58 |
| | | | |
| *Overstatement in Reported Net Income* | *15,190* | *57,293* | *354* |

**Failure to Properly Account for Its Statement of Cash Flows**

108.    During the Relevant Time Period, Tarragon failed to properly account for its Statement of Cash Flows by failing to properly classify its cash inflows and cash outflows into the proper categories as operating, investing or financing activities.

109.    Under both GAAP and SEC Regulations, a statement of cash flows is considered to be an integral part of a full set of financial statements and is required to be disclosed on a periodic basis along with a company's balance sheet, income statement and statement of changes in stockholder's equity. FASB Statement of Financial Accounting

Standard ("SFAS") No. 95, *Statement of Cash Flows,* ¶1; FASB Statement of Financial Accounting Concepts No.5, *Recognition and Measurement in Financial Statements of Business Enterprises,* ¶13; and Article 3 and Article 10 of Regulation S-X [17 C.F.R. §210.3-02 and §210.10-01(c)(3)].

110.    The primary purpose of a statement of cash flow is to present information concerning a company's cash inflows and outflows during a given period. It shows the amount of cash generated and used by a company in a specified period. SFAS No. 95, ¶4. Cash inflows or cash receipts relate to the cash received by the company from its ongoing operations and from external investment sources. Cash outflows or cash disbursements relate to business expenses or investments made by the company. In its statement of cash flows, a company is required to classify cash inflows and cash outflows as resulting from (i) its investing transactions, (ii) its financing transactions or (iii) its operating activities based upon the nature of the activity. SFAS No. 95, ¶¶6 and 14.

111.    The statement of cash flows, along with the related footnote disclosures, should provide investors with information to assess the following:

1.    the enterprise's ability to generate positive future net cash flows;

2.    the enterprise's ability to meet its obligations, its ability to pay dividends, and its needs for external financing;

3.    the reasons for differences between net income and associated cash receipts and payments; and

4.    the effects on an enterprise's financial position of both its cash and noncash investing and financing transactions during the period. SFAS No. 95, ¶¶6 and 45-47.

112.    Here, Tarragon failed to properly classify its cash inflows and outflows by failing to account for them in the proper category as operating, investing or financing

activities. Tarragon restated its financial statements for fiscal years 2004 and 2005 and for the first, second and third quarters of 2006 due to this accounting violation.

**Improper Recognition of Revenue Under the Percentage-of-Completion Method**

113.    Tarragon's reported revenues and earnings were also inflated during the Relevant Time Period because it recognized revenue under the percentage-of-completion method (¶¶ 65-71, 73-75, 77, 79, 80) when there did not exist a reasonable basis for Tarragon to use such method. Thus, at projects such as One Hudson Park, Tarragon recognized revenue despite the fact that relatively small deposits of 10% or less were put down on the units with no reasonable expectation that full payment would be made and without conducting adequate due diligence that the prospective purchaser had the means to complete the proposed purchase.

114.    Moreover, the ratification of EITF 06-8 in November 2006 further highlighted the fact that Tarragon was not taking appropriate steps to evaluate the adequacy of the prospective purchasers' continuing investment to conclude that the sales price was collectible. The uncollectability of the sales price and the need to collect additional deposits from prospective purchasers was not a mere possibility, but was highly likely because the small deposits collected were insufficient to demonstrate a commitment to pay the full purchase price.

**Tarragon's Restatement and Write-off's Are an Admission of Falsity**

115.    The fact that Tarragon has restated its fiscal 2004 through third quarter 2006 financial statements and has admitted that such financial statements should no  be relied upon is an admission that the financial statements originally issued were false and that the overstatement of income was material. Pursuant to GAAP, as set forth in

Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by Tarragon was to correct for material errors in its previously issued financial statements. *See* APB No. 20, ¶¶7-13. Moreover, SFAS No. 154, *Accounting Changes and Error Corrections,* states: "Any error in the financial statements of a prior period discovered subsequent to their issuance shall be reported as a prior-period adjustment by restating the prior-period financial statements." SFAS No. 154, ¶25. Thus, GAAP provides that financial statements should be restated in order to correct an error in previously issued financial statements. Tarragon's restatement is due to an error. Thus, the restatement is an admission by Tarragon that its previously issued financial results and its public statements regarding those results were false.

116.    In addition, Tarragon was ultimately required to record total allowances of more than $25 million with respect to previously recognized revenue under the percentage-of-completion method with respect to One Hudson Park. Thus, Defendants failure to make appropriate determinations regarding collectability resulted in the improper inflation of Tarragon's revenue during the Relevant Period.

**Tarragon's Financial Statements Violated Fundamental Concepts of GAAP**

117.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1 ¶40)

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No.1, ¶42);

(f)    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable

as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

        (g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

        (h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

        118.    Further, the undisclosed adverse information concealed by defendants during the Relevant Time Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

        119.    The adverse information concealed by Defendants during the Relevant Time Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

**FUTILITY OF DEMAND ON THE BOARD OF DIRECTORS**

        120.    Plaintiff has not made a demand on Tarragon's Board of Directors to pursue the claims asserted herein, because such demand is excused and would have been a futile act for the reasons set forth below and throughout this Complaint:

a.  All of the Director Defendant directors of the Company are accused of a breach of fiduciary duties for failing to put into place adequate internal controls and adequate means of supervision to prevent the wrongful conduct complained of herein and in other complaints filed against the Company, creating a substantial doubt that any of the Individual Defendants could consider a demand in a disinterested and independent manner;

b.  A substantial likelihood exists that Individual Defendants did not exercise valid business judgment because the wrongful actions and/or inactions by Individual Defendants alleged herein constituted breaches of their respective fiduciary duties of good faith, disclosure, and loyalty to Tarragon and its stockholders, and an abdication of the directors' responsibilities giving rise to liability to Tarragon; and

c.  Certain of the Individual Defendants are presently defendants in certain federal securities class action suits described above, and face a substantial likelihood of liability given the misstatements of Tarragon's operating revenues, gains and expenses.  Accordingly, Tarragon's directors have disabling conflicts and could not be relied upon to reach a truly independent decision as to whether to

> commence action against themselves arising out of the
> same misconduct.

121.    As such, each and all of the Individual Defendant directors were on direct notice that rigorous and ever-vigilant scrutiny of compliance with legal guidelines for ethical corporate conduct were absolutely essential to protect the Company and its shareholders from substantial liability and the potential financial impact to Tarragon resulting from both pending civil actions and reputational harm in the market place.

122.    Given the importance to Tarragon to maintain the integrity of the financial reports and auditing practices as well as the need to maintain adequate internal controls and monitoring of business functions, the Tarragon Board of Directors was or should have been aware of the risk of harm to the Company and its shareholders.

123.    Moreover, Defendants Schrag, Schafran, Stark and Davis were members of the Company's Audit Committee making their responsibilities even greater.    The Committee was entrusted with a great deal of power and influence in connection with financial reporting and financial controls.    Their responsibility to the Company's shareholders to prevent and ferret out fraud and inadequate financial controls is even greater than the other directors. The audit committee met a mere five times during 2005.

124.    In addition, Grant Thornton's statements that it had conducted in audits of Tarragon's financial statements in accordance with GAAS were false. As was reported by *Bloomberg* on July 17, 2007:

> The official mission of the auditing profession's watchdog is "to protect the interests of investors." In practice, what it really protects best are the dirty secrets of the accounting firms and their corporate audit clients.
>
> Created in 2002 by the Sarbanes-Oxley Act, the Public Company

Accounting Oversight Board inspects the firms that audit companies with U.S. traded securities. In its brief history, the board has identified scores of companies where outside auditors have done lousy jobs checking the books. Investors crave that kind of knowledge.

In its reports to the public, though, the board doesn't name the companies. So last month, for instance, when the board released its annual inspection report on Grant Thornton LLP, the sixth-largest U.S. accounting firm by revenue, one of the audits it criticized was at a company identified only as "Issuer A." Transparency, this isn't.

The report said Grant Thornton failed "to obtain sufficient competent
evidential matter to support its audit opinion" and "failed to identify" an accounting violation "that it should have identified and addressed before issuing its audit report."

In a response letter, the firm complained about the harsh wording and said it actually had identified the problem. The violation: Issuer A, which restated its financials last year, had left off its balance sheet a certain 90 percent-owned partnership, the rest of which was owned mainly by company insiders.

What's Missing

Here's what the report left out: Issuer A is Tarragon Corp., a New York based real-estate developer awash in Florida condominiums. Last year's restatement slashed 2005 net income 39 percent to $88.5 million. And Grant Thornton remains its auditor. Faced with those facts, some investors during proxy season almost certainly would vote to fire the auditor and perhaps even withhold votes from directors who sit on the company's audit committee.

125.     According to the 1992 "Internal Control -- Integrated Framework," published by the Committee of Sponsoring Organizations of the Treadway Commission, which is the accepted standard for defining and assessing the effectiveness of the internal control of organizations in the United States, "internal control" is defined as follows:

Internal control is a process, effected by an entity's board of

directors, management, and other personnel, designed to provide

reasonable assurance regarding the achievement of objectives in the following categories:

- Effectiveness and efficiency of operations.

- Reliability of financial reporting.

- *Compliance with applicable laws and regulations.*

(Emphasis added.)

126.    As such, the Tarragon Audit Committee was at all times specifically responsible for oversight of compliance by Tarragon with applicable laws and regulations.  Relevant to this demand futility analysis, as noted above, several of the Audit Committee members have special skill, knowledge and experience that they were duty bound to bring to bear, in their roles as directors and members of the Audit Committee, for the benefit of Tarragon and its shareholders.

127.    Defendants Liebman, Schafran, Schrag and Weisbrod are members of the Executive Compensation Committee. While on the Committee, they approved compensation plans for directors and executives which included millions of dollars which have not been re-sought since the information that the Company's financial results were grossly inflated became known. The Executive Compensation Committee met twice during 2005.

128.    Additionally defendants Schrag, Schafran and Davis are members of the Corporate Governance and Nominating Committee. While on the Committee, they were responsible for identifying, evaluating and recommending to the Board Individuals to serve as directors. The Committee also oversees he Board's annual review of director independence and effectiveness of the corporate governance guidelines. The Committee

met once in 2005.

129.    Despite of and in the face of all of this knowledge, and despite the fact that they were on notice of serious issues concerning the blatancy of the accounting violations and misrepresentations, the Individual Defendants recklessly failed to make adequate inquiry and/or take appropriate action to ensure that serious violations of various fiduciary duties would be recognized, tracked and, ultimately, reported through appropriate channels with notice to the full Tarragon Board of Directors.

130.    Instead of ensuring that effective compliance reporting and corrective action was built into Tarragon's system of internal controls, by their reckless disregard of known risks, the Individual Defendants instead allowed a culture to persist at Tarragon that placed profits before fiduciary duties and compliance with all applicable laws and regulations.

131.    The wrongful acts and omissions at issue constitute violations of law resulting from the Individual Defendants' bad faith, knowing and reckless failure to take effective action to protect the Company and its shareholders by ensuring compliance by Tarragon with all applicable legal and regulatory requirements.  Such conduct is thus not subject to the protection of the business judgment rule, nor are the Individual Defendants protected from personal liability for such bad faith misconduct by virtue of any exculpatory provision in the Company's certificate of incorporation.

132.    As a result of the Defendant Directors' bad faith and reckless breach of fiduciary duty, the Company and its shareholders have suffered, and will further suffer, massive financial harm.

133.    For all of these reasons, all of the Defendant Directors face a substantial

likelihood of liability on the claims asserted in this action, making them materially interested with respect to consideration of a pre-suit demand. Accordingly, such demand would be futile, rendering pre-suit demand excused for the purposes of this derivative action.

134.    Moreover, to the extent that the Company presently maintains or previously maintained officers and directors liability insurance coverage, that insurance would be the primary or principal source of any recovery against the defendants, and would be rendered void if the Company commenced proceedings against the Individual Defendants Friedman, Rothenberg, Liebman, Weisbrod, Fray, Davis, Schafran, Schrag, Stern, as these policies uniformly contain provisions which void coverage if the Company brings suit in its own name. For this reason also, demand is excused.

135.    Furthermore, in 2006, defendant Friedman and affiliates made a $30 million unsecured revolving line of credit available to the Company. this unsecured loan replaced a two-year $20 million revolving line of credit that defendant Friedman and affiliates made available to the Company in 2004 and 2005. The largest aggregate amount of indebtedness under the line of credit was $30,703,145, $12,488,107 and $3,978,880 for the years 2006, 2005 and 2004, respectively. Interest paid was $291,948, 58,978 and $5,764 for the years 2006, 2005 and 2004, respectively. As of December 31, 2006, the outstanding amounts under this loan was $10,380,976. In March 2007, the line of credit was increased to $40 million.. In August 2007, Tarragon and Friedman agreed that all payments would be deferred until November 2007, and no further advances would be made under this line of credit. In November 2007, this line of credit was converted into a term loan that matures in January 2009, and Tarragon was granted the right to defer

interest payments until November 2007. Interest payments totaling $1.5 million were made in November and December of 2007 in connection with the conversion of the line of credit to a term loan.

136.    Tarragon received property and asset management fees totaling $75,468 in 2006, $9,777 in 2005 and $13,526 in 2004 and loan origination fees of $155,750 in 2006 from real estate partnerships controlled by Mr. Friedman.

137.    Between August 7, 2007 and August 23, 2007, 5,541,866 shares of the Company's common stock beneficially owned by Friedman were sold as a result of margin calls. As of December 4, 2007, defendant Friedman beneficially owned 22.3% of the Company's common stock outstanding. Prior thereto, defendant Friedman beneficially owned approximately 43% or 12,478,000 shares of the Company's common stock.

138.    In 1997, the Company formed Ansonia Apartments, L.P., a Delaware limited partnership ("Ansonia"), with Ansonia LLC, a New York limited liability company. Defendants Frary, Rothenberg and others are members in Ansonia LLC, which is the limited partner in Ansonia. Tarragon Development Corporation is the general partner of Ansonia.

139.    In November 2000, the Company formed Ansonia Liberty LLC, a Connecticut limited liability company, for the purpose of acquiring a 124-unit apartment community known as the "Liberty Building" located in New Haven, Connecticut. In October 2001, Frary acquired a 10% member interest in Ansonia Liberty LLC. The Company's investment in Ansonia Liberty L.L.C. was fully recovered in 2002 from distributions to the members of cash proceeds from refinancing of the mortgage secured

by the property.  In 2004, the Company received cash distributions of $158,408 from Ansonia Liberty L.L.C.  Defendant Frary also received $30,273 in cash distributions from Ansonia Liberty L.L.C. in 2005 and $24,601 in 2004.

140.    In November 2005, the Company contributed its interests in fourteen apartment properties, including the Liberty Building, to Ansonia in exchange for an increased ownership interest in Ansonia, and Frary contributed his interest in Ansonia Liberty LLC in exchange for an individual ownership interest in Ansonia. Simultaneously, Ansonia closed a $391 million non-recourse structured financing secured by first and second lien mortgages on 23 of its 25 properties and pledges of equity interests in the related property-owning entities.

141.    In 2005, the Company received $64.4 million in cash distributions from Ansonia, including $64 million representing the Company's share of the net proceeds from the structured financing transaction.  In 2004, the Company received cash distributions of $4,854,462 from Ansonia in connection with refinancings and supplemental mortgages on four of its properties.

142.    In June 2006, Ansonia received an additional $20 million in loan proceeds under the financing of its portfolio. Tarragon received $15,814,890 in cash distributions representing the Company's share of the net proceeds from this transaction. Defendants Rothenberg,. Frary and Ms. Swenson received cash distributions from Ansonia in 2006, 2005 and 2004 in the amounts provided in the following table.

| Name | 2006 | 2005 | 2004 |
|------|------|------|------|
| Richard S. Frary | $333,768 | $1,395,785 | $340,672 |
| Robert P. Rothenberg | $677,961 | $2,802,594 | $814,439 |
| Eileen Swenson | $121,051 | $ 500,404 | $115,506 |

143.    Tarragon received property management fees of $1,840,455 in 2006,

$1,142,087 in 2005 and $1,025,968 in 2004 from properties owned by Ansonia.

144.    In November 1999, the Company formed Tarragon Calistoga LLC, a Nevada limited liability company, with defendant Frary.   The Company has an 80% managing member interest in Tarragon Calistoga LLC, and Frary holds the remaining 20% member interest.   Tarragon Calistoga LLC owns (i) a 5% member interest in Calistoga Ranch Owners LLC, a California limited liability company, which owns a property development in Napa Valley, California, and (ii) a 25% member interest in CR Tarragon Palm Springs LLC, a California limited liability company, which owns a Palm Springs, California resort development.   In June 2001, Frary received $133,289.50 in distributions from Tarragon Calistoga LLC and the Company received $533,157.99.

145.    Additionally, on February 14, 2005, and with the Company's securities trading at artificially inflated prices, the Company and security-holders sold $62 million of senior convertible notes.   These notes were sold with a conversion ratio of 54.4662 shares of the Company's common stock per $1,000 note, which reflected an initial conversion price of $18.36 per share.

146.    Defendant Davis, the sole shareholder of RMS, Inc. provided property level management services for several properties owned by the Company earning thousands of dollars in fees for performing such services.

147.    On September 30, 2006, Tarragon issued 616,667 shares of 10% cumulative preferred stock, liquidation value $12.00, and 668,096 shares of Tarragon common stock to Rhodie LLC in connection with Rhodie's right to convert its membership units in Tarragon Development Corporation into Tarragon securities.

## INVOLVEMENT IN CERTAIN LEGAL PROCEEDINGS

148.    In connection with an action styled *Olive, et al. v. National Income Realty Trust, et al.,* NIRT, among others, entered into an agreement in May 1994 (the "Olive settlement") which provided that any related party transaction entered into prior to April 27, 1999, with certain limited exceptions, would require the unanimous approval of the NIRT Board of Trustees. In addition, pursuant to the Olive settlement, related party transactions could only be undertaken in exceptional circumstances, and after a determination by the Board of Trustees that the transaction was in the best interest of NIRT and that no other opportunity existed that was as good as the opportunity presented by such transaction.

149.    In light of the consolidation of NIRT into Tarragon, the Board of Directors of Tarragon voluntarily elected to treat the requirements for approval of related party transactions contained in the Olive settlement as binding on Tarragon through April 27, 1999. Following that date, the Board changed that policy to approval by a majority of the Independent Directors entitled to vote.

150.    In November 1994, defendant Friedman consented to an order prohibiting him from participating in an insured depository institution without the prior written approval of the Director of the Office of Thrift Supervision.

151.    Also, during the Relevant Time Period, and with the Company's securities trading at artificially inflated prices, Company insiders sold 4,154,651 shares of the Company's stock for gross proceeds of $9,082,458.  This trading by Company insiders is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of | Price Per | Gross |
|---|---|---|---|---|
| June 7, 2007 | Rohdie, Robert | 3700 | $10.50 | $38,850 |

| May 11, 2006 | Weisbrod, Carl B. | 2000 | $17.02-17.12 | $34,000 |
| December 16, 2005 | Davis, Willie K. | 1720 | $21.78 | $37,461 |
| September 19, 2005 | Liebman, Lance | 2000 | $18.51 | $37,020 |
| September 12, 2005 | Liebman, Lance | 200 | $19.80 | $3,960 |
| September 6, 2005 | Liebman, Lance | 2000 | $21.00 | $42,000 |
| September 6, 2005 | Swenson, Eileen | 20000 | $21.20 | $424,000 |
| September 1, 2005 | Weisbrod, Carl B. | 500 | $21.20 | $10,600 |
| September 1, 2005 | Weisbrod, Carl B. | 3000 | $21.59 | $64,770 |
| August 30, 2005 | Swenson, Eileen | 6100 | $21.31 | $129,991 |
| August 29, 2005 | Liebman, Lance | 2000 | $21.00 | $42,000 |
| August 26, 2005 | Swenson, Eileen | 6400 | $21.16 | $135,424 |
| August 25, 2005 | Swenson, Eileen | 7500 | $21.24 | $159,300 |
| July 18, 2005 | Rohdie, Robert | 1000 | $25.20 | $25,200 |
| June 28, 2005 | Schrag, Raymond | 500 | $23.90 | $11,950 |
| June 28, 2005 | Schrag, Raymond | 500 | $24.50 | $12,250 |
| June 27, 2005 | Friedman, Lucy N. | 25000 | $23.55 | $58,8750 |
| June 24, 2005 | Swenson, Eileen | 3500 | $22.07 | $77,245 |
| June 23, 2005 | Swenson, Eileen | 1500 | $22.97 | $34,455 |
| June 17, 2005 | Swenson, Eileen | 5000 | $23.06 | $115,300 |
| May 23, 2005 | Weisbrod, Carl B. | 3000 | $21.80 | $65,400 |
| May 23, 2005 | Weisbrod, Carl B. | 5000 | $21.87 | $109,350 |
| May 18, 2005 | Swenson, Eileen | 13200 | $21.10 | $278,520 |

| | | | | |
|---|---|---|---|---|
| May 16, 2005 | Schafran, Lawrence G. | 25500 | $20.50 | $522,750 |
| May 16, 2005 | Liebman, Lance | 7000 | $21.26 | $148,820 |
| May 16, 2005 | Swenson, Eileen | 1300 | $22.11 | $28,743 |
| May 13, 2005 | Swenson, Eileen | 9500 | $22.36 | $212,420 |
| May 12, 2005 | Swenson, Eileen | 6000 | $22.16 | $132,960 |
| May 11, 2005 | Swenson, Eileen | 10000 | $22.71 | $227,100 |
| March 28, 2005 | Weisbrod, Carl B. | 4000 | $21.78 | $87,120 |
| February 24, 2005 | Schrag, Raymond | 887 | $21.24 | $18,840 |
| | **TOTAL:** | **180,984 Shares** | | **$3,886,694** |

## PLAINTIFF'S FIRST CAUSE OF ACTION:
## DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY

152.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153.    The Individual Defendants breached their fiduciary duties to the Company and to its shareholders by failing in their responsibility to maintain adequate accounting controls and by employing improper accounting and audit practices and procedures, which artificially inflated the value of the Company's common stock.

154.    All of the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Tarragon in a manner consistent with the operations of a publicly held company.

155.    All of the Individual Defendants failed to properly consider the interests of

the Company and its public shareholders and failed to exercise proper supervision and wasted corporate assets by paying bonuses to certain of its executive officers while inflating corporate earnings and putting the Company at risk for millions of dollars of legal liability and/or legal costs to defend the Company.

156.    Individual Defendants' misconduct described above constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

157.    All of the Individual Defendants owe and owed a fiduciary duty to Tarragon to supervise the issuance of its press releases and public filings to ensure that they were truthful and accurate and that they conformed to federal and state law.  The Individual Defendants breached their fiduciary duty by failing to properly supervise and monitor Tarragon's accounting practices and the adequacy of its internal financial controls and audits and by allowing misleading statements and filings to be issued and made.  These actions could not have been exercised in good faith or with the prudence required of the business judgment rule to protect the interests of the Company and its shareholders.

158.    Nevertheless, the Individual Defendants have engaged in a sustained and systematic failure to exercise their oversight responsibilities to ensure that Tarragon complied with Federal and State Laws, rules and regulations and to ensure the integrity of its financial reporting and statements to the public.

159.    As a direct result of the Individual Defendants' breaches and ancillary conduct, Tarragon has been the subject of securities fraud class action lawsuits by allegedly defrauded investors, has lost market share, has had its reputation in the business

community tarnished and has thus been damaged.

**PLAINTIFF'S SECOND CAUSE OF ACTION**
**FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION**

160.     Plaintiff repeats and realleges each and every allegation set forth above.

161.     At the time of the stock sales set forth herein, the defendants knew the information described above, and certain of those defendants sold Tarragon common stock on the basis of such information.

162.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the defendants that had sold their shares of Tarragon common stock during the Relevant Time Period used for their own benefit when they sold Tarragon common stock.

163.     The defendants that sold their shares during the Relevant Time Period sold Tarragon securities while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

164.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the defendants fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the defendants obtained thereby.

**PLAINTIFF'S THIRD CAUSE OF ACTION:**
**CONTRIBUTION AND INDEMNIFICATION**

165.     Plaintiff repeats and realleges each and every allegation set forth above.

166.     Tarragon is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to defendants' liability to the Company.

167.    Tarragon's alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of defendants as alleged above, and Tarragon is entitled to contribution and indemnification from each of the defendants in connection with all such claims that have been, are or may in the future be asserted against Tarragon by virtue of Individual Defendants' misconduct.

168.    Plaintiff has no adequate remedy at law.

**WHEREFORE,** Plaintiff demands judgment as follows:

A.      Directing each and all of the Defendants to account to the Company for all damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

B.      Requiring each and all of the Defendants to return to Tarragon all salaries, profits and/or the value of other remuneration of whatever kind paid to them by the Company during the time they were in breach of the fiduciary duties they owed to Tarragon.

C.      Directing each and all of the Defendants to pay interest at the highest rate allowable by law on the amount of damages sustained by the Company as a result of Defendants' culpable conduct;

D.      Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

E.    Granting such other and further relief as the Court may deem just and proper.

Respectfully submitted,

_____
Joshua M. Lifshitz (JL-9172)
Peter D. Bull (PB-9118)
Bull & Lifshitz, LLP
18 East 41st Street
New York, New York 10007
Telephone: (212) 213-6222

90