UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ————————————————————— X | |
| | ) |
| ERNEST GOTTDIENER, Derivatively and on | ) |
| Behalf of Nominal Defendant, TARRAGON, Inc. | ) Civil Action No.: 07CV9436 |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| WILLIAM S. FRIEDMAN, ROBERT P. ROTHENBERG, ) | |
| WILLIE K. DAVIS, LANCE LIEBMAN, LAWRENCE G. ) | |
| SCHAFRAN, V.J. SCHRAG, CARL B. WEISBROD, | ) |
| RICHARD S. FRARY, MARTHA E. STARK, ROBERT | ) |
| C. RHODIE, ERIN DAVIS PICKENS, | ) |
| | ) |
| | ) |
| | ) |
| | ) AMENDED COMPLAINT |
| Defendants, | ) (Jury Trial Demanded) |
| | ) |
| And | ) |
| | ) |
| TARRAGON CORPORATION, | ) |
| | ) |
| Nominal Defendant. | ) |
| ————————————————————— X | |

## AMENDED STOCKHOLDER'S DERIVATIVE COMPLAINT

Plaintiff, Ernest Gottdiener by and through his attorneys of record, brings this Amended Verified Stockholder's Derivative Complaint on behalf of Nominal Defendant Tarragon Corporation ("Tarragon" or the "Company"), and alleges upon personal knowledge as to his own acts and as to all other matters upon information and belief, and based upon the investigation of Plaintiff's counsel, which includes a review of regulatory filings and reports, securities analyst reports and advisories about Tarragon, press releases and other public statements issued by the Company, as follows:

## INTRODUCTION

1.     This is a stockholder's derivative action brought by plaintiff, Ernest Gottdiener, who has held Tarragon common stock at all relevant times.

2.     The Individual Defendants (identified below) were or are the members of Tarragon's Board of Directors and/or were officers of the Company.  They have been and are highly compensated and benefit from compensation plans, which provide them with incentives to remain on the Board or in high level management positions and provide further incentives to maintain a high price for Tarragon stock.

3.     The Nominal Defendant, Tarragon, is a Nevada corporation.  Tarragon and its subsidiaries engage in homebuilding and real estate development, and real estate service businesses in the United States.  It develops, renovates, builds, and markets high and mid-rise condominiums; town homes, traditional new developments, and low-rise condominiums; and low and mid-rise rental apartment communities in the urban locations and communities.  The Company also engages in land development and conversion of existing rental apartment communities to condominiums.  In addition, it offers real estate services, such as property management, condominium management, and acquisition and renovation of apartment properties, as well as provides mortgage lending services.

4.     As of December 31, 2006, Tarragon had 35 residential communities with 4,560 homes or home sites in inventory or under development in 6 states; and approximately 14,600 apartments in 12 states, including 11,000 in rental communities and 3,300 in condominium conversion communities.  The Company was founded in 1973

and is based in New York, New York.

5.      On March 19, 2007, Tarragon informed investors that it planned to spin-off its Homebuilding Division as an independent publicly traded company during the year. As a result, the Company informed investors that it was withholding its financial guidance until the spin-off was completed. Additionally, the Company stated that its goal for 2007 was "to validate the confidence our investors have placed in the strength of our long term strategy, aggressively manage our balance sheet, and improve earnings over 2006."

6.      On July 17, 2007, *Bloomberg* reported that the Company's auditor had "failed to obtain sufficient competent evidential matter to support its audit opinion" regarding the Company's financial statements, and had "failed to identify an accounting violation that it should have identified and addressed before issuing its audit report." The article further disclosed that Tarragon had left a 90 percent owned partnership off of its balance sheet.

7.      Then on August 9, 2007, the Company shocked investors when it reported that it was unable to timely file its Quarterly Report because it needed additional time "to finalize its evaluation of property impairment charges and other write-downs necessitated by the recent decision to sell certain properties." The Company also disclosed that it was unable to obtain loan modifications and other financing, which had materially affected the Company's liquidity, and raised doubt about its ability to continue as a going concern. Additionally, the Company's Board of Directors had formed a special committee "to evaluate strategic and financial alternatives that may be available to Tarragon and its stakeholders," including "all available forms and sources of financing, property sales and

other strategic transactions." Finally, the Company stated that it was postponing the spin-off of its homebuilding business, and that it expected to record impairment charges in excess of $125 million.

8.    On this news, the Company's shares declined $1.88, or over 66.6 percent, to close on August 9, 2007 at $0.91 per share, on unusually heavy trading volume.

9.    The Complaint alleges that, throughout the relevant time period of January 5, 2005 through the present (the "Relevant Period"), defendants failed to disclose material adverse facts about the Company's financial well-being, business relationships, and prospects. Specifically, defendants failed to disclose or indicate the following: (1) that the Company had failed to consolidate a limited partnership into its consolidated financial statements; (2) that the Company had failed to properly report its consolidated statement of cash flows by misclassifying items among its operating, investing and financing activities; (3) that the Company had failed to timely take property impairment charges and other write-downs on certain properties; (4) that the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (5) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times; (6) that the Company was experiencing liquidity issues due to its inability to obtain loan modifications and financing; (7) that the Company lacked adequate internal and financial controls; and (8) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects for 2007 were lacking in a reasonable basis when made.

10.    As a result of defendants' wrongful acts and omissions, and the

precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

11.     Nevertheless, had the Individual Defendant directors of the Company, as identified below, fulfilled their responsibilities to the Company and its shareholders, they would have recognized the Company's financial and administrative controls were entirely inadequate, and they would have implemented changes required to ensure compliance with effective financial and administrative controls and accurate financial reporting.

12.     Accordingly, it is alleged that as a result of the reckless breach of their fiduciary duties to monitor and put into place reasonable control and review procedures, the Individual Defendants have inflicted upon the Nominal Defendant Tarragon severe and continuing damages.

## PARTIES

13.     Plaintiff Ernest Gottdiener is and, at the times of the wrongs complained of herein, was an owner of Tarragon common stock and is domiciled in the state of Florida.

14.     Nominal Defendant Tarragon is a Nevada Corporation that maintains its executive offices at 423 West 55th, 12th Floor, New York, New York.

15.     Defendant William S. Friedman ("Friedman") is a resident of the State of New York and was at all relevant times the Company's Chairman of the Board and Chief Executive Officer ("CEO") of the Company.

16.     Defendant Robert P. Rothenberg  ("Rothenberg") is a resident of the State of New York and was at all relevant times the Company's President, Chief Operating Officer ("COO"), Chief Executive Officer of Tarragon Development Corporation and

director of the Company.

17.    Defendant Willie K. Davis ("Davis") is a resident of the State of New York and was at all relevant time a director of the Company.

18.    Defendant Lance Liebman ("Liebman") is a resident of the State of New York and has been a member of the Company's Board of Directors since 1998.

19.    Defendant Lawrence G. Schafran ("Schafran") is a resident of the State of New York and has been a member of the Company's Board of Directors since 1998.

20.    Defendant Raymond V.J. Schrag ("Schrag") is a resident of the State of New York and has been a member of the Company's Board of Directors since 1998.

21.    Defendant Carl B. Weisbrod ("Weisbrod") is a resident of the State of New York and has been a member of the Company's Board of Directors since 1998.

22.    Defendant Richard S. Frary ("Frary") is a resident of the State of New York and has been a member of the Company's Board of Directors since 2004.

23.    Defendant Martha E. Stark ("Stark") is a resident of the State of New York and has been a member of the Company's Board of Directors since 2005.

24.    Defendant Robert C. Rohdie ("Rohdie") is a resident of the State of New York and has served as a member of the Board of Directors and as President and Chief Executive Officer of Tarragon Development Corporation, a wholly owned subsidiary responsible for real estate development and renovation projects, from February 2000 through August 14, 2007.  In February 2000, Tarragon entered into an agreement to acquire the interests of Robert C. Rohdie and his affiliates in ten apartment communities. Defendant Rohdie, Tarragon's partner in the development of these projects, contributed his equity interests to Tarragon Development Company, LLC ("TDC"), an operating

entity the Company formed, in exchange for a preferred interest in TDC of $10 million. Defendant Rohdie's preferred interest in TDC earned a guaranteed return until September 30, 2006, when he converted his preferred interest into 668,096 shares of the Company's common stock and 616,667 shares of the Company's 10% cumulative preferred stock in accordance with the terms of the operating agreement of TDC. Defendant Rohdie received distributions of $770,366, $623,556 and $421,889 in 2006 (through the date of the conversion), 2005 and 2004, respectively, in payment of his guaranteed return.

25.      Defendant Erin Davis Pickens ("Pickens") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and Executive Vice President.

26.      Defendants in paragraphs 15-25 are collectively referred to hereinafter as the "Individual Defendants."  During the Relevant Time Period, each of the Individual Defendants, as senior executive officers and/or directors of Tarragon, were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

## **ADDITIONAL PERSONS**

27.      Beachworld Partners, L.P. ("Beachworld") is a Texas limited partnership

the business address of which is 423 West 55th Street, 12th Floor, New York, New York 10019. Defendant Friedman is the sole general partner of Beachworld and Lucy Friedman, defendant Friedman's wife, and their four children (Ezra H. Friedman, Tanya E. Friedman, Gideon Z. Friedman, Samuel N. Friedman) are Beachworld's partners. Beachworld jointly filed Schedules 13D with defendant Friedman with respect to their ownership interest in Tarragon.   In addition, Beachworld has many other entangling business relationships with Tarragon.

28.    Grant Thornton LLP ("Grant Thornton") is the U.S. member firm of Grant Thornton International, a global accounting, tax and business advisory organization, which maintains its national headquarters at 175 West Jackson Boulevard, 20th Floor, Chicago, IL 60604. Grant Thornton made statements in its audit on Tarragon's financial statements for the fiscal years ended December 31, 2004, 2005, 2006 which, with Grant Thornton's consent, were included in the Forms 10-K filed by Tarragon with the SEC for those fiscal years.  In addition, Grant Thornton reviewed Tarragon's Forms 10-Q prior to their being filed with the SEC.

29.    At all times herein, the Individual Defendants, in performing each and all of the acts and/or non-actions described herein, functioned as the employees, agents, control persons and/or co-conspirators with each and every other Individual Defendant identified herein.

## VENUE AND JURISDICTION

30.    Both the venue and jurisdiction of this matter are proper in that the Nominal Defendant is headquartered in and at all times mentioned herein has and continues to do business in New York, New York.  Moreover, much of the preparation of

the materially misleading and false public statements occurred in this District.

## DUTIES AND OBLIGATIONS OF DIRECTORS

31.     The Individual Defendants owed Tarragon and its shareholders fiduciary duties including the duties of care and loyalty that require, *inter alia*, that they control and manage the company in a fair, just, honest and equitable manner.

32.     To discharge their legal duties, the Director Defendants were required to exercise reasonable and prudent supervision over, and keep themselves informed of Tarragon's senior management, policies, practices, controls and financial affairs which included, *inter alia*, taking steps necessary to ensure that adequate policies and reporting systems existed at Tarragon and functioned properly to ensure that relevant government rules and regulations under which Tarragon and its subsidiaries operated were followed, so as to prevent the engaging in of improper financial reporting and promote the efficient and proper use and preservation of its property and assets and engage in fair dealing with the investing public.

33.     Moreover, Director Defendants, due to their substantial experience and expertise in the specialized area of business management, were aware of the highly fiduciary nature of the business -- that is, they were aware that Tarragon, as a publicly-owned business, was in a position of heightened trust and confidence with respect to the monies and the persons who invested their money in the business, and that this relationship gives rise to fiduciary duties and potential liabilities to the entities and persons to whom those duties are owed.  Accordingly, their duties of loyalty, good faith and care to Tarragon and its shareholders required that they take appropriate action to ensure compliance by the Company with the fiduciary duties owed to third parties, so as

to protect the Company and its shareholders from losses arising from liability for breach of those duties.

34.     Further, the Director Defendants, pursuant to Nevada law, to the extent that they exercised control over management of the business and affairs of Tarragon and its subsidiaries, were required to use their knowledge, experience and ability to control and direct Tarragon management in furtherance of the best interests of Tarragon and its shareholders.  In addition, as many of the Director Defendants have, and at all relevant times had, special knowledge, skill, expertise and experience directly gained as a result of, among other things, their executive roles at Tarragon; and other financial services-related entities.

35.     These individual Director Defendants were required to use their special knowledge, skill, expertise and experience for the benefit of, *inter alia*, Tarragon and its subsidiaries, in the exercise of their judgment as directors of Tarragon.

36.     Thus, pursuant to their membership on the Board, as well as on various Committees of the Board, and, in some cases, positions as senior executive and managers at Tarragon, the Director Defendants, pursuant to Nevada law, owed the Company and its stockholders fiduciary obligations of candor, fidelity, trust, and loyalty, and are and were required to use their ability to control and direct Tarragon in a fair, just, and equitable manner, as well as to act in furtherance of the best interests of Tarragon and its stockholders.  In addition, while they occupied their directorships, the Individual Defendants owed Tarragon the fiduciary duty to exercise due care and diligence in the management and administration of the affairs of the Company, and in the use and preservation of its property and assets.

37.    To discharge the aforesaid duties under Nevada law, the Individual Defendants were required to exercise reasonable and prudent supervision over management and the policies, practices, controls, and financial affairs of the Company pursuant to their fiduciary obligations to use the same care and diligence as would an ordinary prudent person in a like position. Specifically, the Individual Defendants were required, among other things:

(a)    Manage, conduct, supervise and direct the business affairs of Tarragon in accordance with applicable state and federal law and rules and regulations;

(b)    Neither violate nor permit any officer, director, agent or employee of Tarragon to violate applicable state laws, federal laws, rules, regulations;

(c)    Establish and maintain systematic and accurate books and records of the business and affairs of Tarragon and procedures for the reporting of the business and affairs to the Board of Directors, and periodically investigate, or cause independent investigation to be made of, said books and records;

(d)    Maintain and implement an adequate and functioning system of internal financial and accounting controls, such that Tarragon financial statements and other publicly disseminated information would be accurate;

(e)    Exercise supervision over the public statements made and/or issued to the securities markets relating to Tarragon;

(f)     Remain informed as to the status of Tarragon's business, conditions, practices and operations, and upon receipt of notice or information of imprudent or unsound practices or operations, make reasonable inquiry in connection therewith, and take steps to correct such practices or operations and make such disclosures as are necessary to comply with state and federal securities laws;

(g)     and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

38.     Notwithstanding the above-referenced duties, the Individual Defendants, in carrying out their functions for the Nominal Defendant Company, breached their fiduciary duties by, among other things:

(a)     permitting wrongful business practices to occur which had the effect of manipulating revenues and earnings;

(b)     inadequately supervising the employees, managers and putative independent auditors of Tarragon and failing to instruct and ensure that they acted with honesty and integrity in order to preserve and enhance Tarragon's reputation in the business community;

(c)     recklessly exposing Tarragon to millions of dollars of damages, including costs associated with class actions brought by shareholders of the Company for violations of federal securities laws; and

(d)    failing to institute legal action against those officers, directors,

contractors and/or and employees of the Company, responsible for

permitting Tarragon to engage in the conduct complained of

herein.

## SUBSTANTIVE ALLEGATIONS AND BACKGROUND

### Background

39.    Tarragon is a homebuilder and real estate developer with multiple business

lines.  The Company's homebuilding and real estate development segment focuses on

developing, renovating, building and marketing homes in high-density, urban locations

and planned communities.

### Materially False and Misleading
### Statements Issued During the relevant Time Period

40.    The Relevant Time Period begins on January 5, 2005.  On this day, the

Company issued a press release entitled "Tarragon Corporation Affirms 2004 Guidance

And Releases 2005 Earnings Forecast." Therein, the Company, in relevant part, stated:

> Tarragon Corporation (Nasdaq: TARR), a leading homebuilder
> specializing in the development and marketing of high-density
> residential communities and a real estate investor with a portfolio
> of approximately 14,000 apartments, today reaffirmed its previous
> guidance for 2004, forecasting net income of $42 to $46 million, or
> approximately $2.40 to $2.60 per share, versus net income for
> fiscal 2003 of $31.2 million or $1.80 per share in each case on a
> fully diluted basis.
>
> Tarragon Corporation simultaneously announced its 2005 earnings
> guidance.  Net income for fiscal 2005 is expected to be $75 to $80
> million, or approximately $3.85 to $4.10 per share, fully diluted,
> based on projected total consolidated revenue of $475 to $525
> million.  Most of the growth in earnings and revenue is from
> closings that are included in the $400 million Homebuilding
> Division contract backlog.  Homebuilding Division pretax net
> income is expected to range from $110 to $115 million.

Homebuilding Division sales revenue, including revenue from unconsolidated joint ventures, is projected to be $700 to $750 million with a gross margin over 24 percent.

Investment Division growth in 2005 will come from the completion and lease-up of the 860 rental apartments currently under development, as well as opportunistic acquisitions of existing communities such as the 510 apartment portfolio in Manchester/West Haven, Connecticut, currently under purchase contract. Moreover, based on higher occupancy and rent levels, especially in Florida, Tarragon anticipates Investment Division net operating income, including net operating income from unconsolidated joint ventures, of $65 to $70 million, a 5 percent improvement over 2004.

Tarragon Chairman and Chief Executive Officer, William S. Friedman, commented, "2004 was a banner year for the Homebuilding Division and 2005 should be even better. Our investments over the past 12 to 36 months, in both product and people, are now bearing fruit. We look forward to continuing to find and develop new projects as we realize revenues from our growing number of active, for-sale communities."

41.     On March 16, 2005, the Company issued a press release entitled "Tarragon Corporation Reports Record Results for 2004; Company Will Expand Homebuilding and Strengthen Balance Sheet by Selling Substantial Portion of Rental Portfolio." Therein, the Company, in relevant part, stated:

Tarragon Corporation (Nasdaq: TARR), a leading urban homebuilder specializing in the development and marketing of high-density residential communities, announced today that its consolidated revenues for 2004 grew to $311 million, up 136 percent from revenues of $131.6 million in 2003. Increased revenue primarily reflects strong home sales, which grew, on a consolidated basis, from $56.3 million in 2003 to $220.5 million in 2004.

The Company also reported record profits of $44.7 million, representing a 43 percent increase over 2003 net income of $31.2 million. Following the Company's 3-for-2 stock split that was effective February 10, 2005, and on a fully diluted per-share basis, earnings increased 41 percent year-to-year from $1.20 to $1.69. Income tax expense in 2004 was $15 million, while in 2003 there

14

was no income tax due to the application of net operating loss carry-forwards.

As a result of the growth in profitability of the Company's homebuilding business, Tarragon has adopted a strategic plan to sell a substantial portion of the assets in its rental portfolio (Investment Division). The Company will redeploy the capital now invested in these rental properties to support further expansion of homebuilding and to strengthen its balance sheet.

Chairman and CEO William Friedman commented, "Tarragon is now principally an urban homebuilder, and to a much lesser extent an owner and manager of rental properties. Virtually all of our operating profits come from homebuilding while over half of our assets are still invested in rental properties. Moreover, the large amount of debt associated with our rental properties distorts the financial strength of our Company, impeding our continued rapid growth. At the same time, the market value of our rental properties has continued to increase due to their performance and current market conditions. As a result, we see an opportunity to realize cash through the sale of our rental properties and redeploy a substantial portion of the capital invested in the rental portfolio to reduce debt and expand our homebuilding activities. We plan on retaining approximately 2,000 apartments for conversion to condominiums or redevelopment."

Friedman said that Tarragon, together with its investment bankers, Lazard Freres & Co. LLC, examined various strategies for obtaining the best value for shareholders from the investment portfolio, including a spin-off and IPO. He said that the analyses demonstrated that the maximum shareholder value is likely to result from selling a substantial portion of the portfolio to support the fast-growing and highly profitable homebuilding operations.

Friedman added, "Using the rental portfolio as a non-dilutive source of further homebuilding capital will be, we believe, strongly accretive to earnings while allowing us to reduce debt and get the highest possible return on shareholder assets."

42.     Also on March 16, 2005, Tarragon filed its Annual Report with the SEC on Form 10-K. The Company's 10-K was signed by the Individual Defendants, among others, and reaffirmed the Company's financial results announced on the same day.

43.     The Company's 10-K filed on March 16, 2005 also contained Sarbanes-

Oxley required certifications, signed by Defendants Friedman and Pickens, who stated:

I, [William S. Friedman and Erin D. Pickens], certify that:

1. I have reviewed this annual report on Form 10-K of Tarragon Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(t)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\*\*\*

Each of the undersigned officers of Tarragon Corporation [William S. Friedman and Erin D Pickens], a Nevada corporation (the "Company"), hereby certifies that (i) the Company's Annual Report on Form 10-K for the year ended December 31, 2004, fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 and (ii) the information contained in the Company's Annual Report on Form 10-K for the year ended December 31, 2004, fairly presents, in all material respects, the financial condition and results of operations of the Company, at and for the periods indicated.

44.    The 2004 Form 10-K also contained a statement from defendant Grant

Thornton representing that it had conducted an audit of Tarragon in accordance with

Generally Accepted Auditing Standards ("GAAS") and that the Company's financial

results for the fiscal year ended December 31, 2004, were reported in conformity with

Generally Accepted Accounting Principles ("GAAP"). Specifically, Grant Thornton

addressed a letter dated March 15, 2005, to Tarragon's stockholders and board of

directors, which was included with its consent in the 2004 Form 10-K, stating that:

> We have audited the accompanying consolidated balance sheets for
> Tarragon Corporation and subsidiaries as of December 31, 2004
> and 2003, and the related consolidated statements of income,
> stockholders' equity and cash flows for each of the three years in
> the period ended December 31, 2004. These financial statements
> are the responsibility of the Company's management. Our
> responsibility is to express an opinion on these financial statements
> based on our audits.

> We conducted our audits in accordance with the standards of the
> Public Company Accounting Oversight Board (United States of
> America). Those standards require that we plan and perform the
> audit to obtain reasonable assurance about whether the financial
> statements are free of material misstatement. An audit includes
> examining, on a text basis, evidence supporting the amounts and
> disclosures in the financial statements. An audit also includes
> assessing the accounting principles used and significant estimates
> made by management, as well as evaluating the overall financial
> statement presentation. We believe that our audits provide a
> reasonable basis for our opinion.

> In our opinion, the financial statements referred to above present
> fairly, in all material respects, the consolidated financial position
> of Tarragon Corporation and subsidiaries, as of December 31,
> 2004 and 2003, and the consolidated results of their operations and
> their consolidated cash flows for each of the three years in the
> period ended December 31, 2004 in conformity with accounting
> principles generally accepted in the United States of America.

> As discussed in Note 1 to the consolidated financial statements,
> the Company adopted, Statements of Financial Accounting
> Standards No. 142, "Goodwill and Other Intangible Assets," No.
> 144 "Accounting for the Impairment or Disposal of Long-Lived
> Assets," and the fair value accounting method of No. 123

"Accounting for Stock-Based Compensation" in 2002 and No. 145 "Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections" in 2003, and Financial Accounting Standards Board Interpretation 46-R "Consolidation of Variable Interest Entities" in 2004.

We also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States of America), the effectiveness of Tarragon Corporation's internal control over financial reporting as of December 31, 2004, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 15, 2005 expressed an unqualified opinion on management's assessment of, and an adverse opinion on the effective operation of, internal control over financial reporting.

45.    On April 22, 2005, the Company agreed to purchase a 30% interest in Fenwick Tarragon Apartments, LLC from Felboa, Inc. ("Felboa") for a $967,000 promissory note secured by 55,402 shares of Tarragon common stock. Felboa had the right at the maturity of the promissory note on January 6, 2006, to either retain the common stock or to receive the $1 million and return the common stock.

46.    On May 10, 2005, Tarragon filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendants Friedman and Pickens, and contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶43, *supra*. The Form 10-Q also contained the following representation concerning the preparation and presentation of the financial statements contained in the Form 10-Q:

The accompanying Consolidated Financial Statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X.

47.     On May 11, 2005, the Company issued a press release entitled "Tarragon" Corporation Reports First-Quarter 2005 Results; Net Income $21.6 Million vs. $1.9 Million; Value of Active Developments and Pipeline Soars 74 Percent to $3.3 Billion, Raises Guidance on 2005 Homebuilding Sales and Earnings." Therein, the Company, in relevant parts stated:

> Tarragon Corporation (Nasdaq: TARR), an urban homebuilder specializing in the development and marketing of high-density residential communities, today announced its first-quarter 2005 results and provided higher guidance for 2005.
>
> Total consolidated revenues increased 57 percent to $80.6 million, from first-quarter 2004 revenues of $51.4 million. Consolidated homebuilding sales rose 76 percent to $63.6 million, from first quarter 2004 homebuilding sales of $36.1 million. Net income, after provision for income taxes of $139 million, was $21.6 million in the first quarter of 2005 versus $1.9 million for the same period last year. There was no provision for income taxes in the first quarter of 2004. Income from continuing operations, after a tax provision of $7.3 million, grew six-fold to $11.4 million compared to $1.8 million in the first-quarter 2004, which had no tax provision. Fully diluted earnings-per-share for the first-quarter 2005 were $0.70 compared to $0.07 per share for the first-quarter 2004.
>
> Tarragon's rapid growth is illustrated by the following:
>
> - Total homebuilding revenue, including revenue from unconsolidated subsidiaries, grew 233 percent from $36.1 million in the first quarter of 2004 to $120 million in the first quarter of 2005
>
> - 527 homes worth $178 million were delivered in the first quarter of 2005, compared to 85 homes worth $17.7 million in the first quarter of 2004
>
> - 800 new contracts worth $257.6 million were signed in the first quarter of 2005 versus 315 contracts worth $47.6 million during the like period in 2004. The average price of the new contracts signed in 2005 was $322,000 compared to $250,000 in 2004

- Total contract backlog as of March 31, 2005, increased 81 percent to $423.5 million from $234 million at March 31, 2004

- Total value of homes in active developments (including backlog) increased 80 percent from $1.0 billion at March 31, 2004, to nearly $1.8 billion at March 31, 2005

- The pipeline of future developments nearly doubled over the past twelve months from 2,600 homes, with a potential sales value of $880 million as of March 31, 2004, to over 5,100 homes with an estimated sales value of $1.5 billion as of March 31, 2005.

Tarragon Chairman and CEO William Friedman commented, "The pace of our homebuilding activity continues to accelerate -- sales, closings, acquisitions and new opportunities. We foresee continued rapid growth in the quarters ahead, and anticipate delivering more than 3,000 homes to buyers during the remainder of 2005. Despite moving several projects from pipeline to active development our pipeline grew 23 percent in the first quarter. This expanding pipeline, coupled with our active developments, now totals more than 10,000 homes."

**Capital Redeployment Activities**

Tarragon's capital redeployment strategy announced in March 2005 is proceeding rapidly. The Company is developing a disposition strategy for 39 rental properties with a market value of $275 million. Twenty seven of these properties are being actively marketed for sale. Of these, the Company has contracts or offers in hand on 14 properties totaling $96.6 million, which would result in pre-tax gains on sale of approximately $44 million.

Tarragon has also identified a portfolio of 27 high-quality rental properties, representing 6,500 units with a fair market value in excess of $500 million that it hopes to refinance and contribute to a joint venture with a financial partner to free up approximately $150 million in capital and reduce consolidated debt by over $190 million. These properties, in Connecticut and the southeast, achieved same-store NOI growth of 8.2 percent in the first quarter of 2005 compared to same quarter of 2004. Tarragon expects to manage the proposed joint venture and retain a minority interest in it. The joint venture is expected to acquire existing apartment communities within core markets and buy new rental properties to be developed by Tarragon.

Finally, eight rental properties comprising 2,500 apartments with a book value of $178 million will be retained for conversion to condominiums as market conditions warrant. These properties have an estimated condominium sellout exceeding $400 million.

Friedman commented, "Since adopting this strategic plan in mid- March we have moved quickly to implement it. We will continue to provide updates on the redeployment program throughout the year."

**Revised Guidance**

In January 2005, Tarragon estimated 2005 net income of $75 to $80 million. This estimate assumed $53 to $58 million of after-tax income from continuing operations (principally homebuilding activities) and $22 million in after-tax gain on sale of properties. With the decision to substantially divest the rental portfolio, Tarragon expects to realize extraordinary gains on sale of properties in 2005 that will materially exceed the January guidance.

Accordingly, the Company believes that for 2005, guidance based on its after-tax income from continuing operations (essentially excluding gain on property sales) will be more meaningful. Based on current backlog and activity, Tarragon expects total Homebuilding sales, including revenue from unconsolidated joint ventures, to range from $775 million to $825 million for 2005, which is 10 percent higher than the guidance issued in early January. Based on this increased sales volume, and somewhat higher than originally anticipated margins, Tarragon is increasing its guidance for after-tax income from continuing operations by 33 percent to a range of $70 to $75 million.

48.    On July 18, 2005, Tarragon issued a press release announcing an offer to convert its outstanding 8% Senior Convertible Notes due 2009 purportedly in order to simplify its capital structure. Tarragon offered 81.6993 shares of common stock and $50 in cash for each $1,000 principal amount of convertible notes tendered.

49.    On August 9, 2005, the Company issued a press release entitled "Tarragon Corporation Reports Second-Quarter 2005 Results; Revenue Up by 51 Percent; Backlog Up by 75 Percent; Pipeline Grows to 7,000 Homes." Therein, the Company, in relevant

part, stated:

> Tarragon Corporation (Nasdaq: TARR), a leading homebuilder specializing in the development and marketing of high-density residential communities, announced its second-quarter results and affirmed its guidance for 2005.
>
> Total revenues for the quarter ended June 30, 2005, increased to $85 million, 51 percent higher than second-quarter 2004 revenues of $56.1 million. Net income for the second quarter ended June 30, 2005, was $9.1 million, versus $17.2 million in the prior year's second quarter, which included an income tax benefit, gain on sale and other nonrecurring items of $12.7 million. Diluted earnings per share for the second quarter 2005 were $0.30 compared to $0.65 in the second quarter of 2004. Pre-tax earnings from continuing operations increased 43 percent to $13.2 million this quarter from $9.3 million in the second quarter 2004.
>
> For the six-month period revenues were $164.1 million, up 55 percent over the prior period revenues of $106.1 million. The six- month net income was $30.7 million, up 60 percent over the prior year net income of $19.1 million, which also included the income tax benefit, gain on sale and other nonrecurring items mentioned above. Diluted earnings per share for the six-month period were $0.99 compared to $0.73 in the prior year.
>
> Tarragon Chairman and CEO William Friedman commented, "Revenues for the quarter grew by 51 percent. This increase is even more impressive when we note that more than $40 million in sales were pushed out to the third quarter ending September 30 due to an unusual delay in processing condominium filings for one sold out condominium conversion project in Florida; those sales have now closed. Sales and pricing in all markets where we are participating continue to meet our highest expectations. Last weekend, for example, we signed contracts for 47 homes worth $14 million. Based on our growing contract backlog and the continued high rate of new sales, we affirm our guidance for the year."
>
> Consolidated homebuilding revenue rose 64 percent to $69.1 million, from second-quarter 2004 homebuilding revenue of $42.1 million. Total homebuilding revenue including revenue from unconsolidated joint ventures, grew 217 percent from $42.1 million in the second quarter of 2004 to $133.3 million in the second quarter of 2005. For the six-month period ended June 30, 2005, consolidated and unconsolidated homebuilding revenue

increased to $253.4 million (including $68.4 million accounted for under the percentage of completion method on four projects), up 224 percent over the same period last year.

The increase continues a growth trend that has seen record numbers of home deliveries. In the quarter ended June 30, 2005, 651 homes worth $163.5 million were delivered, compared to 77 homes worth $18.2 million in the second quarter of 2004. For the six-month period, 1,178 homes worth $341.5 million were delivered, compared to 162 homes worth $35.9 million during the same period last year.

Income from Continuing Operations, after provision for income taxes of $5.2 million, was $8.1 million in the second quarter of 2005. Second quarter 2004 Income from Continuing Operations of $14.3 million included a $5.0 million income tax benefit resulting from the Company's reversal of a valuation allowance against a deferred tax asset. For the six months ended June 30, 2005, Income from Continuing Operations before income tax tripled to $32 million from $10.8 million for the same period 2004.

*** 

**Company Affirms Guidance**

Based on the current backlog and scheduled closings, as well as additional sales volume expected to be generated from its active communities, Tarragon affirmed its earlier Guidance of 2005 After Tax Income from Continuing Operations of $70 - $75 million dollars.

50.    Also, on August 9, 2005, Tarragon filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendants Friedman and Pickens, and reaffirmed the Company's financial results announced on the same day. The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶43, supra.

51.    On August 23, 2005, $54.25 million of Senior Convertible Notes were converted into 4,432,181 shares of Tarragon common stock pursuant to the terms of the revised offer to holders of the Senior Convertible Notes.

24

52.    On November 9, 2005, the Company issued a press release entitled "Tarragon Reports Record Results for Third Quarter 2005; Raises Full-year 2005 Estimate and Guides 2006 Earnings per Share from Continuing Operations with Growth of at Least 65 Percent Over 2005." Therein, the Company, in relevant part, stated:

> Tarragon Corporation (Nasdaq: TARR), the urban homebuilder specializing in the development and marketing of high-density residential communities, announced its third-quarter results and raised its guidance for 2005.

> **Third-quarter Financial highlights:**

> - Fully diluted EPS reached $1.70 vs. $0.14 in the prior year

> - Fully diluted EPS from continuing operations of $1.01 vs. $0.14 in the prior year

> - Total consolidated homebuilding revenues of $243.4 million, representing a 328 percent increase over third quarter 2004

> - Home deliveries of 1,160 at an average price of $243,000, resulting in sales of $281.0 million

> - New orders of 962 homes worth $271.0 million, at an average price of $282,000

> - Backlog value $540.0 million, up 51 percent over the previous year backlog of $357.0 million

> - Total value of active developments increased to more than $2.3 billion, representing over 7,500 homes in 43 communities

> - Additional future development pipeline of 8,600 homes in 24 communities

> - Stockholders' equity as of September 30, 2005, of $291.3 million, up from $130.6 million one year earlier

> **2005/2006 Guidance:**

> - 2005 EPS from continuing operations of $2.27 - $2.42, up from $2.17 - $2.32 (excludes estimated income from previously announced investment division capital redeployment program

and the charge associated with conversion of senior convertible notes)

- 2006 consolidated homebuilding revenues of at least $1.0 billion and EPS from continuing operations of at least $4.00 representing an increase of more than 65 percent over 2005 revised guidance.

2005 third-quarter net income was $50.5 million, or $1.70 per fully diluted share, compared to $3.9 million, or $0.14 per fully diluted share in 2004. Included in third-quarter 2005 net income is $22.4 million in after-tax gains on sale of investment assets. Total consolidated revenues for the quarter ended September 30, 2005, increased 264 percent to $260.1 million from third-quarter 2004 revenues of $71.5 million. Income from continuing operations increased more than seven-fold to $28.1 million this quarter from $3.8 million in the third quarter 2004. Third-quarter 2005 income from continuing operations included a one-time charge of $7.2 million relating to the conversion of $54.25 million of senior convertible notes into common stock.

Net income for the nine-month period was $81.1 million, or $2.70 per fully diluted share, up 252 percent over the prior year net income of $23.0 million, or $0.87 per fully diluted share. Included in the 2005 net income is $31.4 million of after-tax gains on sales of investment assets compared to $2.7 million for the same period last year. For the nine-month period total consolidated revenues were $425.4 million, up 138 percent over the prior period revenues of $178.7 million. For the nine months ended September 30, 2005, income from continuing operations was up 143 percent to $47.8 million, or $1.67 per fully diluted share, from $19.7 million, or $0.74 per share, for the same period 2004.

Consolidated homebuilding revenue rose 328 percent to $243.4 million from third-quarter 2004 homebuilding revenue of $56.9 million. Total homebuilding revenue, including revenue from unconsolidated joint ventures, grew 442 percent to $308.5 million in the third quarter 2005, from $56.9 million in the third quarter of 2004. For the nine-month period ended September 30, 2005, consolidated and unconsolidated homebuilding revenue increased to $561.9 million, up 316 percent from $135.1 million in 2004.

Tarragon Chairman and CEO William S. Friedman commented, "Sales have continued at a strong pace in Florida, South Carolina and New Jersey. October was one of our strongest months ever with 429 new orders worth $92.0 million, despite lost

selling days due to weather. Based on the strength of this quarter's results and our contract backlog which, as of October 31, stood at $600.0 million, we have raised our guidance for the year and set a floor to our 2006 earnings expectations of $4.00 per share, fully diluted."

\*\*\*

**Company Raises 2005 Guidance and Announces 2006 Guidance**

Based on the current backlog and scheduled closings, Tarragon is raising its 2005 guidance of after-tax income from continuing operations to $73.0 - 78.0 million or $2.27 - $2.42 per fully diluted share, before income from the investment division capital redeployment program and costs associated with the conversion of its senior convertible notes in August 2005.

Tarragon also announced that it anticipates 2006 consolidated revenues in excess of $1.0 billion and income from continuing operations of at least $4.00 per fully diluted share.

53.    Also on November 9, 2005, Tarragon filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendants Friedman and Pickens, and reaffirmed the Company's financial results previously announced on the same day. The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶43, supra.

54.    On November 16, 2005, Tarragon filed a Form 8-K with the SEC containing a slide presentation of a presentation defendant Friedman intended to make to professional investors at the Southwestern Showcase 2005 in Irving, Texas. The presentation projected 2005 after-tax income from continuing operations of $2.35 per share up 90% from 2004 and 2006 after-tax income from continuing operations of $4.00 per share on revenue of $1 billion. The presentation also contained a slides titled "Tarragon - Strong Growth and Momentum" showing increasing year-end common stock

price for Tarragon and increasing income from continuing operations. A separate slide titled "Significant Growth in Sales Backlog" showed an increasing trend in the number of sales contracts and the aggregate amount of such backlogs. Another slide titled "Concentration in Markets with Pent-Up Demand" contained images of the 7 states in which Tarragon operated (Florida, New York, New Jersey, Connecticut, Texas, Tennessee and South Carolina) with a description of the number and type of pending projects in each state.

55.     On March 15, 2006, the Company issued a press release entitled "Tarragon Corporation Announces Record 2005 Financial Results." Therein, the Company, in relevant part, stated:

- 2005 Net Income of $146 Million or $4.71 Per Diluted Share Up 231 Percent

- Income From Continuing Operations of $3.36 Per Diluted Share, Up 173 Percent

- Full-Year Consolidated Revenue Up 102 Percent

- Total Homebuilding Sales Up 133 Percent

- Board Authorizes Additional One Million Share Repurchase Plan

- Company Announces $0.10 Per Share Dividend

- 2006 Guidance of $3.70 to $4.20 Income From Continuing Operations Per Diluted Share

    Tarragon Corporation (Nasdaq: TARR), a leading urban homebuilder specializing in the development and marketing of high-density residential communities, today announced record financial results for the year ended December 31, 2005.

    Tarragon also announced an annual dividend of $0.10 per share, payable on May 1, 2006 to shareholders of record as of the

close of business on April 10, 2006, and a one million share increase in share repurchase authorization.

Consolidated revenue for the full year 2005 was $571.9 million, up 102% from $282.9 million in 2004. Substantially all of the revenue increase was due to very strong homebuilding sales, which for the year totaled $504.7 million, up 129% from $220.5 million in 2004. Homebuilding sales, including revenue from unconsolidated properties, were $735.5 million in 2005, up 133% from $315.5 million in 2004.

Net income for 2005 was $145.8 million, or $4.71 per diluted share, compared to $44.7 million, or $1.65 per diluted share, in 2004.

"Tarragon has posted a record year with these solid financial results," said Chairman and CEO William S. Friedman. "Our focused growth strategy is gaining traction and we expect to continue that momentum in 2006, even as the unprecedented growth rates that our industry has enjoyed in the past few years begin to moderate. We continue to strengthen our balance sheet and take steps to allow investors to participate in our growth, including declaring a dividend and repurchasing shares in the market. We believe that the long-term industry fundamentals remain very strong, especially in our urban markets."

During 2005 we executed a record 3,899 new orders worth $963 million, up 178% over 1,404 new orders worth $360 million, in 2004. Tarragon delivered 3,343 homes in 2005 at an average price of $268,000, excluding lots, resulting in sales of $878 million compared to 942 home deliveries in 2004 at an average price of $259,000, excluding lots, or $215 million in total sales. For the fourth quarter ended December 31, 2005, 527 new orders were executed worth $138.8 million up from 513 new orders during the same period last year worth $129.7 million. Home deliveries in the fourth quarter of 2005 totaled 949 worth $251 million compared to 526 home deliveries during the same period last year worth $144.6 million. As a result of the strong sales activity, the Company's non-cancelable contractual backlog rose 25% to $427.3 million, compared to the year earlier figure of $342.7 million.

Mr. Friedman commented, "While overall buyer traffic at our developments remains robust, some of our markets are returning to historically normal levels of housing sales activity. We have, for example, noted a marked slowdown in certain

investor-driven West Coast Florida markets, but elsewhere in Florida the level of activity is only low compared to the unusually high levels of last year. Our guidance for 2006 assumes continued sluggishness in these West Coast Florida communities and moderate sales levels, in line with historical norms for the remainder of the market. In the Northeast, where we are opening sales offices for three new communities in the next month, pricing is stable, traffic is high and we are not anticipating a comparable slowdown in sales levels."

***

**2006 Guidance**

The Company is issuing full-year 2006 earnings guidance of $3.70 to $4.20 in Income from Continuing Operations per diluted share. The Company anticipates additional income from the completion of the capital redeployment program.

56.    On March 16, 2006, Tarragon filed its Annual Report with the SEC on Form 10-K. The Company's 10-K was signed by the Individual Defendants, among others, and reaffirmed the Company's financial results previously announced on March 15, 2006. The Company's 10-K also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶43, supra.

57.    The 2005 Form 10-K also contained a statement from defendant Grant Thornton stating that it had conducted an audit of Tarragon in accordance with GAAS and that the Company's financial results for the fiscal year ended December 31, 2005, were reported in conformity with GAAP. Specifically, Grant Thornton addressed a letter dated March 15, 2006, to Tarragon's stockholders which was included with its consent in the 2005 Form 10-K stating that:

We have audited the accompanying consolidated balance sheets of Tarragon Corporation and subsidiaries (collectively, the "Company") as of December 31, 2005 and 2004, and the related consolidated statements of income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2005. These financial statements are the responsibility of the