Barclays Capital Real Estate Inc. served a default notice related to six promissory notes, and General Electric Capital and Fannie Mae demanded immediate payment on other debt, New York-based Tarragon said in a filing today with the U.S. Securities and Exchange Commission.

"We have not filed for bankruptcy, and we are very hopeful that that will not be necessary," Tarragon Chief Executive Officer William Friedman said today in an interview. "We are working on arranging financing and a liquidity plan that will permit us to satisfy the lenders."

\*\*\*

Tarragon, which builds condominiums and townhouses, said today that it received a delisting notice on Aug. 13 from the Nasdaq Stock Market for failing to file on time its quarterly earnings report for the period ended June 30.

The company's outstanding debt was $1.6 billion on July 31, according to today's statement. Robert Rhodie, a Tarragon director, resigned from the board Aug. 14.

Barclay's demanded immediate payment of $15 million on the six notes. Tarragon owes $163.2 million on that debt. GE Capital is seeking immediate payment of about $185.7 million, while Fannie Mae wants the homebuilder to immediately pay back $65.8 million.

\*\*\*

Tarragon is down 92 percent this year. The stock rose 30 cents today to close at 92 cents in Nasdaq trading, valuing the company at $26.4 million. The homebuilder had a market worth of $349 million at the end of 2006.

90.     On August 23, 2007, the Company filed an 8-K with the SEC which

stated, in relevant part:

As previously disclosed by Tarragon Corporation (the "Company") in its press release filed with its Current Report on Form 8-K dated August 9, 2007, *the Company has not made its August 2007 debt service payments as well as certain other vendor payments.*

Accordingly, in connection with attempts by the Company's lenders to exercise contractual rights relating to such obligations, on August 17, 2007, *the Company received notices of default and acceleration from National City Bank ("National City") related to a loan made to a wholly owned subsidiary of the Company and acceleration notices from Fannie Mae related to four promissory notes issued by four other wholly owned subsidiaries of the Company. Each of the notices state that these obligations have been accelerated, including accrued interest, expenses and approximately $75.1 million of outstanding principal under the National City loan and approximately $13.4 million, in the aggregate, of outstanding principal under the promissory notes issued to Fannie Mae.* The National City loan is guaranteed by the Company. The four Fannie Mae promissory notes generally are non-recourse to the Company. *Defaults under the National City loan and Fannie Mae promissory notes also constitute a cross- default or event of default under certain of the Company's other loan agreements, indentures, mortgages and other evidences of indebtedness, and the lenders that are parties thereto may elect to exercise their rights and remedies thereunder.*

The Company is currently in discussions with certain of its lenders with respect to the matters described above and in prior filings; however, there can be no assurance as to the outcome of any such discussions. [Emphasis added.]

91.     On or about December 24, 2007, Tarragon filed with the SEC its Form 10-Q for the fiscal quarter ended June 30, 2007, which had previously been scheduled to be filed by August 15, 2007. The Form 10-Q, among other things, disclosed that:

(a) Tarragon did not pay August 2007 debt service as scheduled and received notices of default and acceleration from certain of its lenders. Tarragon had restored its good standing on loans from General Electric Capital Corporation ("GECC") and Fannie Mae. However, with respect to several loans including a $157.1 million senior credit facility from Barclay's Capital Real Estate, Inc., the Company continued to be in default;

(b) Tarragon had not paid certain loans that have matured since June 30, 2007, and was seeking extensions of the maturities from these lenders;

(c) Tarragon had received notices of default, as guarantor, from the lenders of three unconsolidated entities because August 2007 and September 2007 debt service payments were not made timely;

(d) Tarragon, as of June 30, 2007, was not in compliance with financial covenants for debts totaling $342.5 million and, of that amount, $77.2 million has been satisfied through the sale of properties securing the debt;

(e) Tarragon had recorded a $17.9 million allowance for estimated customer defaults in June 2007 with respect to customer defaults on the Company's One Hudson Park development;

(f) Eighteen (18) buyers at One Hudson Park had defaulted after June 30, 2007 on units with a total purchase price of $16.3 million; and

(g) The default rate for high-rise and mid-rise condominium developments had accelerated from 2.4% for the full year 2006, to 42.9% for the second fiscal quarter of 2007 ended June 30, 2007 to 316% for the third fiscal quarter of 2007.

92.    On December 24, 2007, the Company also filed its Form 10-Q for the quarter ended September 30, 2007. The Form 10-Q disclosed that:

> In July 2007, we began experiencing increased buyer defaults at One Hudson Park. Deposits required for projects in this product-type have typically been 5% to 20% of the purchase price, which we concluded were sufficient to motivate buyers to comply with their contractual obligations. At One Hudson Park, where buyers were required to make deposits of up to 10% of the purchase price, revenue has been recognized on the percentage of completion method on firm contracts that meet the requirements established in SFAS No. 66, "Accounting For Sales of Real Estate"

("SFAS 66"), including the conclusion that sale prices are collectible. Recent changes in the credit markets have made it more difficult for buyers to obtain suitable financing, resulting in five buyers defaulting subsequent to September 30, even though they made significant nonrefundable deposits (ranging from $32,000 to $163,000). The allowance for estimated losses due to potential customer defaults takes into consideration these five defaults, as well as an estimate of expected future defaults under firm contracts existing at September 30, 2007. The allowance of $7.7 million was recorded as a reduction to homebuilding sale revenue.

### TARRAGON'S VIOLATION OF GAAP RULES
### IN ITS FINANCIAL STATEMENTS
### FILED WITH THE SEC

93.    These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for, and disclosure about its revenues, in violation of GAAP rules.

### TARRAGON'S FALSE FINANCIAL
### REPORTING DURING THE RELEVANT TIME PERIOD

94.    The Individual Defendants breached their fiduciary duties to shareholders by causing the Company to falsely report its results for fiscal 2004 through August 9, 2007 by improper accounting entries, which inflated the Company's reported net income and manipulated the Company's reported cash flows. The Company subsequently has admitted that its financial statements for fiscal 2004, 2005 and the first three quarters of fiscal 2006 should not be relied upon.

95.    Tarragon included its false financial statements and results in press releases and in its SEC filings. The SEC filings represented that the financial information presented therein was a fair statement of Tarragon's financial results and that the results

were prepared in accordance with GAAP.

96.    These representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of Tarragon's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

97.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. § 210. 10-01(a).

98.    The fact that Tarragon is restating its financial statements, and disclosed that these financial statements should not be relied upon is an admission that they were false and misleading when originally issued (APB No. 20, ¶¶17-13; SFAS No. 154, ¶25).

### Failure to Consolidate Unprofitable Variable Interest Entity

99.    Tarragon overstated its income during the Relevant Time Period by failing to consolidate its unprofitable variable interest entity Ansonia into its consolidated financial statements in violation of GAAP, making the statements reporting earnings based upon that improper consolidation (¶¶ 40 - 47, 49, 50, 52, 53, 55 - 59, above) materially false or misleading and causing all statements during that period of time

projecting future revenues and earnings to be lacking in a reasonable basis.

100.    Prior to the enactment of FASB Interpretation Number ("FIN") 46(R) in December 2003, a company would consider whether or not to consolidate another entity into its consolidated financial statements based solely on financial control. If the company controlled the entity through voting interest *(i.e.,* by owning more than a 50% interest), then consolidation would generally take place. With the enactment of FIN 46(R)[1], a company is required to assess its equity investments to determine if they are "variable interest entities" and to decide whether to consolidate the variable interest entity based on factors other than strict voting control. Variable interests may arise from financial instruments, service contracts, guarantees, leases or other arrangements with the entity. A company will consolidate the entity if it determines it is the primary beneficiary of the entity and the risks associated with the entity are not properly dispersed amongst the other owners. A company is the primary beneficiary if it will absorb a majority of the entity's losses or returns.

101.    If an investment in which a company owns more than a 20% interest does not qualify as a variable interest entity, then a company may treat the entity as an equity investment for accounting purposes. Under the equity method a company records its initial investment at the original cost. Thereafter, the company will record its proportionate share of the operating income or loss from the investment each period thereby increasing or decreasing its cost basis in the investment. When a company's investment balance reaches zero, the company will discontinue recording its shares of the

---

1 FIN 46(R) is effective for all non-purpose variable interest entities for the first interim or annual period ending after March 15, 2004. In the case of Tarragon, it applied to the Company's results for the quarter ending March 31, 2004 - the Company's first quarter 2004 results.

loss except to the extent that the company has guaranteed any of the investment's obligations. APB No. 18, ¶¶6( b) and 19.

102.    Tarragon has numerous investments in partnerships or joint ventures. Tarragon adopted FIN 46(R) as of January 1, 2004, for all of its partnerships and joint ventures formed before February 1, 2003. Upon the adoption of FIN 46(R), Tarragon consolidated seven partnerships and joint ventures into the Company's consolidated financial results which had previously been unconsolidated. Tarragon was not required to take any charges upon consolidating any of these seven variable interest entities as none of the entities' assets were less than their liabilities. Nevertheless, despite its adoption of FIN 46(R), Tarragon failed to consolidate Ansonia into its financial statements.

103.    In December 1997, Tarragon formed Ansonia with Ansonia LLC in order to acquire and reposition or renovate older suburban apartment properties in central and eastern Connecticut. Tarragon was the general partner of Ansonia while Ansonia LLC was its limited partner. The four principals out of the five of Ansonia LLC are or were affiliated with the Company:

1.    Richard Frary - Frary has been a member of Ansonia LLC since 1997. He joined Tarragon in April 2004 as a director.

2.    Defendant Rothenberg - Rothenberg has been a managing member of Ansonia LLC since 1997.  He joined Tarragon in September 2000 as its COO and a director.

3.    Saul Spitz - Spitz has been a member of Ansonia LLC since 1997. He joined Tarragon in September 2000 as its Executive Vice President of Acquisition.

4.    Eileen Swenson - Swenson has been a member of Ansonia LLC since 1999. She joined Tarragon in September 2000 as President of Tarragon Management, Inc.

104.    In 1997, Tarragon obtained a 70% interest in the partnership due to its

initial contribution to Ansonia. The outside partners did not make any monetary contributions to Ansonia at the outset but obtained a 30% interest in the partnership subject to their obligation to pay Tarragon 30% of the amounts contributed to the partnership by the Company plus interest. In August 2001, the outside partners - most of whom were officers and/or directors of Tarragon *by* this point - met their obligation to pay Tarragon 30% of the amounts it contributed plus interest through a contribution of $232,000 cash and the issuance of notes totaling $5.3 million. The notes, which were payable from 30% of Ansonia's net cash flow, were fully paid in 2002. In November 2005, Tarragon contributed additional properties into Ansonia in exchange for an increase in its interest from 70% to 89.44%.

105.    Here, in violation of GAAP, Tarragon failed to consolidate Ansonia's unprofitable results into its own despite the fact that it was the limited partnerships' primary beneficiary. Given its general partnership interest in Ansonia of almost 90% and the fact that the remaining limited partnership interest in Ansonia was held primarily by individuals who were directly or indirectly related to Tarragon as officers and/or directors of the Company, Tarragon should have consolidated Ansonia into its financial statements. Had it consolidated Ansonia, as it was required to do under FIN 46(R), Tarragon's financial results would have been harmed.

106.    As a result of its restatement, Tarragon was forced to record a $16.8 million charge for a change in accounting principle in its fiscal year 2004 results upon adoption of FIN 46(R) to take into account the difference between the assets of Ansonia and its liabilities at the time. Further, Tarragon was forced to record unprofitable results for the partnership into its fiscal year 2005 and first quarter 2006 results.

107.    Tarragon restated its financial statements for fiscal years 2004 and 2005 and for the first quarter of 2006 due to this accounting violation. The chart below demonstrates the material impact this violation had on Tarragon's financial results during the Relevant Time Period:

**Effect on Tarragon's Financial Statements**

| (in thousands except EPS) | FY04 | FY05 | lQFY06 |
|---|---|---|---|
| | | | |
| Net Income as Originally Reported | 44,708 | 145,791 | 18,828 |
| Net Income as Restated | 29,518 | 88,498 | 18,474 |
| | | | |
| Diluted EPS as Originally Reported | $1.65 | $4.71 | $0.59 |
| Diluted EPS as Restated | $1.09 | $2.93 | $0.58 |
| | | | |
| *Overstatement in Reported Net Income* | *15,190* | *57,293* | *354* |

### Failure to Properly Account for Its Statement of Cash Flows

108.    During the Relevant Time Period, Tarragon failed to properly account for its Statement of Cash Flows by failing to properly classify its cash inflows and cash outflows into the proper categories as operating, investing or financing activities.

109.    Under both GAAP and SEC Regulations, a statement of cash flows is considered to be an integral part of a full set of financial statements and is required to be disclosed on a periodic basis along with a company's balance sheet, income statement and statement of changes in stockholder's equity. FASB Statement of Financial Accounting

Standard ("SFAS") No. 95, *Statement of Cash Flows*, ¶1; FASB Statement of Financial Accounting Concepts No.5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶13; and Article 3 and Article 10 of Regulation S-X [17 C.F.R. §210.3-02 and §210.10-01(c)(3)].

110.    The primary purpose of a statement of cash flow is to present information concerning a company's cash inflows and outflows during a given period. It shows the amount of cash generated and used by a company in a specified period. SFAS No. 95, ¶4. Cash inflows or cash receipts relate to the cash received by the company from its ongoing operations and from external investment sources. Cash outflows or cash disbursements relate to business expenses or investments made by the company. In its statement of cash flows, a company is required to classify cash inflows and cash outflows as resulting from (i) its investing transactions, (ii) its financing transactions or (iii) its operating activities based upon the nature of the activity. SFAS No. 95, ¶¶6 and 14.

111.    The statement of cash flows, along with the related footnote disclosures, should provide investors with information to assess the following:

1.    the enterprise's ability to generate positive future net cash flows;

2.    the enterprise's ability to meet its obligations, its ability to pay dividends, and its needs for external financing;

3.    the reasons for differences between net income and associated cash receipts and payments; and

4.    the effects on an enterprise's financial position of both its cash and noncash investing and financing transactions during the period. SFAS No. 95, ¶¶6 and 45-47.

112.    Here, Tarragon failed to properly classify its cash inflows and outflows by failing to account for them in the proper category as operating, investing or financing

activities. Tarragon restated its financial statements for fiscal years 2004 and 2005 and for the first, second and third quarters of 2006 due to this accounting violation.

**Improper Recognition of Revenue Under the Percentage-of-Completion Method**

113.    Tarragon's reported revenues and earnings were also inflated during the Relevant Time Period because it recognized revenue under the percentage-of-completion method (¶¶ 65-71, 73-75, 77, 79, 80) when there did not exist a reasonable basis for Tarragon to use such method. Thus, at projects such as One Hudson Park, Tarragon recognized revenue despite the fact that relatively small deposits of 10% or less were put down on the units with no reasonable expectation that full payment would be made and without conducting adequate due diligence that the prospective purchaser had the means to complete the proposed purchase.

114.    Moreover, the ratification of EITF 06-8 in November 2006 further highlighted the fact that Tarragon was not taking appropriate steps to evaluate the adequacy of the prospective purchasers' continuing investment to conclude that the sales price was collectible. The uncollectability of the sales price and the need to collect additional deposits from prospective purchasers was not a mere possibility, but was highly likely because the small deposits collected were insufficient to demonstrate a commitment to pay the full purchase price.

**Tarragon's Restatement and Write-off's Are an Admission of Falsity**

115.    The fact that Tarragon has restated its fiscal 2004 through third quarter 2006 financial statements and has admitted that such financial statements should no be relied upon is an admission that the financial statements originally issued were false and that the overstatement of income was material. Pursuant to GAAP, as set forth in

Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by Tarragon was to correct for material errors in its previously issued financial statements. *See* APB No. 20, ¶¶7-13. Moreover, SFAS No. 154, *Accounting Changes and Error Corrections,* states: "Any error in the financial statements of a prior period discovered subsequent to their issuance shall be reported as a prior-period adjustment by restating the prior-period financial statements." SFAS No. 154, ¶25. Thus, GAAP provides that financial statements should be restated in order to correct an error in previously issued financial statements. Tarragon's restatement is due to an error. Thus, the restatement is an admission by Tarragon that its previously issued financial results and its public statements regarding those results were false.

116.    In addition, Tarragon was ultimately required to record total allowances of more than $25 million with respect to previously recognized revenue under the percentage-of-completion method with respect to One Hudson Park. Thus, Defendants failure to make appropriate determinations regarding collectability resulted in the improper inflation of Tarragon's revenue during the Relevant Period.

**Tarragon's Financial Statements Violated Fundamental Concepts of GAAP**

117.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1 ¶40)

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No.1, ¶42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable

as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

118.    Further, the undisclosed adverse information concealed by defendants during the Relevant Time Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

119.    The adverse information concealed by Defendants during the Relevant Time Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

## FUTILITY OF DEMAND ON THE BOARD OF DIRECTORS

120.    Plaintiff has not made a demand on Tarragon's Board of Directors to pursue the claims asserted herein, because such demand is excused and would have been a futile act for the reasons set forth below and throughout this Complaint:

a.  All of the Director Defendant directors of the Company are
    accused of a breach of fiduciary duties for failing to put
    into place adequate internal controls and adequate means of
    supervision to prevent the wrongful conduct complained of
    herein and in other complaints filed against the Company,
    creating a substantial doubt that any of the Individual
    Defendants could consider a demand in a disinterested and
    independent manner;

b.  A substantial likelihood exists that Individual Defendants
    did not exercise valid business judgment because the
    wrongful actions and/or inactions by Individual Defendants
    alleged herein constituted breaches of their respective
    fiduciary duties of good faith, disclosure, and loyalty to
    Tarragon and its stockholders, and an abdication of the
    directors' responsibilities giving rise to liability to
    Tarragon; and

c.  Certain of the Individual Defendants are presently
    defendants in certain federal securities class action suits
    described above, and face a substantial likelihood of
    liability given the misstatements of Tarragon's operating
    revenues, gains and expenses. Accordingly, Tarragon's
    directors have disabling conflicts and could not be relied
    upon to reach a truly independent decision as to whether to

75

commence action against themselves arising out of the same misconduct.

121.    As such, each and all of the Individual Defendant directors were on direct notice that rigorous and ever-vigilant scrutiny of compliance with legal guidelines for ethical corporate conduct were absolutely essential to protect the Company and its shareholders from substantial liability and the potential financial impact to Tarragon resulting from both pending civil actions and reputational harm in the market place.

122.    Given the importance to Tarragon to maintain the integrity of the financial reports and auditing practices as well as the need to maintain adequate internal controls and monitoring of business functions, the Tarragon Board of Directors was or should have been aware of the risk of harm to the Company and its shareholders.

123.    Moreover, Defendants Schrag, Schafran, Stark and Davis were members of the Company's Audit Committee making their responsibilities even greater.    The Committee was entrusted with a great deal of power and influence in connection with financial reporting and financial controls.    Their responsibility to the Company's shareholders to prevent and ferret out fraud and inadequate financial controls is even greater than the other directors. The audit committee met a mere five times during 2005.

124.    In addition, Grant Thornton's statements that it had conducted in audits of Tarragon's financial statements in accordance with GAAS were false. As was reported by *Bloomberg* on July 17, 2007:

> The official mission of the auditing profession's watchdog is "to protect the interests of investors." In practice, what it really protects best are the dirty secrets of the accounting firms and their corporate audit clients.
>
> Created in 2002 by the Sarbanes-Oxley Act, the Public Company

Accounting Oversight Board inspects the firms that audit companies with U.S. traded securities. In its brief history, the board has identified scores of companies where outside auditors have done lousy jobs checking the books. Investors crave that kind of knowledge.

In its reports to the public, though, the board doesn't name the companies. So last month, for instance, when the board released its annual inspection report on Grant Thornton LLP, the sixth-largest U.S. accounting firm by revenue, one of the audits it criticized was at a company identified only as "Issuer A." Transparency, this isn't.

The report said Grant Thornton failed "to obtain sufficient competent
evidential matter to support its audit opinion" and "failed to identify" an accounting violation "that it should have identified and addressed before issuing its audit report."

In a response letter, the firm complained about the harsh wording and said it actually had identified the problem. The violation: Issuer A, which restated its financials last year, had left off its balance sheet a certain 90 percent-owned partnership, the rest of which was owned mainly by company insiders.

### What's Missing

Here's what the report left out: Issuer A is Tarragon Corp., a New York based real-estate developer awash in Florida condominiums. Last year's restatement slashed 2005 net income 39 percent to $88.5 million. And Grant Thornton remains its auditor. Faced with those facts, some investors during proxy season almost certainly would vote to fire the auditor and perhaps even withhold votes from directors who sit on the company's audit committee.

125.    According to the 1992 "Internal Control -- Integrated Framework," published by the Committee of Sponsoring Organizations of the Treadway Commission, which is the accepted standard for defining and assessing the effectiveness of the internal control of organizations in the United States, "internal control" is defined as follows:

Internal control is a process, effected by an entity's board of

directors, management, and other personnel, designed to provide

reasonable assurance regarding the achievement of objectives in the following categories:

- Effectiveness and efficiency of operations.

- Reliability of financial reporting.

- *Compliance with applicable laws and regulations.*

  (Emphasis added.)

126.    As such, the Tarragon Audit Committee was at all times specifically responsible for oversight of compliance by Tarragon with applicable laws and regulations. Relevant to this demand futility analysis, as noted above, several of the Audit Committee members have special skill, knowledge and experience that they were duty bound to bring to bear, in their roles as directors and members of the Audit Committee, for the benefit of Tarragon and its shareholders.

127.    Defendants Liebman, Schafran, Schrag and Weisbrod are members of the Executive Compensation Committee. While on the Committee, they approved compensation plans for directors and executives which included millions of dollars which have not been re-sought since the information that the Company's financial results were grossly inflated became known. The Executive Compensation Committee met twice during 2005.

128.    Additionally defendants Schrag, Schafran and Davis are members of the Corporate Governance and Nominating Committee. While on the Committee, they were responsible for identifying, evaluating and recommending to the Board Individuals to serve as directors. The Committee also oversees he Board's annual review of director independence and effectiveness of the corporate governance guidelines. The Committee

met once in 2005.

129.    Despite of and in the face of all of this knowledge, and despite the fact that they were on notice of serious issues concerning the blatancy of the accounting violations and misrepresentations, the Individual Defendants recklessly failed to make adequate inquiry and/or take appropriate action to ensure that serious violations of various fiduciary duties would be recognized, tracked and, ultimately, reported through appropriate channels with notice to the full Tarragon Board of Directors.

130.    Instead of ensuring that effective compliance reporting and corrective action was built into Tarragon's system of internal controls, by their reckless disregard of known risks, the Individual Defendants instead allowed a culture to persist at Tarragon that placed profits before fiduciary duties and compliance with all applicable laws and regulations.

131.    The wrongful acts and omissions at issue constitute violations of law resulting from the Individual Defendants' bad faith, knowing and reckless failure to take effective action to protect the Company and its shareholders by ensuring compliance by Tarragon with all applicable legal and regulatory requirements. Such conduct is thus not subject to the protection of the business judgment rule, nor are the Individual Defendants protected from personal liability for such bad faith misconduct by virtue of any exculpatory provision in the Company's certificate of incorporation.

132.    As a result of the Defendant Directors' bad faith and reckless breach of fiduciary duty, the Company and its shareholders have suffered, and will further suffer, massive financial harm.

133.    For all of these reasons, all of the Defendant Directors face a substantial

likelihood of liability on the claims asserted in this action, making them materially interested with respect to consideration of a pre-suit demand. Accordingly, such demand would be futile, rendering pre-suit demand excused for the purposes of this derivative action.

134.    Moreover, to the extent that the Company presently maintains or previously maintained officers and directors liability insurance coverage, that insurance would be the primary or principal source of any recovery against the defendants, and would be rendered void if the Company commenced proceedings against the Individual Defendants Friedman, Rothenberg, Liebman, Weisbrod, Fray, Davis, Schafran, Schrag, Stern, as these policies uniformly contain provisions which void coverage if the Company brings suit in its own name. For this reason also, demand is excused.

135.    Furthermore, in 2006, defendant Friedman and affiliates made a $30 million unsecured revolving line of credit available to the Company. this unsecured loan replaced a two-year $20 million revolving line of credit that defendant Friedman and affiliates made available to the Company in 2004 and 2005. The largest aggregate amount of indebtedness under the line of credit was $30,703,145, $12,488,107 and $3,978,880 for the years 2006, 2005 and 2004, respectively. Interest paid was $291,948, 58,978 and $5,764 for the years 2006, 2005 and 2004, respectively. As of December 31, 2006, the outstanding amounts under this loan was $10,380,976. In March 2007, the line of credit was increased to $40 million.. In August 2007, Tarragon and Friedman agreed that all payments would be deferred until November 2007, and no further advances would be made under this line of credit. In November 2007, this line of credit was converted into a term loan that matures in January 2009, and Tarragon was granted the right to defer

interest payments until November 2007. Interest payments totaling $1.5 million were made in November and December of 2007 in connection with the conversion of the line of credit to a term loan.

136. Tarragon received property and asset management fees totaling $75,468 in 2006, $9,777 in 2005 and $13,526 in 2004 and loan origination fees of $155,750 in 2006 from real estate partnerships controlled by Mr. Friedman.

137. Between August 7, 2007 and August 23, 2007, 5,541,866 shares of the Company's common stock beneficially owned by Friedman were sold as a result of margin calls. As of December 4, 2007, defendant Friedman beneficially owned 22.3% of the Company's common stock outstanding. Prior thereto, defendant Friedman beneficially owned approximately 43% or 12,478,000 shares of the Company's common stock.

138. In 1997, the Company formed Ansonia Apartments, L.P., a Delaware limited partnership ("Ansonia"), with Ansonia LLC, a New York limited liability company. Defendants Frary, Rothenberg and others are members in Ansonia LLC, which is the limited partner in Ansonia. Tarragon Development Corporation is the general partner of Ansonia.

139. In November 2000, the Company formed Ansonia Liberty LLC, a Connecticut limited liability company, for the purpose of acquiring a 124-unit apartment community known as the "Liberty Building" located in New Haven, Connecticut. In October 2001, Frary acquired a 10% member interest in Ansonia Liberty LLC. The Company's investment in Ansonia Liberty L.L.C. was fully recovered in 2002 from distributions to the members of cash proceeds from refinancing of the mortgage secured

by the property. In 2004, the Company received cash distributions of $158,408 from Ansonia Liberty L.L.C. Defendant Frary also received $30,273 in cash distributions from Ansonia Liberty L.L.C. in 2005 and $24,601 in 2004.

140.    In November 2005, the Company contributed its interests in fourteen apartment properties, including the Liberty Building, to Ansonia in exchange for an increased ownership interest in Ansonia, and Frary contributed his interest in Ansonia Liberty LLC in exchange for an individual ownership interest in Ansonia. Simultaneously, Ansonia closed a $391 million non-recourse structured financing secured by first and second lien mortgages on 23 of its 25 properties and pledges of equity interests in the related property-owning entities.

141.    In 2005, the Company received $64.4 million in cash distributions from Ansonia, including $64 million representing the Company's share of the net proceeds from the structured financing transaction. In 2004, the Company received cash distributions of $4,854,462 from Ansonia in connection with refinancings and supplemental mortgages on four of its properties.

142.    In June 2006, Ansonia received an additional $20 million in loan proceeds under the financing of its portfolio. Tarragon received $15,814,890 in cash distributions representing the Company's share of the net proceeds from this transaction. Defendants Rothenberg,. Frary and Ms. Swenson received cash distributions from Ansonia in 2006, 2005 and 2004 in the amounts provided in the following table.

| Name | 2006 | 2005 | 2004 |
|------|------|------|------|
| Richard S. Frary | $333,768 | $1,395,785 | $340,672 |
| Robert P. Rothenberg | $677,961 | $2,802,594 | $814,439 |
| Eileen Swenson | $121,051 | $ 500,404 | $115,506 |

143.    Tarragon received property management fees of $1,840,455 in 2006,

$1,142,087 in 2005 and $1,025,968 in 2004 from properties owned by Ansonia.

144.    In November 1999, the Company formed Tarragon Calistoga LLC, a Nevada limited liability company, with defendant Frary.  The Company has an 80% managing member interest in Tarragon Calistoga LLC, and Frary holds the remaining 20% member interest.  Tarragon Calistoga LLC owns (i) a 5% member interest in Calistoga Ranch Owners LLC, a California limited liability company, which owns a property development in Napa Valley, California, and (ii) a 25% member interest in CR Tarragon Palm Springs LLC, a California limited liability company, which owns a Palm Springs, California resort development.  In June 2001, Frary received $133,289.50 in distributions from Tarragon Calistoga LLC and the Company received $533,157.99.

145.    Additionally, on February 14, 2005, and with the Company's securities trading at artificially inflated prices, the Company and security-holders sold $62 million of senior convertible notes.  These notes were sold with a conversion ratio of 54.4662 shares of the Company's common stock per $1,000 note, which reflected an initial conversion price of $18.36 per share.

146.    Defendant Davis, the sole shareholder of RMS, Inc. provided property level management services for several properties owned by the Company earning thousands of dollars in fees for performing such services.

147.    On September 30, 2006, Tarragon issued 616,667 shares of 10% cumulative preferred stock, liquidation value $12.00, and 668,096 shares of Tarragon common stock to Rhodie LLC in connection with Rhodie's right to convert its membership units in Tarragon Development Corporation into Tarragon securities.

## INVOLVEMENT IN CERTAIN LEGAL PROCEEDINGS

148.    In connection with an action styled *Olive, et al. v. National Income Realty Trust, et al.,* NIRT, among others, entered into an agreement in May 1994 (the "Olive settlement") which provided that any related party transaction entered into prior to April 27, 1999, with certain limited exceptions, would require the unanimous approval of the NIRT Board of Trustees. In addition, pursuant to the Olive settlement, related party transactions could only be undertaken in exceptional circumstances, and after a determination by the Board of Trustees that the transaction was in the best interest of NIRT and that no other opportunity existed that was as good as the opportunity presented by such transaction.

149.    In light of the consolidation of NIRT into Tarragon, the Board of Directors of Tarragon voluntarily elected to treat the requirements for approval of related party transactions contained in the Olive settlement as binding on Tarragon through April 27, 1999. Following that date, the Board changed that policy to approval by a majority of the Independent Directors entitled to vote.

150.    In November 1994, defendant Friedman consented to an order prohibiting him from participating in an insured depository institution without the prior written approval of the Director of the Office of Thrift Supervision.

151.    Also, during the Relevant Time Period, and with the Company's securities trading at artificially inflated prices, Company insiders sold 4,154,651 shares of the Company's stock for gross proceeds of $9,082,458. This trading by Company insiders is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of | Price Per | Gross |
|---|---|---|---|---|
| June 7, 2007 | Rohdie, Robert | 3700 | $10.50 | $38,850 |

| May 11, 2006 | Weisbrod, Carl B. | 2000 | $17.02-17.12 | $34,000 |
| December 16, 2005 | Davis, Willie K. | 1720 | $21.78 | $37,461 |
| September 19, 2005 | Liebman, Lance | 2000 | $18.51 | $37,020 |
| September 12, 2005 | Liebman, Lance | 200 | $19.80 | $3,960 |
| September 6, 2005 | Liebman, Lance | 2000 | $21.00 | $42,000 |
| September 6, 2005 | Swenson, Eileen | 20000 | $21.20 | $424,000 |
| September 1, 2005 | Weisbrod, Carl B. | 500 | $21.20 | $10,600 |
| September 1, 2005 | Weisbrod, Carl B. | 3000 | $21.59 | $64,770 |
| August 30, 2005 | Swenson, Eileen | 6100 | $21.31 | $129,991 |
| August 29, 2005 | Liebman, Lance | 2000 | $21.00 | $42,000 |
| August 26, 2005 | Swenson, Eileen | 6400 | $21.16 | $135,424 |
| August 25, 2005 | Swenson, Eileen | 7500 | $21.24 | $159,300 |
| July 18, 2005 | Rohdie, Robert | 1000 | $25.20 | $25,200 |
| June 28, 2005 | Schrag, Raymond | 500 | $23.90 | $11,950 |
| June 28, 2005 | Schrag, Raymond | 500 | $24.50 | $12,250 |
| June 27, 2005 | Friedman, Lucy N. | 25000 | $23.55 | $58,8750 |
| June 24, 2005 | Swenson, Eileen | 3500 | $22.07 | $77,245 |
| June 23, 2005 | Swenson, Eileen | 1500 | $22.97 | $34,455 |
| June 17, 2005 | Swenson, Eileen | 5000 | $23.06 | $115,300 |
| May 23, 2005 | Weisbrod, Carl B. | 3000 | $21.80 | $65,400 |
| May 23, 2005 | Weisbrod, Carl B. | 5000 | $21.87 | $109,350 |
| May 18, 2005 | Swenson, Eileen | 13200 | $21.10 | $278,520 |

| May 16, 2005 | Schafran, Lawrence G. | 25500 | $20.50 | $522,750 |
| May 16, 2005 | Liebman, Lance | 7000 | $21.26 | $148,820 |
| May 16, 2005 | Swenson, Eileen | 1300 | $22.11 | $28,743 |
| May 13, 2005 | Swenson, Eileen | 9500 | $22.36 | $212,420 |
| May 12, 2005 | Swenson, Eileen | 6000 | $22.16 | $132,960 |
| May 11, 2005 | Swenson, Eileen | 10000 | $22.71 | $227,100 |
| March 28, 2005 | Weisbrod, Carl B. | 4000 | $21.78 | $87,120 |
| February 24, 2005 | Schrag, Raymond | 887 | $21.24 | $18,840 |
| | **TOTAL:** | **180,984 Shares** | | **$3,886,694** |

## PLAINTIFF'S FIRST CAUSE OF ACTION:
## DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY

152.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153.     The Individual Defendants breached their fiduciary duties to the Company and to its shareholders by failing in their responsibility to maintain adequate accounting controls and by employing improper accounting and audit practices and procedures, which artificially inflated the value of the Company's common stock.

154.     All of the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Tarragon in a manner consistent with the operations of a publicly held company.

155.     All of the Individual Defendants failed to properly consider the interests of

the Company and its public shareholders and failed to exercise proper supervision and wasted corporate assets by paying bonuses to certain of its executive officers while inflating corporate earnings and putting the Company at risk for millions of dollars of legal liability and/or legal costs to defend the Company.

156.    Individual Defendants' misconduct described above constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

157.    All of the Individual Defendants owe and owed a fiduciary duty to Tarragon to supervise the issuance of its press releases and public filings to ensure that they were truthful and accurate and that they conformed to federal and state law. The Individual Defendants breached their fiduciary duty by failing to properly supervise and monitor Tarragon's accounting practices and the adequacy of its internal financial controls and audits and by allowing misleading statements and filings to be issued and made. These actions could not have been exercised in good faith or with the prudence required of the business judgment rule to protect the interests of the Company and its shareholders.

158.    Nevertheless, the Individual Defendants have engaged in a sustained and systematic failure to exercise their oversight responsibilities to ensure that Tarragon complied with Federal and State Laws, rules and regulations and to ensure the integrity of its financial reporting and statements to the public.

159.    As a direct result of the Individual Defendants' breaches and ancillary conduct, Tarragon has been the subject of securities fraud class action lawsuits by allegedly defrauded investors, has lost market share, has had its reputation in the business

community tarnished and has thus been damaged.

### PLAINTIFF'S SECOND CAUSE OF ACTION
### FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION

160.    Plaintiff repeats and realleges each and every allegation set forth above.

161.    At the time of the stock sales set forth herein, the defendants knew the information described above, and certain of those defendants sold Tarragon common stock on the basis of such information.

162.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the defendants that had sold their shares of Tarragon common stock during the Relevant Time Period used for their own benefit when they sold Tarragon common stock.

163.    The defendants that sold their shares during the Relevant Time Period sold Tarragon securities while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

164.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the defendants fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the defendants obtained thereby.

### PLAINTIFF'S THIRD CAUSE OF ACTION:
### CONTRIBUTION AND INDEMNIFICATION

165.    Plaintiff repeats and realleges each and every allegation set forth above.

166.    Tarragon is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to defendants' liability to the Company.

167.    Tarragon's alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of defendants as alleged above, and Tarragon is entitled to contribution and indemnification from each of the defendants in connection with all such claims that have been, are or may in the future be asserted against Tarragon by virtue of Individual Defendants' misconduct.

168.    Plaintiff has no adequate remedy at law.

**WHEREFORE,** Plaintiff demands judgment as follows:

A.    Directing each and all of the Defendants to account to the Company for all damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

B.    Requiring each and all of the Defendants to return to Tarragon all salaries, profits and/or the value of other remuneration of whatever kind paid to them by the Company during the time they were in breach of the fiduciary duties they owed to Tarragon.

C.    Directing each and all of the Defendants to pay interest at the highest rate allowable by law on the amount of damages sustained by the Company as a result of Defendants' culpable conduct;

D.    Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

89

E.    Granting such other and further relief as the Court may

deem just and proper.


Respectfully submitted,

Joshua M. Lifshitz (JL-9172)
Peter D. Bull (PB-9118)
Bull & Lifshitz, LLP
18 East 41st Street
New York, New York 10007
Telephone: (212) 213-6222

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— X

ERNEST GOTTDIENER, Derivatively and on　　　　　　　)
Behalf of Nominal Defendant, TARRAGON, Inc.　　　　 )

　　　　　　　　　　　　　　Plaintiff,

　　　　　　　　　　vs.

WILLIAM S. FRIEDMAN, ROBERT P. ROTHENBERG,
WILLIE K. DAVIS, LANCE LIEBMAN, LAWRENCE G.
SCHAFRAN, V.J. SCHRAG, CARL B. WEISBROD,
RICHARD S. FRARY, MARTHA E. STARK, ROBERT
C. RHODIE, ERIN DAVIS PICKENS,

　　　　　　　　　　　　　　Defendants,

　　　　　　　　And

TARRAGON CORPORATION,

　　　　　　　　　　　　　　Nominal Defendant,

———————————————————————— X

Civil Action No.: 07CV9436

## CERTIFICATE OF SERVICE

I, the undersigned, declare as follows:

　　　That I am employed in the County of New York, New York; I am over the age of eighteen

years, and not a party to or interest in the within action; my business address is 18 East 41st Street,

New York, New York 10017, and that on March 5, 2008, I served the within:

**AMENDED STOCKHOLDER'S DERIVATIVE COMPLAINT**

by depositing a true copy thereof in a United States mailbox at New York, New York in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

That there is a regular communication by mail between the place of mailing and the place so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th day of March 2008, at New York, New York.

Executed on March 5, 2008 at New York, New York 10017.

By: _____
    DORIS M. BOUCHER